UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

**FRANCIS W. HOOKER, JR.,**
**For himself and on behalf of all**
**similarly situated individuals,**

       **Plaintiff,**

**v.**                     **CASE NO.: 4:13-cv-0003 (AWA/LRL)**

**SIRIUS XM RADIO, INC.,**

       **Defendant.**

### PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS

COMES NOW Plaintiff, Francis W. Hooker, Jr. ("Plaintiff" or "Hooker"), by counsel, and for his Response Memorandum in Opposition to Defendant's Motion to Strike Class Allegations states as follows:

### Introduction

Plaintiff filed this action seeking statutory damages and injunctive relief for Defendant's violations of the Telephone Consumer Protection Act, *47 U.S.C. § 227, et seq.* ("TCPA" or "Act") arising out of multiple calls made by or on behalf of Defendant to Plaintiff's cell phone number using an automatic telephone dialing system.

Defendant filed a Motion to Compel Arbitration. Plaintiff opposed the motion on the basis that there was no agreement to arbitrate between the parties. Plaintiff also demanded a jury trial (ECF Doc. 14) to summarily resolve all issues of material fact as to this dispute pursuant to *9 U.S.C § 4* and *Fed R. Civ. P. 38*. Finding that there was a genuine dispute as to whether a contract containing an arbitration provision was formed between the parties, the Court denied the motion without prejudice to its renewal following discovery. The Court did not address Plaintiff's demand for a jury trial on the arbitration issue.

Defendant now moves this Court to strike the class allegations from the Complaint pursuant to *Federal Rules of Civil Procedure 23(d)(1)(D)*.

## Statement of Facts

On August 19, 2011, Hooker and his wife purchased a 2012 Hyundai Elantra ("the 2012 Hyundai Elantra") from Gateway Hyundai in Chester, Virginia ("Gateway Hyundai"). *Complaint, ¶ 23*; *Declaration of Francis W. Hooker, Jr. dated December 27, 2013, ¶ 2*; *Declaration of Alexandra Rae Hooker dated December 27, 2013, ¶ 2.*[1] Mr. and Mrs Hooker's declarations are attached as **Exhibit 1 and 2** respectively.

The 2012 Hyundai Elantra came equipped with a Sirius XM satellite radio receiver and 90 days of complimentary satellite radio programming. *Complaint, ¶ 24*; *Hookers' Declarations, ¶ 3.* The Hookers understood that the satellite radio receiver was standard equipment in all 2012 Hyundai Elantras and that 90 days of complimentary satellite radio programming was included with the sale of all Hyundai Elantras by Gateway Hyundai. *Id. at ¶ 5.*

Neither Hooker nor his wife requested that a satellite radio receiver be installed in the 2012 Hyundai Elantra or that the sale of that vehicle include a complimentary period of satellite radio programming. *Hookers' Declarations, ¶ 4.* They simply bought a car as it was equipped on the lot of Gateway Hyundai. *Id.* Similarly, neither registered for complimentary satellite radio programming, and neither did anything to activate the satellite radio receiver or the satellite radio programming which was already being received by their vehicle before its purchase. *Id. at ¶ 10.*

From the time when Hooker first test drove the 2012 Hyundai Elantra until the complimentary satellite radio programming to that vehicle stopped in November, 2011, neither Hooker nor his wife spoke to or communicated with Sirius XM or any person who, to their knowledge, was acting on its behalf about any terms or conditions under which the complimentary satellite radio programming was to be provided. *Id. at ¶¶ 8-9.*

Neither Gateway Hyundai nor any of its employees informed the Hookers that they would

---

[1]Mr. and Mrs. Hooker's declarations mirror one another. Accordingly, all further citations to the Hookers' declarations will be in the format *Hookers' Declarations, ¶ __.*

have to agree to the terms of a Sirius XM customer agreement in order to receive the complimentary programming that was included with their new vehicle, *id. at ¶ 13*, or that they would be bound by the customer agreement if they did not decline or cancel the complimentary programming. *Id. at ¶ 14*. Gateway Hyundai did not provide the Hookers with or ask them to sign any contract or agreement purporting to govern any relationship between them and Sirius XM. *Id. at ¶ 11*. Likewise, it did not inform the Hookers that they should expect to receive a proposed contract or agreement in the mail or otherwise. *Id. at ¶ 12*.

Although Defendant's representative, Elizabeth Ruhland, has declared that a "Welcome Kit" containing the Sirius XM customer agreement "would have been mailed" to Hooker between September 9 and September 16, 2011, both Hooker and his wife deny receiving it. *Id. at ¶ 15*. Moreover, as discussed further herein, had the Hookers received a Welcome Kit from the Defendant, its receipt would not have alerted them to the fact that any contract or agreement purporting to bind them was contained therein. *Id. at ¶¶ 16-19*.

## <u>Standard of Review</u>

Often, motions to strike class allegations are based, in whole or in part, upon *Federal Rule of Civil Procedure 12(f)* which permits the court to "strike from a pleading . . . any redundant, immaterial, impertinent or scandalous matter."[2]

---

[2]"Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) quoting 5A A. Charles Alan Wright *et al., Federal Practice & Procedure* § 1380, 647 (2d ed. 1990).

Striking class allegations under *Rule 12(f)* "is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Manning v. Boston Med. Center Corp.*, 725 F.3d 34, 59 (1st Cir. 2013) (citations and internal quotation marks omitted).

"[A] court should typically await the development of a factual record before determining whether the case should move forward on a representative basis." *Manning, supra.*, 725 F.3d at 59. See also *Belsito Comm., Inc. v. Dell, Inc.*, 2013 U.S. Dist. LEXIS 130598, *36 (S.D.N.Y. 2013), *Seifi v. Mercedes-Benz USA, LLC*, 2013 U.S. Dist. LEXIS 73415, *25-26 (N.D. Cal 2013).

Rule 12(f) motions must be filed before responding to the pleading or, if a response is not allowed under Rule 7(a), within 21 days after being served with the pleading. As Defendant filed its response to the Complaint before filing the pending motion, any motion under Rule 12(f) would be untimely. *Home Shopping Network, Inc. v. Happy Mind, Inc.*, 1991 U.S. App. LEXIS 8285, *5 (4ᵗʰ Cir. 1991) (unpublished). Therefore, Defendant has filed its motion to strike pursuant to *Rule 23*, or more specifically *Rule 23(d)(1)(D)*.

*Rule 23* provides that in conducting a class action, a court may issue an order that requires "that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." *Fed. R. Civ. P. 23(d)(1)(D)*.

There is disagreement as to whether *Rule 23(d)(1)(D)*, by itself, may be used as a vehicle for a motion to strike class allegations. At least one court has held that it cannot, stating:

> "After a determination has been made that a class action is not proper under Rule 23(c)(1), courts typically issue an order requiring that the pleadings be amended to reflect that decision[.]" *Id.* While the issuance of such an order is often done without reference to *Rule 23(d)(1)(D)*, this rule provides courts with the authority to mandate the amendment of the pleadings. *See id.* In short, *Rule 23(d)(1)(D)* can be used to remove class allegations from a complaint after the class certification issue has be [sic] properly presented and determined by a court. *See id.; cf. Fed. R. Civ. P. 23 Advisory Committee Notes to Subdivision (c)(1).*
>
> . . . Walgreens' reliance on *Rule 23(d)(1)(D)* as a vehicle to strike class allegations is misplaced. As stated above, this Rule can only be used once the issue of class certification has been properly presented and decided by a court. Because Plaintiffs have not moved for class certification, the issue has not been properly placed before the Court. Put succinctly, *Rule 23(d)(1)(D)* is useless to Walgreens at this point.

*Boatwright v. Walgreen Co.*, 2011 U.S. Dist. LEXIS 22102, *5-7 (N.D. Ill. 2011). In short, *Rule 23(d)(1)(D)* as interpreted in *Boatwright* is a housekeeping rule designed to provide courts with the authority to require that the pleadings be conformed to the ruling on class certification. Judge Keller applied *Rule 26(d)(4)*, the predecessor of *Rule 23(d)(1)(D)*, in just this manner in *Davis v. Portsmouth*, 579 F. Supp. 1205, 1208 (E.D. Va. 1983).

Those courts which have allowed *Rule 23(d)(1)(D)* to be used as a basis for a motion to strike class allegations have applied a *Rule 12(b)(6)* standard of review. *Sherrard v. Boeing Co.*, 2013 U.S. Dist. LEXIS 154125, *7 (E.D. Mo. 2013); *Mungo v. CUNA Mut. Ins. Society*, 2012

U.S. Dist. LEXIS 120845, *11-12 (D.S.C. 2012); *Sjoblom v. Charter Comm., LLC*, 2007 U.S.

Dist. LEXIS 93879, *19-20 (W.D. Wis. 2007); *Bessette v. Avco Fin. Servs, Inc.*, 279 B.R. 442,

450 (D.R.I. 2002);  *Bryant v. Food Lion, Inc.*, 774 F. Supp. 1484, 1495 (D.S.C. 1991).

The *Rule 12(b)(6)* standard of review is well known to this Court.  Recently, it was

summarized as follows:

> The Supreme Court has stated that in order "[t]o survive a [*Rule 12(b)(6)*] motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal quotations omitted). Specifically, "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.
>
> Moreover, at the motion to dismiss stage, the Court is bound to accept all of the factual allegations in the Complaint as true.  *Id.* at 678.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Assessing the claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

*Signore v. Bank of Am., N.A.*, 2013 U.S. Dist. LEXIS 145649, * (E.D. Va. 2013).

In the context of a motion to strike class allegations, the defendant bears the burden of

proving the implausibility of the class allegations.  As noted in *Bessette, supra*, 279 B.R. at 451:

> The proponent of the class certification bears the burden of proving Rule 23 requirements before the class can be certified. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997). The present question before the Court, however, is not whether the class should be certified, but whether the class allegations in the complaint should be stricken.  At this stage, the burden is not on the party seeking class certification, rather, as the non-moving party, all reasonable inferences must be construed in her favor.

See also *Bryant, supra*, 774 F. Supp. at 1495 ("Thus, to prevail, the defendants have the burden

of demonstrating from the face of plaintiffs' complaint that it will be impossible to certify the

classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove.") and

*Mungo, supra*, 2012 U.S. Dist. LEXIS 120845, *11-12.

Defendant has asked this Court to consider evidence outside of the pleadings in deciding

its motion to strike.  To do so would be improper and run counter to the overwhelming weight of

authority that a motion to strike class allegations should be governed under a *Rule 12(b)(6)*

standard of review. Moreover, discovery has just begun.

If this Court intends to take the unusual if not unprecedented course of considering Defendant's evidence outside of the pleadings in connection with its motion to strike class allegations, then Plaintiff would request notice of the same and the opportunity to file a motion and supporting declaration under *Rule 56(d)* [formerly *Rule 56(f)*] to complete class discovery and to supplement its response to Defendant's motion before any ruling.

However, on the chance that this Court may consider Defendant's evidence outside the pleadings, Plaintiff has submitted its own such evidence with the request that it be considered in the event this Court should decide to consider that offered by Defendant.

<u>**Argument**</u>

## I.   Introduction

In its Memorandum in Support, Defendant argues that if Plaintiff received the Welcome Kit, he accepted the terms of Defendant's enclosed customer agreement by failing to cancel the complimentary satellite radio programming within 3 days of its activation. Alternatively, Defendant argues that if Plaintiff did not receive the Welcome Kit, he cannot represent class members who did receive the Welcome Kit. Either way, Defendant argues, the class allegations should be stricken.

Defendant's argument follows the "either or" analysis employed by the court in *King v. Capital One Bank (USA) N.A.*, 2012 U.S. Dist. LEXIS 163562 (W.D. Va. 2012). However, Defendant's argument is flawed in that it mistakenly assumes that Class Members who received Defendant's Welcome Kit and failed to cancel the complimentary programming within three days of its activation are bound by the terms of Defendant's customer agreement.

Moreover, Defendant's argument fails to recognize significant differences between the language of Defendant's customer agreement and the language of the agreement in *King* which render *King* distinguishable.

Finally, Defendant's argument ignores the fact that versions of the customer agreement

Page 6 of 30

which were mailed or otherwise provided by Defendant to a significant number of Class Members between January 4, 2009, and June 14, 2009, did not even contain an arbitration provision and that Plaintiff is not precluded from representing those persons.

For all these reasons, as more fully explained herein, Defendant's Motion to Strike Class Allegations should be denied.

## II.     Virginia contract law regarding offer and acceptance.

"A federal court must apply the conflicts rules of the state in which it sits when deciding a federal issue that incorporates state law." *McNeil v. Haley South, Inc.*,  2010 U.S. Dist. LEXIS 95658, *9-10 n.3 (E.D. Va. 2010) citing *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988) and *Johnson v. Carmax, Inc.*, 2010 U.S. Dist. LEXIS 70700, *6-7 (E.D. Va. 2010).  As such, this Court should apply the conflict rules of Virginia as the forum state in determining whether any contract to arbitrate was formed between Plaintiff or Class Members and Defendant. *McNeil, supra*, 2010 U.S. Dist LEXIS 95658 at *9-10; *Johnson, supra*, 2010 U.S. Dist. LEXIS 70700 at *6-7.

 "It is a long-standing rule in Virginia that 'the nature, validity and interpretation of contracts are governed by the law of the place where [the contract was] made....'" *Black v. Powers*, 48 Va. App. 113, 128, 628 S.E.2d 546, 554 (2006) quoting *C.I.T. Corp. v. Guy*, 170 Va. 16, 22, 195 S.E. 659, 661 (1938).  See also *McNeil, supra*, 2010 U.S. Dist LEXIS 95658 at *9-10 n.3.

"The place where the contract was made is where the final act necessary to make the contract occurred." *Nasser v. Whitepages, Inc.*, 2013 U.S. Dist. LEXIS 166133, *15 (W.D. Va. 2013) citing *KECO Indus., Inc. v. ACF Indus., Inc.*, 316 F.2d 513, 514 (4th Cir. 1963) and *Chesapeake Supply & Equip. Co. v. J.I. Case Co.*, 700 F. Supp. 1415, 1417 (E.D. Va. 1988).

In the case of any purported contract between Plaintiff or those Class Members who were residing in Virginia when Defendant mailed its customer agreement to them, any act (or silence or inaction) which might be construed as acceptance would have occurred in Virginia.

Therefore, the Court should look to Virginia law to determine whether any contract exists between Defendant and Plaintiff or any Virginia Class Members.

With regard to Class Members who resided in other states, Virginia courts presume that the common law of other states is the same as that of Virginia in the absence of evidence to the contrary. *Mountain Lake Land Co. v. Blair*, 109 Va. 147, 151, 63 S.E. 751, 752 (1909). See also *Wade v. Foreign Mission Board*, 16 Va. Cir. 61, 68 (1989). Moreover, as will become apparent herein, applicable Virginia law is in accordance with the common law of the other jurisdictions.

The essential elements of a valid contract are an offer, an acceptance of the offer and valuable consideration. *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980). "It is elementary that mutuality of assent - the meeting of the minds of the parties - is an essential element of all contracts. . . . [W]hether a party assented to the terms of a contract [is ascertained] from that party's words or acts, not from his or her unexpressed state of mind." *Phillips v. Mazyck*, 273 Va. 630, 636, 643 S.E.2d 172 (2007) (internal quotation marks and citations omitted). "The law . . . judges of an agreement between two persons exclusively from those expressions of their intention which are communicated between them." *Lucy v. Zehmer*, 196 Va. 493, 503, 84 S.E.2d 516, 522 (1954), quoting *Clark on Contracts*, 4 ed., § 3, p. 4.

"A party's silence . . . is insufficient to show its intention to be bound by the terms of a contract." *Phillips, supra*, 273 Va. at 638 (holding plaintiff's silence was insufficient to evidence assent to an arbitration agreement). See also *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010). "An offeror cannot prescribe conditions so as to turn the offeree's silence into acceptance" *17A Am Jur 2d, Contracts, § 98.*

"[A]n offeror can not merely by saying that the offeree's silence will be taken as an acceptance, cause it to operate as such. The offeror cannot force the offeree to take pen in hand, to use a postage stamp, or to speak under penalty of being bound by a contract by not expressing a rejection." Joseph M. Perillo, *Corbin on Contracts, Rev. Ed.(1993)*, § 3.19. "An offeror may condition the continuance of his offer upon acceptance within a specified time, but, without the

clear assent of the offeree or some duty, under the circumstances, to respond, he may not arbitrarily insist upon affirmative rejection within a limited, perhaps unreasonable, period. *Cargo Carriers, Inc. v. Richmond Steel Co.*, 263 F.2d 919, 924 (4th Cir. 1959).

"Requiring an offeree to take affirmative steps to reject an offer . . . is inconsistent with general contract law.  In the absence of special relations between the parties or other circumstances, the offeree need make no reply to the offer and his silence and inaction cannot be construed as assent."  *Thompson v. Kings Entertainment Co.*, 674 F. Supp. 1194, 1199 (E.D. Va. 1987).

### III.   Defendant's Welcome Kit did not communicate an offer to Plaintiff or to the Class Members.  Moreover, even if the customer agreement contained within the Welcome Kit was effective as an offer, neither Plaintiff nor the Class Members had any duty to read or respond to it.

Defendant claims that in the ordinary course of business it "would have mailed" to Plaintiff a Welcome Kit containing (among other things) a customer agreement which it proposed to govern its relationship with Plaintiff.  Plaintiff and his wife have denied receiving any such Welcome Kit or customer agreement.  *Hookers' Declarations, ¶ 15*.  Clearly, no contract can arise from an offeror's <u>unsuccessful</u> attempt to communicate an offer.[3]

However, even if it were shown that a Welcome Kit had been received by Plaintiff or by the Class Members, there still would have been no effective communication of any offer by Defendant.  The reason is that nothing on the Welcome Kit envelope provided notice that the it contained any agreement which Defendant proposed to govern its relationship with the recipients of its complimentary programming.  Moreover, the documents contained within the Welcome Kit envelope demonstrate that the customer agreement was intended to apply only to those persons who elected to extend Defendant's satellite radio programming beyond their complimentary programming period.

In his discovery, Plaintiff requested that Defendant produce all versions of the Welcome

---

[3]Defendant has not asserted that a contract arose as a result of any other communication or attempted communication between the parties.

Kits (including the corresponding Welcome Kit envelopes) which were mailed or otherwise provided to the recipients of its complimentary programming and all documents constituting any Welcome Kit mailed or otherwise provided to Mr. or Mrs. Hooker in September, 2011.  In response, Defendant has produced those documents attached *in globo* as **Exhibit 3.**  The Welcome Kit produced by Defendant is composed of (1) a Welcome Kit envelope, (2) a Welcome letter, (3) a "renewal" form to be used to extend satellite radio programming beyond the complimentary period, (4) a brochure and channel lineup, (5) a channel lineup visor and finally (6) a proposed customer agreement.[4]

The envelope in which Defendant's Welcome Kits were mailed appears in Exhibit 3 as document numbered SXMHKR434.[5]  The only words appearing on the front of the Welcome Kit envelope, other than Defendant's logo and return address and the postage paid imprint, are "IMPORTANT INFORMATION About the Satellite Radio Service in Your Vehicle."  The only words on the back are "Create a custom channel guide."  Noticeably missing is any mention of any proposed customer agreement enclosed within the envelope.

Recently in *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2nd Cir 2012), the Second Circuit considered the legal effect of a "welcome email" upon recipients who, unlike Plaintiff and the Class Members, had previously enrolled in a online discount program offered by the defendant in exchange for a monthly fee.  The plaintiffs filed a class action against the defendant asserting various claims.  The defendant filed a motion to dismiss and compel arbitration.  It asserted that the plaintiffs had assented to an arbitration provision by enrolling in its "Great Fun" program, receiving the emailed terms of its program and then not cancelling their Great Fun

---

[4]The Welcome Kit produced by Defendant appears to be a 2011 version comprised of documents numbered SXMHKR434-SXMHKR447.  For purposes of this argument, Plaintiff will assume that the Welcome Kit produced is similar to ones in use at other times relevant to this action. *See Sirius XM's Responses to Requests 37 - 40 of Plaintiff's First Set of Requests for Admission*, attached as Exhibit B to the Hookers' Declarations.

[5]For convenience, Plaintiff will omit the six zeros appearing after the SXMHKR when identifying particular documents included within Exhibit 3.

membership during a specified period of time.

The email which contained the terms and conditions of defendant's program had a subject line of "Welcome to Great Fun" and "Important information about your membership privileges."[6]  It did not mention that a purported contract or terms were included within the body of the email.  The Second Circuit concluded that receipt of the emails containing the defendant's terms and conditions, including the arbitration provision, was insufficient to bind the recipients even though they - unlike the Hookers - had previously enrolled in the defendant's program, stating:

> "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993, 101 Cal. Rptr. 347, 351 (1972). We do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, and that a failure to act affirmatively to cancel the membership will, alone, constitute assent.

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2nd Cir 2012).  Later the court added:

> [C]ases applying the "duty to read" principle to terms delivered after a contracting relationship has been initiated do not nullify the requirement that a consumer be on notice of the existence of a term before he or she can be legally held to have assented to it. "While new commerce on the Internet [and elsewhere] has exposed courts to many new situations, it has not fundamentally changed the principles of contract."

*Id.* at 124.

As in *Schnabel*, Defendant did not sufficiently communicate or provide notice of its proposed customer agreement to Plaintiff or the Class Members - who discovery will show never "enrolled" to receive Defendant's complimentary programming.  Moreover, even assuming that some Class Members may have opened the Welcome Kit envelope, and assuming further that some of those may have even noticed the proposed customer agreement among the many pages

---

[6]The "Welcome" portion of the subject line was mentioned in the district court's factual recitation.  *Schnabel v. Trilegiant Corp.*, 2011 U.S. Dist LEXIS 18132, * 4-5 (D. Conn. 2011). The "Important Information" portion was mentioned by the appellate court.  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 n. 14 (2nd Cir. 2012).  The email subject line message in *Schnabel* bears remarkable resemblance to the Welcome Kit envelope message in this case.

enclosed, they were under no duty to read it.

Had Plaintiff and the Class Members previously contracted with Defendant on a "terms to follow" basis, then perhaps they would have been obligated to read any terms of which they received sufficient notice.[7]  However, in the five declarations that Defendant has filed in this matter, Defendant has never alleged or even suggested that it contracted with Plaintiff or any Class Members regarding the complimentary programming prior to the mailing and receipt of the Welcome Kits.

As such, any customer agreement contained within any Welcome Kit envelope mailed to Plaintiff or to the Class Members constituted a mere offer which Plaintiff and the Class Members were not bound to read.

## IV.   Neither Plaintiff nor the Class Members accepted Defendant's proposed customer agreement by their silence or inaction.

### A.   The silence and inaction of Plaintiff and the Class Members was not an objective manifestation of assent.

The customer agreement which Defendant asserts was included in its Welcome Kit

---

[7]See, e.g. *Sherr v. Dell, Inc.*, 2006 U.S. Dist. LEXIS 51864 (S.D.N.Y. 2006) (The plaintiff contracted with Dell for a new computer over the phone.  The terms of the agreement followed with shipment of the computer); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal 2002) (The plaintiff called DirecTV and became a subscriber.  A customer agreement which governed the relationship formed between DirecTV and the plaintiff was then mailed to the plaintiff along with the first billing statement.); *Lozano v. AT&T Wireless*, 216 F. Supp. 2d 1071 (C.D. Cal. 2002) (The plaintiff became a cell phone customer of AT&T by selecting a plan and purchasing a phone.  An arbitration provision was included within a Welcome Guide contained within the box of the newly purchased phone, provided after a contract for service has been signed.).

In each of these cases, and in other cases upon which Defendant's earlier Motion to Compel was based, the plaintiff entered into a contractual relationship with the defendant by virtue of an initial transaction (e.g. purchasing a computer, subscribing to DirecTV) and the terms followed on a "return or approve" basis.  In each of these cases, the courts held that the plaintiff was bound by the terms that followed the initial contract, whether or not read.

In this case, Plaintiff and the Class Members did not purchase Defendant's product or subscribe to its service.  They simply bought or leased a vehicle.  Therefore, any customer agreement enclosed within Defendant's Welcome Kit was not the terms of any pre-existing contract between the parties. It was, plain and simple, an unsolicited offer which neither Plaintiff nor the Class Members was obligated to respond to or even read.

provides:

> IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION.  IF YOU DO NOT CANCEL YOUR SUBSCRIPTION, WITHIN 3 BUSINESS DAYS OF ACTIVATION OF YOUR RECEIVER, IT WILL MEAN THAT YOU AGREE TO THIS AGREEMENT WHICH WILL BE LEGALLY BINDING ON YOU.

Exhibit 3, Doc. SXMHKR436, right column, ¶ 4.  By its terms, Defendant purports to require that Plaintiff affirmatively reject its offer and asserts that Plaintiff's silence or inaction will be deemed acceptance.[8]

As noted above, Defendant's demand for an affirmative rejection of its offer is contrary to general contract principals.  The reason is that an acceptance of an offer must be <u>objectively manifested and unequivocal</u> to be binding.  *Byrum v. Bear Invest. Co.*, 936 F.2d 173, 175 (4th Cir. 1991); *Nolan Bros., Inc. v. Century Sprinkler Corp.*, 220 F.2d 726, 729 (4th Cir. 1955); and *Kutsmeda v. Informed Escrow, Inc.*, 2006 U.S. Dist. LEXIS 4208, *8-9 (E.D. Va. 2006).  Yet silence and inaction may mean many different things.  As noted in one treatise:

> Silence may indicate that the offeree did not hear or receive or understand the offer, or that the offer was still under consideration.  It may instead indicate that the offeree preferred to give no thought to the offer and to waste no time and effort in making a reply, whether orally or by a writing.  In such cases, the offeror is not reasonable in giving the offeree's mere silence an interpretation that the offeree accepts.

*Corbin on Contracts, supra*, § 3.18.

In this case, the uncertainty of whether the silence and inaction of Plaintiff and the Class Members was a manifestation of acceptance was compounded by Defendant's own actions in how it delivered and worded its offer.

The offer was delivered by standard or bulk mail in an envelope which made no mention

---

[8]Indeed, Defendant's terms would have required that Plaintiff and the Class Members cancel the programming within 3 days of activation of their vehicle's receiver, regardless of when the Welcome Kit containing the offer was even mailed.  In Plaintiff's case, Defendant's representative declared that Plaintiff's receiver was activated on August 23, 2011, *Ruhland Declaration (ECF Doc. 13), ¶ 7*, which activation occurred without Plaintiff's participation. *Hookers' Declarations, ¶ 10*.  Yet that same representative declared that the Welcome Kit would have been mailed to Plaintiff between September 9 and 16, 2011.  *Ruhland Declaration (ECF Doc. 13), ¶ 10*.  Thus Defendant deemed its customer agreement to have been accepted by Plaintiff well before it was even mailed to him.

of the proposed customer agreement or of the fact that the recipients' failure to cancel the complimentary programming would be construed by Defendant as acceptance of its terms. *See Exhibit 3, Doc. SXMHKR434*. Thus, an offeree's silence might indicate that he considered Defendant's Welcome Kit to be junk mail and discarded it without opening it.

However, if the recipient opened the Welcome Kit envelope, he would be greeted with a letter which read in pertinent part:

> **Welcome to SiriusXM!**  Your new [vehicle] is equipped with many exciting features - including a 3 month trial subscription to the XM Select package[9]. *The service is already activated and it's yours to enjoy*.
> * * *
> To continue enjoying SiriusXM once your trial is over, simply complete and return the enclosed renewal form in the postage-paid envelope provided.

*Exhibit 3, Doc. SXMHKR447* (first emphasis in original; second added).

As with the Welcome Kit envelope, the Welcome Kit letter does not mention the proposed customer agreement or the fact that Defendant would construe the recipient's failure to cancel the complimentary programming as acceptance of the proposed contract terms.  Thus, an offeree's silence and inaction might indicate that, having read the Welcome Kit letter and determined that it was a solicitation to subscribe to Defendant's programming following the complimentary period, the entire Welcome Kit was discarded without further reading.

However, if the recipient of the Welcome Kit went further to review the renewal form as suggested by the Welcome Kit letter, he would find in the first paragraph under the "Please choose the method of payment" heading, the following:

> By providing my payment information below or enclosing a check, I authorize my payment for the offer I have selected and agree to automatic renewal and billing for the plan I have chosen.  *I agree to the SiriusXM Customer Agreement* (available at siriusxm.com) and certify that I am at least 18 years of age.

*Exhibit 3, Doc. SXMHKR441* (emphasis added).  This language is followed by a place to provide credit card information and a signature.  Further below, in the "Payment Terms" section, the

---

[9]Presumably, Welcome Letters sent to purchasers or lessees whose vehicles were equipped with a Sirius receiver would refer to a Sirius Select Package.

reader would find the following, "*It is important that you read our Customer Agreement*; see www.siriusxm.com, *because renewal of your service means that you have agreed to its terms*." *Id.*

      An offeree who read the renewal form enclosed within the Welcome Kit could reasonably understand that customer agreement was applicable only to those persons who extended the satellite radio programming beyond the complimentary period and provided their signature on the "renewal" form.  Thus, an offeree's silence and inaction might be intended as a rejection of Defendant's proposed customer agreement, not assent.

      Finally, if the Welcome Kit recipient made it past the brochure and channel lineup and the visor channel lineup to the proposed agreement, he might notice its title, "Customer Agreement."  The term "customer" is defined as "someone who buys goods or services from a business." www.merriam-webster.com/dictionary/customer (last viewed on December 21, 2013).  Class Members did not purchase Defendant's complimentary programming and, therefore, were not Defendant's "customers."   Like Plaintiff, they simply bought or leased a car or other vehicle.  Their silence and inaction might indicate that they saw the "Customer Agreement" title and determined that the agreement did not apply to them and did not require their attention unless they became customers by completing and signing the "renewal" form contained in the Welcome Kit.

      It is anticipated that Defendant may suggest that a determination of which Class Members read and intended to be bound by its customer agreement will require individual inquiries that preclude class treatment.  However, Virginia follows the objective theory of contract formation. *Adams v. Doughtie*, 63 Va. Cir. 505, 520 (City of Portsmouth, 2003) (Hon. Mark D. Davis).  As such, the determination of whether an offer has been accepted is not a matter of subjective intent. Rather, "[t]he question . . . of whether an enforceable [contract] has been reached is governed by the intent of the parties as objectively manifested." *Byrum, supra*, 936 F.2d at 175 (emphasis added).  "The modern test for determining whether there was acceptance (reflecting the objective

theory of contract) is whether it would be clear to a reasonable person in the position of the offeror that there was an acceptance." *Adams, supra*, 63 Va. Cir. at 520.   Thus, no individual inquiry is required as to what each Class Member subjectively intended by his or her silence.

In this case, discovery will show that all of the Class Members received their offers from Defendant in the same manner and under the same circumstances.  To the extent that some Class Members may have accepted Defendant's offer by completing and signing the renewal form contained in the Welcome Kit, such persons can be identifiable from Defendant's records and, if necessary, may be excluded by amendment to the Class definition.

However, as to those Class Members who remained silent and failed to cancel their complimentary programming within 3 business days of activation of their vehicle's satellite radio receiver, there was no clear, unequivocal, and objectively manifested communication of assent. Silence and inaction is generally an insufficient manifestation of assent.  Moreover, as will be discussed in the next section, the facts of this case do not fall under any of the four exceptions that have been found to exist to the general rule.

**B.     There was no special relationship or circumstances from which a determination might be made that the silence or inaction of Plaintiff or the Class Members was acceptance of Defendant's offer.**

As noted above, "in the absence of special relations between the parties or other circumstances, the offeree need make no reply to the offer and his silence and inaction cannot be construed as assent." *Thompson, supra*, 674 F. Supp. at 1199.

Plaintiff's research has not disclosed any case in which the Virginia Supreme Court has addressed the issue of what special relations or circumstances, if any, would warrant treating silence or inaction as acceptance of an unsolicited offer.  Indeed, the Supreme Court's pronouncements in *Phillips, supra,* 273 Va. at 638, suggests that, under Virginia law, there are no circumstances under which silence or inaction will be deemed to be acceptance of an unsolicited offer.

However, in *Thompson*, this Court stated that cases involving special relations or

circumstances could be classified into the following four categories:

> (1) Where the offeree with reasonable opportunity to reject offered goods or services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation.

> (2) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

> (3) Where because of previous dealings or otherwise, the offeree has given the offeror reason to understand that the silence or inaction was intended by the offeree as a manifestation of assent, and the offeror does so understand.

> (4) Where the offeree takes or retains possession of property which has been offered to him, such taking or retention in the absence of other circumstances is an acceptance.

*Thompson, supra*, 674 F. Supp. at 1199, n.8.  See also *Restatement (Second) Contracts* § 69

(1981).  No such special relations or circumstances exist in this case.

> **1.     Taking the benefit of goods or services under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation.**

The first special relation or circumstance does nor exist because no reasonable man

would conclude that Defendant's complimentary radio satellite programming was offered to

Plaintiff and the Class Members with the expectation of compensation.  True, Defendant likely

hoped that the recipients of its complimentary programming would elect to continue its services

through a paid subscription following the complimentary period.  However, the only services

which Plaintiff or Class Members who did not subscribe might be said to have "taken the benefit

of" was the "complimentary" programming provided with the purchase or lease of new or used

vehicles.  As to that programming, there was no expectation of compensation.

Moreover, Plaintiff did not "take" the benefit of Defendant's services.  Taking implies

some affirmative action on Plaintiff's part.  Plaintiff never requested that Defendant deliver

satellite radio programming to his new vehicle.  *Hookers' Declarations, ¶ 4.*  He never

"enrolled" to receive a "trial subscription."  *Id. at ¶ 10.*  He did not play any role in activating the

programming.  *Id.*  This was all done by Defendant, Hyundai and/or Gateway Hyundai pursuant

to "arrangements" to which Plaintiff was not a party.  *Ruhland Declaration (ECF Doc. 13), ¶ 3;*

*Ness Declaration (ECF Doc. 18), ¶ 3.*  He simply bought a car.  Discovery will show that the same was true for the Class Members.

> **2.      Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.**

This special circumstance or relation has two components: First the offeror must have stated or given the offeree reason to understand that assent be manifested by silence or inaction. Second the offeree, in remaining silent and inactive, must intend to accept the offer.

In this case, there is no evidence that Defendant, or anyone acting on its behalf, ever gave Plaintiff reason to believe that he would be mailed a customer agreement; that if he did not agree to the terms of the customer agreement, he would be required to cancel the complimentary programming; or that his silence and inaction for three days following activation of his car's satellite receiver (without his involvement) would be deemed acceptance.

Defendant will argue that Plaintiff and the Class Members were told exactly that in the customer agreement that would have been mailed to them.  However, the Welcome Kit envelope provided no notice of the enclosed offer of terms, and, in any event, the Class Members were under no duty to read the offer.  Therefore, any statement made in the customer agreement is of no effect in making the determination of whether Plaintiff or the Class Members was obligated respond to Defendant's unsolicited offer.

Moreover, this special circumstance requires that the offeree intend that his silence or inaction constitute acceptance of the unsolicited offer.  As previously noted, whether acceptance exists "is governed by the intent of the [offeree] as objectively manifested."  *Byrum, supra*, 936 F.2d at 175 (emphasis added).  There is no evidence that Plaintiff objectively manifested his intention that silence and inaction be deemed acceptance.  This is not a case where the offeree has previously agreed that his silence or inaction will constitute acceptance.  See, e.g., *Gentry v Superior Court of Los Angeles*, 42 Cal 4th 443, 468, 165 P.3d 556 (2007) (overruled on other grounds).  Discovery will show that the same is true with respect to the Class Members.

      **3.**    **Where because of previous dealings or otherwise, the offeree has given the offeror reason to understand that the silence or inaction was intended by the offeree as a manifestation of assent, and the offeror does so understand.**

The Hookers have <u>never</u> purchased any product or service from Defendant and have <u>never</u> communicated with Defendant about any product or service. *Hookers' Declaration, ¶ 20.* Simply stated, there have been no previous dealings between Plaintiff and Defendant.[10]

Discovery will show that most of the Class Members had no prior dealings with Defendant when they began receiving complimentary satellite radio programming in their vehicles. Even as to any Class Members with whom Defendant may have had previous dealings, Defendants have presented no evidence to suggest that such dealings gave Defendant reason to understand that those Class Members intended that their silence or inaction serve as their manifestation of assent to Defendant's proposed agreement.

      **4.**    **Where the offeree takes or retains possession of property which has been offered to him, such taking or retention in the absence of other circumstances is an acceptance.**

Satellite radio programming is not "property" of which an offeree can take and retain "possession." Rather it is a "service" from which one may benefit. That is the topic of the first exception which was inapplicable due to the absence of any expectation of compensation on the part of Defendant for its complimentary programming services.

Moreover, even assuming that satellite radio programming was "property" and that a Class Member's failure to cancel the programming constituted the "taking or retaining possession" of such property, other circumstances existed which readily explain Plaintiff and Class Members' failure to cancel.

Having purchased or leased vehicles with a period of complimentary satellite radio

---

[10]In its Responses to Plaintiff's First Set of Request for Admission, Defendant has acknowledged that it has not located any records of Mr. or Mrs. Hooker purchasing any product or service offered by Defendant or even communicating with Defendant about any product or service offered by it within eighteen months preceding the dates of the September, 2011 calls. See *Defendant's Responses to Plaintiff's Requests for Admission Nos. 91 - 94*, attached as **Exhibit 4**.

programming included, Class Members, even any who may have read Defendant's proposed customer agreement, would be justified in believing that Defendant could not put them to the choice of cancelling the programming or being bound to the terms of a previously undisclosed agreement after the vehicle's purchase or lease transaction was completed.

### C.    Summary

Defendant had the logistics in place to provide its customer agreement to all recipients of its complimentary programming when they purchased or leased their new or used vehicle.  It provided each recipient with its brochure and channel line up.  *Ness Declaration (ECF Doc. 18), ¶ 4-6.*  It could have done the same with its proposed customer agreements.  It chose not to do so.

Defendant could have required Plaintiff and the Class Members to express their assent to its customer agreements by requiring them to open a trial account in their names following their purchase of their new or used vehicle.  Instead, discovery will show that Defendant chose to open accounts in the name of Plaintiff and other Class Members without any participation on the part of Plaintiff or the Class Members.

Defendant required that those who wished to extend their satellite radio programming beyond the complimentary period sign a renewal form (included within the Welcome Kit) to evidence their assent to the customer agreement.  *Exhibit 3, SXMHKR441.*  Defendant could have required that recipients of its complimentary programming sign a similar form to evidence their assent to the proposed customer agreement before delivering the complimentary programming.  It chose not to do so.

Discovery will show that Defendant's practices regarding its proposed offer of terms was the same with regard to Plaintiff and the other Class Members.  As such, the customer agreement was not binding on the Class Members just as it was not binding on Plaintiff.  Neither Plaintiff nor the Class Members are bound to arbitrate their disputes with Defendant and, as such, Plaintiff is not precluded from representing the Class Members in this action

**V.    *King v Capital One* is distinguishable because (1) the issue of whether silence and inaction constituted acceptance of Defendant's customer agreement is the same for**

**Plaintiff and the Class Members and because (2) unlike the arbitration provision in
*King*, the arbitration provision in this case does not mandate that arbitration be the
exclusive means for resolving disputes unless and until one or the other parties to
the agreement "elects" to arbitrate, and neither party has done so in this case.**

Relying upon *King v. Capital One*, 2012 U.S. Dist. LEXIS 163562 (W.D. Va. 2012),

Defendant argues that whether or not Plaintiff is bound by its customer agreement, he cannot

represent Class Members who are bound by the agreement and its arbitration clause.

In *King*, the plaintiff asserted that she had entered into and paid for a debt management

plan (DMP) with the defendant, Incharge, without ever signing its client agreement.  The client

agreement provided in pertinent part:

> Any dispute between us that cannot be amicably resolved, and all claims or controversies
> arising out of this Agreement, shall be settled *solely and exclusively by binding
> arbitration . . . (it being expressly acknowledged that you will not participate in any class
> action lawsuit in connection with any such dispute, claim, or controversy, either as a
> representative plaintiff or as a member of a putative class) . . . .*

*Id.* at *15-16 (emphasis added).

In considering the defendant's motion to strike class allegations, Judge Moon first

assumed that the plaintiff had signed the defendant's agreement.  He found that arbitration

provision and class action waiver were valid and enforceable.  As such, the plaintiff had agreed

that arbitration would be the exclusive means for resolving disputes.  Likewise, she agreed not to

participate in any class actions.  Therefore, Judge Moon found that, under the first assumption,

the motion to strike class allegations should be granted..

Next Judge Moon assumed that the plaintiff did not sign the client agreement.  He then

noted that "surely [plaintiff] cannot represent anyone who did sign it, either on paper or

electronically [as s]uch individuals would be bound by the express terms of their agreements

with InCharge to arbitrate their claims. . . . [A]llowing plaintiff to represent individuals bound to

pursue their claims in arbitration would render the arbitration clauses totally useless, in

contravention of the FAA."  *King, supra*, 2012 U.S. Dist. LEXIS 163562 at *42-43.

Judge Moon recognized the plaintiff could represent the class of individuals who entered

into and paid for debt management plans without signing the defendant's client agreement.

However, based upon the defendant's evidence, he found "it exceedingly implausible that there are very many, if any, other individuals who entered into DMPs without either signing either a paper or an electronic copy of the Client Agreement containing the arbitration clause." *Id.*, 2012 U.S. Dist. LEXIS 163562 at 43.  As such, the plaintiff could not plausibly meet Rule 23's numerosity requirement.  Therefore, Judge Moon found that, under the second assumption, the motion to strike class allegations should also be granted.

 *King* is distinguishable for two reasons.

 First, unlike the plaintiff in *King*, Plaintiff's circumstances are not unique.  They are the same circumstances faced by every Class Member whose silence and inaction was construed by Defendant as acceptance of its proposed customer agreement.  Although different Class Members may have had different reasons for their silence and inaction (including, but not limited to, not receiving the offer), the operative circumstance is the same for all who did not sign and return Defendant's "renewal" form.  They remained silent.  Like Plaintiff, they are not bound to the terms of Defendant's customer agreements.

 Second, the arbitration provision and the class action waiver in this case are materially different from those in *King*.  Defendant's customer agreements provide in Section I, paragraphs 2 and 6 as follows:

> **2. Formal Resolution.**  If we cannot resolve a Claim informally, . . . then these Claims shall be resolved, *upon election by either party*, exclusively and finally by binding arbitration.
>
>      * * *
>
> **6. Class Actions and Severability.**  *If either party elects to resolve a claim by arbitration*, that Claim shall be arbitrated on an individual basis.  There shall be no right or authority for any claims *to be arbitrated* on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other subscribers, or other persons similarly situated. . . .  You do not have the right to act as a class representative or participate as a member of a class of claimants *with respect to any Claim submitted to arbitration* ("**Class Action Waiver**"). . . .

See, e.g. *Exhibit 3, Doc. No. SXMHKR436*.

 In *King*, arbitration was mandatory and provided the exclusive means for resolving disputes under all circumstances.  Under Defendant's customer agreements, arbitration is

mandatory and the exclusive means for dispute resolution only "upon election by either party." Unless and until such an election is made, either party remains free to pursue litigation. Moreover, under Defendant's agreement, it is only when "either party elects to resolve a claim by arbitration" that the class action waiver applies.

Clearly, Plaintiff has not elected arbitration, and Defendant has offered no evidence that any Class Members have done so. The question is whether Defendant has done so.

Defendant's customer agreements do not define the terms "election" or "elect" or provide any guidance concerning what constitutes an "election of arbitration." Therefore, this Court must resort to principals of contract interpretation. "'Words that the parties used are normally given their usual, ordinary, and popular meaning." *Travco Ins. Co. v. Ward*, 284 Va. 547, 552; 736 S.E.2d 321 (2012) (citations omitted) "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 271 Va. 574, 578, 628 S.E.2d 539 (2006). Any ambiguity in a written contract must be construed against the drafter of the agreement. *Doctors Co. v. Women's Healthcare Assoc., Inc.*, 285 Va. 566, 573, 740 S.E.2d 523 (2013).

"Election" is defined as "the right, power or privilege of making a choice." www.merriam-webster.com/dictionary/election (last viewed December 29, 2013). While this definition is accurate, it is also somewhat meaningless as it offers no guidance concerning what one must do "choose" arbitration.

In this case, Plaintiff has elected to pursue his claims through litigation. Even assuming that Plaintiff is bound by Defendant's customer agreement, he had the right to do so unless and until an "election of arbitration" was made by Defendant. Likewise, Class Members are not obligated to arbitrate their claims against Defendant unless and until Defendant "elects" to resolve their claims through arbitration.

Plaintiff submits that, in order to elect arbitration, it is insufficient for Defendant to

simply demand that Plaintiff or the Class Members file an arbitration proceeding and pay the required filing fee.  Rather, Defendant must do so.  However, it has not done so, either with respect to Plaintiff or any of the Class Members.  *Defendant's Responses to Plaintiff's Requests for Admission Nos. 60-66*, attached as **Exhibit 5**.[11]

It is expected that Defendant will argue that it has elected to arbitrate by filing a motion to compel arbitration in this case and in the two cases in which similar class claims have been asserted.[12]  However, Defendant's motions to compel arbitration in these three cases is nothing more than Defendant complaining that the plaintiffs therein did not made the election that Defendant would have them make.  In that regard, it is noteworthy that Defendant has produced no evidence that it has initiated arbitration against any of the three plaintiffs, either before or after filing its motions to compel.  Defendant has no intention of "electing" arbitration.  It only hopes to prevent Plaintiff from electing to litigate.

Moreover, Defendant argument does nothing to explain how a motion to compel directed at three class representatives constitutes an "election of arbitration" with respect to Class Members.  As noted above, under Defendant's customer agreements, arbitration is only to be on an individual basis.  Therefore, if Defendant wishes to "elect" arbitration as to Class Members, at a minimum it must communicate that "election" to those members.  Defendant has presented no evidence that it has done so.  *See also Exhibit 5*.

However, Defendant does have options.  If this Court determines that Defendant's customer agreement is binding on Plaintiff, Defendant need only file an arbitration proceeding with AAA, pay the required filing fee and then demand that Plaintiff participate in the arbitration.  At that point, arbitration would be mandatory for Plaintiff

Even if this Court determines that the customer agreement is not binding on Plaintiff,

---

[11]In an all too familiar pattern, Defendant denied Requests 63-66 by means of a checkbox, but then admitted the substance of the request in the body of its response.

[12]*Knutson v. Sirius XM Radio, Inc.*, No. 12-cv-418 (S.D. Cal.) and *Rodal v. Sirius XM Radio, Inc.*, No 13-cv-61770 (S.D. Fla).  *Knutson* is currently on appeal to the Ninth Circuit.

Defendant still has options.  It may file arbitration proceedings against any Class Members with whom it has an arbitration agreement, pay the filing fee, and demand that they participate in the arbitration.  At that point, those Class Members would be obligated to arbitrate, and Defendant could properly demand that the Class definition be amended to exclude from the Class those Class Members against whom it had initiated arbitration.  However, thus far Defendant has not initiated arbitration against any Class Members.  *See Exhibit 5.*

Plaintiff does not contend that its interpretation of "election of arbitration" as requiring that the electing party actually initiate arbitration is the only possible interpretation.  Defendant's interpretation of "election of arbitration" as a demand that the other party initiate arbitration might well be another.  However, in this instance, Defendant, not Plaintiff or the Class Members, drafted the customer agreement.  As such, any ambiguity in the customer agreement must be construed against Defendant.  So construed, Defendant has not made an "election of arbitration" with respect Plaintiff's claims.  Certainly, it has not done so with respect to the claims of the Class Members who have not even been notified of their claims.

In summary, assuming that there are some Class Members who are bound by the Defendant's customer agreement, they are not precluded from litigating those claims or from participating as a class member in litigation filed by a third part unless and until Defendant elects to arbitrate by filing a proceeding with the AAA and paying the initial filing fee.  In the meanwhile, Plaintiff may continue to represent them in this action.

**VI.    Those class members, if any, bound solely by Defendant's customer agreement applicable to complimentary Sirius satellite radio programming with effective dates between December 18, 2008, and May 11, 2009, are not bound to submit their disputes to arbitration because those agreements did not contain an arbitration provision.**

The customer agreements applicable to complimentary Sirius satellite radio programming and having effective dates between December 18, 2008, and May 11, 2009, did not contain any arbitration provision or class action waiver.  *See Sirius' Terms and Conditions with an effective date of December 18, 2008, and Sirius' Terms and Conditions with an effective date of May 11,*

*2009, produced by Defendant as SXMHKR109-115 and SXMHKR137-143*, attached, *in globo*, as **Exhibit 6.**

Therefore, assuming that some Class Members are bound by those agreements, Plaintiff would not be precluded from representing those Class Members.  Like Plaintiff, they did not agree to submit their disputes with Defendant to arbitration and did not agree to any class action waiver.

**VII.    The claim resolution procedures (both formal and informal) in Defendant's agreements and the forum selection clause set forth in certain 2009 agreements do not apply because the claims asserted by Plaintiff do not relate to Defendant's service, its website, the terms of its agreement or any subscription of Plaintiff or the Class Members.  Moreover, Defendant waived its right to enforce the informal dispute resolution procedure by filing its Motion to Compel Arbitration, without mention of and thereby by-passing the informal dispute resolution procedure**.

Relying upon *Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, 2013 U.S. Dist. LEXIS 159164 (E.D. Va. 2013) and *Tattoo Art, Inc., v. Tat Int'l, LLC*, 711 F. Supp. 2d 645 (E.D. Va. 2010), Defendant has argued that Plaintiff is precluded from representing Class Members due to the presence of a mandatory dispute resolution procedure in those agreements.[13]

As noted above, the first flaw in Defendant's argument is the assumption that receipt of the customer agreements by Class Members coupled with their silence and inaction equates to their assent to be bound thereby.  As fully discussed above, that is not the case.

Moreover, assuming some Class Members may be bound by these versions of Defendant's customer agreements, the fact is that the dispute resolution procedures and the forum selection clause (found only in certain 2009 agreements) do not apply to the claims asserted in this action.

The dispute section in the 2009 agreements which contains the informal claim resolution procedure and the forum selection clause only applies to claims "relating to the Service, the

---

[13]The customer agreements discussed in the previous section provide for informal dispute resolution to be followed by litigation in New York.  *See Exhibit 6, pages SXMHKR114 and SXMHKR143*.  The other customer agreements provide for informal dispute resolution followed by arbitration.  See Exhibit 3, *page SXMHKR 436*.

Website, your Subscription or these Terms." *See Exhibit 6, pages SXMHKR114 and SXMHKR143, Section I, lead-in sentence*. The dispute section which contains the informal claim resolution and the arbitration provision in the remaining agreements applies only to claims "relating to the Service, the Site, or your Subscription or this Agreement." *See Exhibit 3, page SXMHKR436*. See also page SXMHKR268 of the more legible Online Version of Defendant's Customer Agreement last updated August 1, 2011, produced as SXMHKR255-271, attached as **Exhibit 7**.

The claims asserted by Plaintiff do not relate to any of the four designated items.[14] Instead they relate to telemarketing calls made by or on behalf of Defendant using an autodialer. The telemarketing calls did not relate to Defendant's website, or its service or the terms of its agreements. Defendant may argue that the calls related to the "subscription" of Plaintiff and the Class Members. However, to the extent that the calls related to any subscription, they related to a *then non-existent paid subscription* which Defendant sought to obtain from Class Members, not to the complimentary programming that was provided to the Class Members with the purchase or lease of their vehicles.

If Defendant intended such claims to be included within the "Disputes" section of its agreements, it should have made its intention clear. As noted previously, any ambiguity in a written contract must be construed against Defendant as the drafter of these agreements. *Doctors Co., supra*, 285 Va. at 573.

Defendant may argue that its arbitration provision provides for the arbitration of disputes as to the applicability of its arbitration clause. That argument cannot, however, be made with respect to the 2009 agreements discussed in the previous section which contain no arbitration provision. At least as to those agreements, it will be for this Court, not an arbitrator, to determine whether the claims asserted by Plaintiff are of the type to which the informal dispute

---

[14]It should be noted that the four terms, while capitalized, are not defined in the customer agreements.

resolution procedure applies.

Unless and until this Court determines that the claims asserted by Plaintiff are the same type of claims as are included within the dispute resolution procedures of Defendant's customer agreements, Plaintiff is not precluded from representing at a minimum the segment of Class Members covered by the 2009 customer agreements with no arbitration clause.

Moreover, Defendant waived its right to enforce the informal dispute resolution procedure by filing its Motion to Compel Arbitration, without mention of and thereby by-passing the informal dispute resolution procedure.

**VIII.  This Court has the discretion to stay the litigation and allow Plaintiff to submit the class claims to any required informal resolution procedure, rather than strike the class allegations.  Similarly, the Court has discretion to give Plaintiff the option of consenting to the transfer of this case to New York, in lieu of striking the class allegations, in the event this Court determines that the forum selection clause in certain 2009 agreements is applicable to any Class Members.**

In *Dominion Transmission*, this Court recognized that "it is vested with the *discretion* to determine an appropriate judicial remedy for [a plaintiff's] failure to comply with a condition precedent, to include staying the case or dismissing the complaint." *Dominion Transmission, supra*, 2013 U.S. Dist. LEXIS 159164 at *7.  In the context of this case, striking the class allegations is the functional equivalent of dismissal.

In the event that this Court does find that the informal disputes resolution procedure is applicable to class claims of the type asserted in this action, Plaintiff would request that this Court exercise its discretion not to strike the class allegations, but to stay the litigation and allow Plaintiff to pursue the informal resolution procedure on behalf of those Class Members to whom the informal procedure applies.  It should be noted that nothing in Defendant's customer agreements precludes use of the informal resolution procedure (as opposed to arbitration) with respect to class claims.  *See Exhibit 3, page SXMHKR436, Exhibit 6, pages SXMHKR114 and SXMHKR143, and Exhibit 7, page SXMHKR268.*

Likewise, if this Court were to find that the forum selection clause in certain 2009 agreements is binding on any Class Members, Plaintiff would also request that, before striking

the class allegations, the Court provide Plaintiff with the option of consenting to a transfer of this action to a federal court in New York.  A transfer would effectively give the Defendant the benefit of its bargain and moot the forum selection issue without subjecting the claims of those Class Members to a statute of limitations defense.[15]

## Conclusion

For the foregoing reasons, Defendant's Motion to Strike Class Allegations should be denied.

Moreover, to the extent that there is a genuine dispute as to whether any contract or agreement to arbitrate exists between Defendant and the Class Members, Plaintiff has filed a demand for jury trial on their behalf (ECF Doc. 38) pursuant to 9 U.S.C. § 4 and Fed. R. Civ. P 38 and requests that this Court convene a jury to decide the issue.

Further, Plaintiff renews his request for a jury trial with respect to the genuine dispute as to whether any arbitration agreement exists between Plaintiff and Defendant.  *See Plaintiff's Demand for Jury Trial, ECF Doc. 14.*

**FRANCIS W. HOOKER, JR.**


Date: December 30, 2013                    By:     /s/ William L. Downing
                                                          Of Counsel

Christopher Colt North, Esq. (VSB #16955)
William L. Downing, Esq, (VSB #17704)
Attorneys for Plaintiff
The Consumer & Employee Rights Law Firm, P.C.
751-A Thimble Shoals Boulevard
Newport News, Virginia 23606
Phone: (757) 873-1010
Fax:   (757) 873-8375
cnorthlaw@aol.com and
wdowninglaw@aol.com

---

[15]The TCPA claims asserted by Plaintiff on behalf of Class Members are subject to the four year statute of limitations set forth in *28 U.S.C. § 1658.  Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 114 (2nd Cir 2013); *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 30th day of December 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

William V. O'Reilly, Esq.
Jeffrey A. McSorley, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Email: woreilly@jonesday.com
Email: jamcsorley@jonesday.com

Thomas Demitrack, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Email: tdemitrack@jonesday.com

    /s/ William L. Downing
Christopher Colt North, Esq., VSB #16955
William L. Downing, Esq., VSB # 17704
Attorneys for Plaintiff
The Consumer & Employee Rights Law Firm, P.C.
751-A Thimble Shoals Boulevard
Newport News, Virginia 23606
Phone: (757) 873-1010
Fax: (757) 873-8375
E-mail: cnorthlaw@aol.com
E-mail: wdowninglaw@aol.com