**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

|  |  |  |
|---|---|---|
| **FRANCIS W. HOOKER, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 4:13-cv-00003** |
| **v.** | ) | **(AWA/LRL)** |
| | ) | |
| **SIRIUS XM RADIO INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF
<u>MOTION TO STRIKE CLASS ALLEGATIONS</u>**

## TABLE OF CONTENTS

**Page**

I.  SIRIUS XM'S MOTION TO STRIKE CLASS ALLEGATIONS IS TIMELY AND RIPE FOR DECISION .................................................................................. 2

II.  SIRIUS XM'S CUSTOMER AGREEMENTS ARE VALID CONTRACTS UPON RECEIPT AND CONTINUED USE OF SIRIUS XM'S SERVICE, CONTRARY TO HOOKER'S NEWLY-CONSTRUCTED ARGUMENT .................... 5

III.  HOOKER'S OPPOSITION UNDERSCORES THE INDIVIDUALIZED ISSUES THAT WILL PREDOMINATE ......................................................................... 9

    A.  The "objective theory" of contract formation does not eliminate the individualized inquiry necessary to adjudicate the claim of each putative class member .......................................................................................... 10

    B.  Hooker's own statements demonstrate the need for individualized inquiry ........ 13

    C.  The *Schnabel* case is irrelevant .............................................................. 14

IV.  HOOKER IS IDENTICALLY SITUATED TO THE *KING* PLAINTIFF, AND HIS EFFORT TO DISTINGUISH THE ARBITRATION CLAUSE IN *KING* IS PREMISED ON DISTINCTIONS WITHOUT A DIFFERENCE AND WOULD LEAD TO ABSURD RESULTS ...................................................................... 16

V.  HOOKER'S CLAIMS RELATE TO "THE SERVICE, THE SITE, OR [HIS] SUBSCRIPTION OR THIS AGREEMENT" .................................................. 17

VI.  SIRIUS XM DID NOT WAIVE ITS RIGHT TO INFORMAL DISPUTE RESOLUTION ........................................................................................ 19

VII.  CONCLUSION .......................................................................................... 20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Doughtie*,
63 Va. Cir. 505 (Va. Cir. Ct. 2003)...................................................................................10

*Bearden v. Honeywell Int'l, Inc.*,
No. 09-cv-01035, 2010 WL 1223936 (M.D. Tenn. Mar. 24, 2010) .........................................3

*Bischoff v. DirecTV, Inc.*,
180 F. Supp. 2d 1097 (C.D. Cal. 2002) ...............................................................................7, 11

*Cargo Carriers, Inc. v. Richmond Steel Co.*,
263 F.2d 919 (4th Cir. 1959) ...............................................................................................9

*Cedars-Sinai Med. Ctr. v. Shewry*,
137 Cal. App. 4th 964 (2006) ...............................................................................................10

*Chang v. First Colonial Sav. Bank*,
410 S.E.2d 928 (Va. 1991)...................................................................................................5, 7

*Corp. v. Behrend*,
133 S. Ct. 1426 (2013)..........................................................................................................4

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ...............................................................................................4

*Hill v. Gateway 2000, Inc.*,
105 F.3d 1147 (7th Cir. 1997) .............................................................................................12

*In re Titanium Dioxide Antitrust Litig.*,
No. 10-cv-00318, 2013 WL 4516472 (D. Md. Aug. 26, 2013)................................................11

*In re Walls*,
262 B.R. 519 (Bankr. E.D. Cal. 2001)..................................................................................3

*In re Yasmin and Yaz (Drospirenone) Mktg.*,
275 F.R.D. 270 (S.D. Ill. 2011) ...........................................................................................4

*King v. Capital One Bank (USA), N.A.*,
11-cv-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012), *reconsideration denied*,
11-cv-00068, 2012 WL 6052053 (W.D. Va. Dec. 5, 2012) ................................................16, 17

*Knutson v. Sirius XM Radio Inc.*,
No. 12-00418, 2012 WL 1965337 (S.D. Cal. May 31, 2012), *appeal docketed*, No.
12-56120 (9th Cir. June 18, 2012) ...............................................................................6, 7, 17

*Local Joint Executive Bd. of Las Vegas v. Riverboat Casino, Inc.*,
817 F.2d 524 (9th Cir. 1987) ...................................................................................................11

*Lozano v. AT&T Wireless*,
216 F. Supp. 2d 1071 (2002), *vacated on other grounds*, No. 02-00090, 2003 WL
25548566 (C.D. Cal. Aug. 18, 2003) .........................................................................................8

*Murphy v. DIRECTV, Inc.*,
No. 07-cv-06465, 2011 WL 3319574 (C.D. Cal. Aug. 2, 2011) ...........................................12

*Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*,
752 F. Supp. 2d 721 (W.D. Va. 2010) ......................................................................................9

*Phillips v. Mazyck*,
643 S.E.2d 172 (Va. 2007)..........................................................................................................9

*Picus v. Wal-Mart Stores, Inc.*,
256 F.R.D. 651 (D. Nev. 2009)...................................................................................................3

*Sanders v. Johnson & Johnson, Inc.*,
No. 03-cv-02663, 2006 WL 1541033 (D.N.J. June 2, 2006)....................................................4

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)........................................................................................14, 15, 16

*Sherr v. Dell, Inc.*,
No. 05-cv-10097, 2006 WL 2109436 (S.D.N.Y. July 27, 2006)...............................................8

*Smith v. Merial Ltd.*,
No. 10-cv-00439, 2012 WL 2020361 (D.N.J. June 5, 2012).....................................................3

*Szabo v. Bridgeport Machs., Inc.*,
249 F.3d 672 (7th Cir. 2001) ......................................................................................................4

*Thompson v. Kings Entm't Co.*,
674 F. Supp. 1194 (E.D. Va. 1987) ...........................................................................................9

*Tietsworth v. Sears*,
720 F. Supp. 2d 1123 (N.D. Cal. 2010) .....................................................................................3

*Williams v. MetroPCS Wireless, Inc.*,
No. 09-cv-22890, 2010 WL 1645099 (S.D. Fla. Apr. 21, 2010).............................................8

*Wright v. Family Dollar,*
    No. 10-cv-04410, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010) ..............................................3

**OTHER AUTHORITIES**

1-3 *Corbin on Contracts* § 3.19 (2013) ........................................................8

1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:4 (9th ed. 2012) .............................3

Fed. R. Civ. P. 23 .....................................................................3, 4, 10, 11

**REPLY MEMORANDUM IN SUPPORT OF
MOTION TO STRIKE CLASS ALLEGATIONS**

Plaintiff, Francis W. Hooker, Jr. ("Hooker"), in previously opposing the Motion to Compel Arbitration filed by Sirius XM Inc. ("Sirius XM"), denied that he actually received the Welcome Kit containing the contract between Sirius XM and its subscribers because, he said, he moved his residence around the time the contract was mailed to him and did not recall receiving it. Based on Hooker's factual assertions, this Court found receipt to be a disputed issue of fact, but noted that "[i]f it can be established that Mr. Hooker received the Customer Agreement that was mailed to him, this case may yet be arbitrated." *See* Order at 6-7 (Dkt. No. 28) ("MTC Order"). This highly individualized issue—whether Hooker actually received the Customer Agreement—illustrates why it is impossible for him to represent a class since it will be necessary to determine, as a matter of fact, class member-by-class member, at a series of individual trials or via individual motion, who in the proposed class actually did receive it.

Hooker now tries to duck this individualized inquiry by arguing a theory that he never raised in opposing Sirius XM's arbitration motion: that the way in which Sirius XM offered its Customer Agreement is insufficient as a matter of law to support the formation of a contract at all. Hooker thus says he does not need to address the key factual issue—whether subscribers received the Customer Agreement—upon which Hooker himself relied in opposing arbitration of his own individual claim. Hooker's effort to invalidate *every* contract between Sirius XM and its subscribers as a matter of law fails for two primary reasons.

First, Sirius XM's Customer Agreement explicitly instructs each subscriber who receives the Agreement to cancel Sirius XM's service if the subscriber does not accept the Agreement's terms. Courts routinely enforce such "approve or return" contracts,  and *no* case cited by Hooker finds that silence or inaction in response to such a clause is insufficient to bind a party. Beyond

-1-

that, this is not a case of mere acceptance by silence:  every putative class member continued to enjoy Sirius XM's service after receiving a copy of Sirius XM's Customer Agreement, which explained the terms of that service, and every putative class member had an opportunity to reject those terms by cancelling the service.

Second, Hooker cites *no* case that invalidates contracts on a classwide basis as a matter of law.  To the contrary, Hooker's cited cases highlight the individualized nature of the factual inquiry that will be required in the case of each subscriber (and putative class member) to determine whether that specific subscriber received and is therefore bound by the Customer Agreement.  Hooker's "objective theory of contract formation" does not provide a shortcut—it still requires the Court to evaluate, over and over, the existence of a contract based on the surrounding circumstances involving each putative class member.

No further discovery will inform the issue raised in Sirius XM's motion, and indeed Hooker himself agreed at the Court's scheduling conference that the parties would benefit from a prompt resolution of Sirius XM's motion.  For the reasons stated in Sirius XM's opening brief and this reply, the motion to strike the class allegations should be granted.  Doing so now will simplify this case and likely lead to a prompt resolution of Hooker's individual claim.

## I.    Sirius XM's Motion To Strike Class Allegations Is Timely and Ripe For Decision

Hooker argues that Sirius XM's Motion is procedurally improper even though he agreed to the procedure at the Case Management Conference held on November 6, 2013.  There, Hooker and Sirius XM jointly requested an early briefing schedule on this very motion, even agreeing to briefing dates.  The Court subsequently entered the requested dates in its Rule 16(b) Scheduling Order.  *See* Dkt. No. 33 ¶ 11 (11/15/13) ("[T]he Parties have requested a briefing schedule to resolve an anticipated Motion to Strike Class Allegations.").  Hooker has therefore waived any

objection to the schedule to which he agreed and which reflected the parties' joint acknowledgement that they would benefit from an early judicial resolution of this issue.

The Court's schedule is consistent with the way that courts regularly address motions to strike class allegations. *See, e.g.*, *Smith v. Merial Ltd.*, No. 10-cv-00439, 2012 WL 2020361, at *6 (D.N.J. June 5, 2012) (explaining that such motions are effectively preemptive motions for denial of class certification and that they are properly before the court); *Bearden v. Honeywell Int'l, Inc.*, No. 09-cv-01035, 2010 WL 1223936, at *9, *11 (M.D. Tenn. Mar. 24, 2010) (granting motion to strike; stating that the court has the authority to strike class allegations under Rule 23(c)(1)(A), Rule 23(d)(1)(D), and Rule 12(f)); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1146 (N.D. Cal. 2010) (same); *see also* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:4 (9th ed. 2012) ("Rule 23(d)(1)(D) of the Federal Rules of Civil Procedure expressly authorizes a motion to strike class allegations . . . ."). In ruling on motions to strike class allegations, courts follow Rule 23(c)(1)(A)'s command to determine whether to certify a class "[a]t an early practicable time." Such early rulings promote efficiency because it is a "waste of the parties' resources and judicial resources to conduct discovery on class certification" if it is facially apparent that a class cannot be certified. *In re Walls*, 262 B.R. 519, 523 (Bankr. E.D. Cal. 2001); *accord Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 655 (D. Nev. 2009).

Hooker also urges a Rule 12(b)(6) standard of review, *see* Plaintiff's Response Memorandum In Opposition To Defendant's Motion to Strike Class Allegations at 4-6 (Dkt. No. 39) ("Opp. Motion to Strike"), but such a standard is not appropriate. Courts necessarily must evaluate how the facts will impact the Rule 23 analysis in considering a motion to strike class allegations. *See Wright v. Family Dollar*, No. 10-cv-04410, 2010 WL 4962838, at *2 (N.D. Ill. Nov. 30, 2010) (granting motion to strike class allegations and stating that "[i]n determining whether class certification is appropriate, a district court does not presume that all well-pleaded

-3-

allegations are true and can look beneath the surface of a complaint to conduct the inquiries Rule 23 requires"); *In re Yasmin and Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270, 275, 279 (S.D. Ill. 2011) (granting motion to strike class allegations because individual issues predominated over common issues, and noting that "[a]ssessing the predominance factor requires consideration of the substantive elements of a plaintiff's claims and the proof necessary to establish those elements"); *Sanders v. Johnson & Johnson, Inc.*, No. 03-cv-02663, 2006 WL 1541033, at *2, *11 (D.N.J. June 2, 2006) (citations omitted) (granting motion to strike class allegations and denying cross-motion for partial certification and stating that the court may need to go beyond the pleadings before deciding the certification question).

This is because Rule 23 requires a court to test the allegations of the complaint and not simply accept the pleadings. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)) (stating that it may be necessary for courts to "probe behind the pleadings before coming to rest on the certification question" and that such analysis will frequently overlap with the merits of the underlying claim); *see also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 615) (explaining that an alternative rule would mean that "every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a 'close look' at relevant matters"); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it . . . . Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23.").

In short, the issue in evaluating a motion to strike class allegations is whether it can be shown, even prior to the close of discovery and based on the actual facts, that a class member-by-class member inquiry will be required.  *See* Memorandum in Support of Motion to Strike Class Allegations at 18-20 (Dkt. No. 35) ("Motion to Strike Class Allegations").  This is such a case, as Sirius XM explained in its opening brief, especially since Hooker concedes the existence of the factual dispute that leads to the individualized inquiry.  In the remainder of this reply, Sirius XM addresses each of Hooker's efforts to avoid a dismissal of his class allegations.

**II.     Sirius XM's Customer Agreements Are Valid Contracts Upon Receipt And Continued Use Of Sirius XM's Service, Contrary To Hooker's Newly-Constructed Argument**

Critically, Hooker chose *not* to challenge the validity of the Customer Agreement when he opposed Sirius XM's demand for arbitration of Hooker's individual claim.  He instead urged that it could not factually be shown in the absence of a trial that he actually received the Welcome Kit.  That argument is fatal to any class claim, as Sirius XM explained in its opening brief.  Now, however, Hooker argues that it would not matter whether he (or any other class member) actually received the Welcome Kit containing the Customer Agreement because there was no offer and acceptance.  He has waived that argument by not previously raising it, but in any event he is wrong.  The Virginia Supreme Court has stated that "[t]he offerer has a right to prescribe in his offer any conditions as to time, place, quantity, mode of acceptance, or other matters . . . and the acceptance to conclude the agreement must in every respect meet and correspond with the offer . . . ."  *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 931 (Va. 1991) (citing *Gibney & Co. v. Arlington Brewery Co.*, 70 S.E. 485, 487 (Va. 1911)).  "Approve or return" contracts such as Sirius XM's Customer Agreement meet that standard, and they are common and well-accepted as binding agreements in the consumer context.  *See* Memorandum in Support of Motion to Compel Arbitration at 9-11 ("Motion to Compel Arbitration") (Dkt. No.

12).  Specifically, Sirius XM "offered" the Customer Agreement to its subscribers, who "accepted" it by continuing to use Sirius XM's services once they received it.

In a case raising identical legal and factual issues to this one, a federal district court recently dismissed a class action against Sirius XM in favor of individualized arbitration after finding valid and enforceable the same arbitration provision that is at issue here.  *See Knutson v. Sirius XM Radio Inc.*, No. 12-00418, 2012 WL 1965337 (S.D. Cal. May 31, 2012), *appeal docketed*, No. 12-56120 (9th Cir. June 18, 2012).  In *Knutson*, the plaintiff (a Sirius XM subscriber like Hooker) brought the same claims as Hooker and sought to represent a nationwide class—just like Hooker.  *Id.* at *1-2.  Sirius XM moved to compel arbitration and the plaintiff argued that Sirius XM's Customer Agreement was not enforceable because the plaintiff received it in the mail after the service was activated.  Rejecting the argument, the court there held that the practical realities in providing a product or service to large numbers of consumers made it acceptable for terms and conditions to follow initial transactions.  *Id.* at *3-4.  The court found that it would be impractical for a large service provider such as Sirius XM in today's economy to address the terms of its service specifically with each consumer prior to activating or providing that service.  *Id.*[1]

Here, as in *Knutson*, the first sentence of the letter in the Welcome Kit sent to Hooker clearly states that he had been given a "3-month *trial subscription* to the XM Select package." *See* Opp. Motion to Strike, Exh. 3 at 2 (Dkt. No. 39-3) (emphasis added).  That Welcome Kit contained a Customer Agreement that stated in the opening paragraph of the first page that it

---

[1] The court also found that the "Resolving Disputes" section of the Customer Agreement was conspicuously placed and contained numerous consumer-friendly provisions (including the commitment to reimburse a subscriber's administrative filing fee if the subscriber is successful in arbitration).  *Id.* at *3, *7-8.  Those same provisions exist here.

applied to any "paid, *trial* or other subscription."  *Id*. at 11; Opp. Motion to Strike, Exh. 7 at 1

(Dkt. No. 39-7) (emphasis added).  The Agreement could not be any clearer on the first page:

> "BY ACCESSING OR USING THE SITE OR THE SERVICE,
> YOU AGREE TO BE LEGALLY BOUND BY THIS
> AGREEMENT . . . IF YOU DO NOT ACCEPT THESE TERMS,
> PLEASE NOTIFY US IMMEDIATELY AND WE WILL
> CANCEL YOUR SUBSCRIPTION."

*Id*.  It then reiterated several pages later that "you may cancel your Subscription at any time by

notifying Listener Care."  Opp. Motion to Strike, Exh. 3 at 14; Opp. Motion to Strike, Exh. 7 at

12.

Faced with a similar provision, the court in *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d

1097, 1101 (C.D. Cal. 2002), compelled arbitration even though (as here) the customer

agreement was not mailed until after the services began.  (The clause stated as follows:  "If you

do not accept these terms, please notify us immediately and we will cancel your service."  *Id.*).

The court held that the agreement was binding upon receipt of services, even though the contract

followed in the mail, holding that "[p]ractical business realities make it unrealistic to expect

DirecTV, or any television programming service provider for that matter, to negotiate all of the

terms of their customer contracts, including arbitration provisions, with each customer before

initiating service."  *Id.* at 1105; *see also Knutson,* 2012 WL 1965337, at *4 ("[I]t would be

impractical for Defendant, a large service provider, to negotiate the terms of its Customer

Agreement with each consumer prior to activating the service.").

Hooker tries to avoid the basic contract principles summarized in *Chang* and applied in

cases such as *Knutson* and *Bischoff*, but his cited cases do not support his argument and

specifically do not undermine the "approve or return" cases.[2]  Contrary to the position that Hooker urges from inapplicable cases, silence or inaction *can* bind a party:  "The offeree's conduct, coupled with the silence may be such as to make the silence operative."  Joseph M. Perillo, 1-3 *Corbin on Contracts* § 3.19 (2013) (Matthew Bender).  Here, further, there is more than acceptance by silence—Hooker continued to retain and enjoy Sirius XM's service after being sent a written contract that explained what to do if he did not agree with the terms of the service.  Hooker argues that he did not receive the contract, but his argument demonstrates precisely the individualized inquiry that makes it impossible for him to represent a class.  Many other putative class members did receive the Welcome Kit containing the Customer Agreement (as Sirius XM will show as a factual matter) and continued to enjoy Sirius XM's service after receiving the Agreement, and they can be identified only by individualized inquiry.

None of Hooker's cases are shrinkwrap cases.  Nor do they involve a scenario in which a supplier provided its customer with a service along with explicit terms and conditions describing the way for that customer party to cancel the service if the customer did not accept the terms of the relationship.  They instead stand for the unremarkable position that contracts require assent,

---

[2] *See also Lozano v. AT&T Wireless*, 216 F. Supp. 2d 1071, 1073-75 (2002), *vacated on other grounds*, No. 02-00090, 2003 WL 25548566 (C.D. Cal. Aug. 18, 2003) (compelling arbitration where a customer agreement stating that a customer "could only (1) cancel the contract immediately if the terms and conditions were not agreeable; or (2) cancel the contract within 30 days of activation" was given to the customer after the initial transaction); *Sherr v. Dell, Inc.*, No. 05-cv-10097, 2006 WL 2109436, at *1 (S.D.N.Y. July 27, 2006) (enforcing Dell customer agreement that informed consumers that acceptance of product's delivery served as acceptance of the binding terms and conditions of Dell's agreement, and that the customer could reject the terms and conditions by either refusing delivery or returning the product in accordance with Dell's return policy); *Williams v. MetroPCS Wireless, Inc.*, No. 09-cv-22890, 2010 WL 1645099, at *2, *6 (S.D. Fla. Apr. 21, 2010) (enforcing a provision that provided "BY USING METROPCS's WIRELESS SYSTEM OR ANY OTHER SERVICE, YOU ARE INDICATING YOUR INTENT TO BE BOUND BY THE TERMS AND CONDITIONS OF SERVICE OF THIS AGREEMENT").

which is exactly what the "approve or return" cases say. Hooker cites *Phillips v. Mazyck*, 643 S.E.2d 172, 177 (Va. 2007), but there the court held that silence was not acceptance when a party was told to, but did not, sign the document and send it to opposing counsel in order to form the agreement. Hooker's other cases regarding acceptance by silence are similarly distinguishable. *See Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 723-25 (W.D. Va. 2010) (finding that no new unilateral contract was formed after Cardiology Associates provided its notice of intent to terminate an existing contract and sent a letter demanding that equipment be removed or it would charge a $2000 "space rental fee" and Odyssey Imaging failed to comply with the demands in the letter and took action inconsistent with acceptance by sending a letter referring to Cardiology Associates' actions as a breach of contract); *Cargo Carriers, Inc. v. Richmond Steel Co.*, 263 F.2d 919, 924 (4th Cir. 1959) (finding that "one who defaults in the performance of his contractual obligations may not impose his own arbitrary conditions upon the pursuit by the promisee of his remedies"); *Thompson v. Kings Entm't Co.*, 674 F. Supp. 1194, 1198-99 (E.D. Va. 1987) (holding that continued employment after receiving an employee handbook making employment at will rather than for cause was ambiguous when the handbook provided no notice that employee was required to affirmatively reject handbook terms if he did not agree).

Unlike Hooker's cases, the present issue is not one of unilateral contract modification, the supplying of additional terms after default, or even mere silence without more. Sirius XM provided a service, and mailed a Welcome Kit with a Customer Agreement that contained a contractual provision that required the recipient of that service to take action to avoid a contract.

## III. Hooker's Opposition Underscores The Individualized Issues That Will Predominate

Resolving whether a contract was formed between Sirius XM and Hooker (under Hooker's previously litigated theory or the one that he now presents even though it has been

waived) does nothing to resolve whether contracts were formed between Sirius XM and each of the putative class members that Hooker wants to represent.  Either way, individualized issues abound and they require the granting of Sirius XM's motion to strike the class allegations.[3]

### A.     The "objective theory" of contract formation does not eliminate the individualized inquiry necessary to adjudicate the claim of each putative class member

Hooker contends that Virginia's objective theory of contract formation makes it unnecessary to conduct an individualized inquiry into whether Sirius XM entered into a contract with each class member that received the Customer Agreement and continued to use Sirius XM's service.  This is incorrect.  Hooker's claimed theory would still require an objective evaluation, *under the circumstances pertaining to each individual class member*, whether a contract was formed with that class member.  The consumer-by-consumer inquiry cannot be avoided.

The objective theory of contract formation simply means that, in determining whether a person entered into a contract, a court will look to the conduct of *that person* and the surrounding circumstances related to *that person*.  "[A]n offer has been made if a reasonable person in the offeree's position, in view of the offeror's acts and words *and the surrounding circumstances*, would believe that the offeror has invited the offeree's acceptance." *Adams v. Doughtie*, 63 Va. Cir. 505, 520 (Va. Cir. Ct. 2003) (emphasis added).  The theory is not unique to Virginia and it does not undercut the "approve or return" cases previously discussed.  *Compare Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006) (stating that California recognizes the

---

[3] These individualized issues mean that Hooker cannot  satisfy Rule 23(b)(3), which requires both that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *See* Motion to Strike Class Allegations at 11-12.

objective theory of contracts), *with Bischoff*, 180 F. Supp. 2d at 1104-06 (finding a valid and enforceable arbitration agreement under California law based upon approve or return contract).

Nor does the objective theory of contract formation turn Rule 23 into a one-size-fits-all approach: Rule 23 still requires a fact-based inquiry into whether individualized issues will swamp common ones and, in so doing, the Rule focuses the inquiry on the facts relevant to each of the proposed class members. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-00318, 2013 WL 4516472, at *17-18 (D. Md. Aug. 26, 2013) (finding that individual issues of law and fact predominated and therefore precluded class certification, and noting that "[t]he likely difficulties in managing individual questions of contract formation and interpretation are especially pertinent to this finding. For each class member who challenges the applicability of one or more of the contractual provisions at issue, this Court could be forced to conduct extensive analysis regarding choice of law, and contract formation and interpretation, for each contract"). The objective theory of contract formation, far from providing Hooker a way to avoid Rule 23, underscores the necessity of conducting a case-by-case evaluation of the "surrounding circumstances" between the offeror (Sirius XM) and each offeree (i.e., each of the class members), including a class member-specific inquiry into whether that class member had actual or inquiry notice of the Customer Agreement.

As Hooker acknowledges, a contract may be formed when "the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer." Opp. Motion to Strike at 18; *Local Joint Executive Bd. of Las Vegas v. Riverboat Casino, Inc.*, 817 F.2d 524, 527 (9th Cir. 1987) ("Acceptance by silence is an integral part of the objective theory of contracts."). Hooker may try to quibble in a particular case that a class member did not "intend[] to accept the offer" by remaining silent, but resolution of that issue is part of the individualized, case-by-case inquiry

-11-

that makes this case unsuitable for class treatment.  And that inquiry will take place in the context of Sirius XM's Customer Agreement, which clearly and conspicuously states as follows: "BY ACCESSING OR USING THE SITE OR THE SERVICE, YOU AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT . . . IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION."   Opp. Motion to Strike, Exh. 3 at 11; Opp. Motion to Strike, Exh. 7 at 1.

Thus, while a class member who received the Customer Agreement may claim not to have read this clause, that member may still be bound if the "surrounding circumstances" reasonably show assent.  *See, e.g.*, *Murphy v. DIRECTV, Inc.*, No. 07-cv-06465, 2011 WL 3319574, at *2 (C.D. Cal. Aug. 2, 2011) (granting motion to compel arbitration when plaintiffs did not cancel their service after receiving the Customer Agreement containing arbitration provision and holding that Plaintiffs "were bound by the contract, even if they did not read it"). *See also Hill v. Gateway 2000, Inc*., 105 F.3d 1147, 1149 (7th Cir. 1997) ("Competent adults are bound by such documents, read or unread.").[4]  The objective theory of contract formation still makes it necessary to evaluate the circumstances "surrounding" each consumer, including but not limited to Sirius XM's delivery of the Welcome Kit to each consumer, whether the consumer received the Welcome Kit, whether a consumer who did not nonetheless read the insert in the consumer's glove box, and whether the consumer continued to accept the benefits of Sirius XM's satellite radio service.

---

[4] Hooker's unsupported assertion that putative class members "were under no duty to read" the enclosed contract, Opp. Motion to Strike at 11-12, is thus not the law and directly contrary to the objective theory of contract formation upon which he relies.

**B.      Hooker's own statements demonstrate the need for individualized inquiry**

The individualized inquiry that will be required for the fact finder to determine whether Hooker's claim should be resolved in arbitration will need to happen more than once: specifically, it will need to be repeated for each putative class member.  Hooker has "unequivocally den[ied]" receipt of the Welcome Kit containing the Customer Agreement from Sirius XM, and he therefore argues that he is not bound by the Customer Agreement.  Plaintiff's Response Memorandum in Opposition to Motion to Compel Arbitration (Dkt. No. 15) ("MTC Opp. Brief") at 4; *see also* Declaration of Francis W. Hooker, Jr. ¶¶ 4-7 (Dkt. No. 15-2) ("F. Hooker Dec."); Declaration of Alexandra R. Hooker ¶¶ 4-7 (Dkt. No. 15-3) ("A. Hooker Dec."). He has also stated that he or his wife "could have discarded the Welcome Kit as junk mail." MTC Opp. Brief at 12.  To bolster his position, Hooker further stated that neither he nor his wife visited Sirius XM's website for activation or any other purpose.  F. Hooker Dec. ¶ 9; A. Hooker Dec. ¶ 9.  And, to resolve the contractual issue just for himself, Hooker has twice demanded a jury trial.  Demand for Jury Trial on Arbitration Issues of Fact (Dkt. No. 14); Second Demand for Jury Trial on Arbitration Issues of Fact (Dkt. No. 38).  Hooker then concedes that other putative class members may have quite different facts:  "some Class Members may have opened the Welcome Kit envelope," "some of those may have even noticed the proposed customer agreement," and some class members "could reasonably understand that [the] customer agreement was applicable only to those persons who extended the satellite radio programming beyond the complimentary period." Opp. Motion to Strike at 11, 15.

These are all highly individualized facts, and there likely are others as well.  Hooker has cited many variables relevant to contract formation that will need to be evaluated by a factfinder in determining whether, in the case of a specific subscriber (and therefore a putative class member) an arbitrable agreement exists.  It does not matter whether, in evaluating the

-13-

"surrounding circumstances" for a specific subscriber a factfinder would evaluate these factors under an objective or "reasonable man" standard—the factfinder still has to evaluate them on a case-by-case basis and the focus is always on the circumstances relevant to each subscriber. And, for each class member that is subject to the Customer Agreement, the individualized issues do not end since each such class member is bound to engage in informal dispute resolution, which is also inherently individualized. *See* Motion to Strike Class Allegations at 16-17.

### C.   The *Schnabel* case is irrelevant

Hooker relies heavily on *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012), in support of his argument that he still would not have been bound by the Sirius XM contract even if he had received the Welcome Kit. Opp. Motion to Strike at 10-12. Far from supporting Hooker, *Schnabel* demonstrates precisely the type of individualized analysis that would have to be applied here. [5] In *Schnabel*, two plaintiffs claimed that, in the course of buying certain products online, they were fraudulently induced into enrolling into an online discount program offered by the defendant in exchange for a monthly fee that the defendant, unbeknownst to them, billed to their credit card. 697 F.3d at 113-17. The defendant unsuccessfully moved to compel arbitration, based on an email it sent to the plaintiffs after they enrolled in the discount programs

---

[5] The court's holding in *Schnabel* was simply that the two plaintiffs who denied actual notice of the terms and conditions were not on inquiry notice and thus could not be compelled to arbitrate their individual claims. The court did not reach a judgment as to whether other putative class members who may have been on either actual or inquiry notice could be compelled to arbitrate. Nor was the court confronted with the issue of whether individualized inquiries into contract formation would make class certification improper.

containing the membership's terms and conditions including an arbitration clause. *Id*. at 120-21, 130.[6]

*Schnabel* stands for the unremarkable proposition that a party is not bound by a contract when 1) she had no actual notice of its terms, and 2) the circumstances surrounding the offer of the contract and the alleged acceptance of its terms are insufficient to put her on "inquiry notice" that her conduct will be viewed as assent. *Schnabel* thus shows that whether any putative class member here received the Customer Agreement and therefore had either actual or inquiry notice requires individualized inquiry.

As to actual notice, each of the two plaintiffs in *Schnabel* (like Hooker here) denied having seen the arbitration provision at issue, and the court held that "[the defendant] cannot point to any evidence in the record upon which a jury could rely to conclude otherwise." *Schnabel*, 697 F.3d at 120. That is an individualized factual finding that applies only to the two plaintiffs, who claimed they were seeking only to purchase products online and not sign up for an online discount program. Here, by contrast, the putative class members knowingly received Sirius XM's service and the key factual issue for any particular subscriber is whether the subscriber received the Customer Agreement.

---

[6] The facts in *Schnabel* are therefore different than the facts here, where Sirius XM provided the Customer Agreement (the offer) and subscribers accepted the offer by continuing to use Sirius XM's services after they received it.

Nor is *Schnabel* even a case ruling on class issues, but a ruling involving two plaintiffs who (like Hooker) denied receipt of the relevant terms and conditions containing the arbitration clause and were not otherwise on inquiry notice. *Schnabel* nonetheless underscores the individualized issues that would exist in the case of putative class members who were on either actual or inquiry notice and therefore could be compelled to arbitrate.

Inquiry notice also must be determined on an individual basis. *Schnabel*, 697 F.3d at 120 ("inquiry notice is actual notice of *circumstances* sufficient to put a prudent man on notice") (emphasis added). As the court there explained, "inquiry notice . . . depends on various factors including, but not limited to, the conspicuousness of the term, the course of dealing between the parties, and industry practices" and that "the touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them." *Id*. at 124. This is the individualized, case by case analysis that is required by the objective contract formation analysis. *See supra* Section III.A.

**IV.    Hooker is Identically Situated to the *King* Plaintiff, and His Effort to Distinguish the Arbitration Clause in *King* is Premised on Distinctions Without a Difference and Would Lead to Absurd Results**

This case mirrors *King v. Capital One Bank (USA), N.A.*, 11-cv-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012), *reconsideration denied*, 11-cv-00068, 2012 WL 6052053 (W.D. Va. Dec. 5, 2012). Both Hooker and the plaintiff in *King* denied receiving the written agreement that contained an arbitration provision, and both pursued litigation attempting to represent parties who did receive the written agreement. *See id.* at *14. Neither are adequate class representatives for the reasons explained by the *King* court. Hooker tries to distinguish *King* by describing Hooker's circumstances as "not unique," but that is belied by his argument in opposing the motion to compel arbitration of his individual claim that he, personally, "unequivocally den[ied]" receiving the Customer Agreement, which differentiates him from the countless putative class members who did. Opp. Motion to Strike at 22; MTC Opp. Brief at 4; *see also* F. Hooker Dec. ¶¶ 4-7; A. Hooker Dec. ¶¶ 4-7. Hooker further ignores *King*'s recognition of the individualized inquiry required in evaluating contract formation in the case of individual class members. 2012 WL 5570624, at *14 (stating that the court would have to

evaluate each individual case to decide whether each class member was bound by the arbitration clause).

Hooker also tries to distinguish his case by arguing that the arbitration clause in *King* is different than the arbitration clause here, which provides for arbitration "upon election by either party." *See* Opp. Motion to Strike at 22-25. The argument makes no sense. If anything, the election provision makes resolving claims even more individualized than the mandatory arbitration clause in *King* because whether Sirius XM or the individual subscriber would elect arbitration has to be determined on a case by case basis. By contrast, Hooker's interpretation of the "election" requirement would produce absurd results. Neither the contract nor common sense allows Sirius XM to "elect" arbitration against customers who have not made a claim. Under Hooker's theory, Sirius XM senselessly would have to pay filing fees and commence arbitration proceedings against a large number of subscribers when Sirius XM denies that it did anything wrong and there is no indication that more than a trivial number of Sirius XM's subscribers ever objected to receiving a few phone calls. Sirius XM's conduct, in fact, makes perfect sense—Sirius XM has elected arbitration in an unequivocal fashion in the case of the few subscribers (including Hooker) who have objected to phone calls and who have filed lawsuits. *See Knutson*, 2012 WL 1965337; *Rodal v. Sirius XM Radio Inc.*, No. 13-cv-61770 (S.D. Fla.).

## V.    Hooker's Claims Relate To "the service, the Site, or [his] subscription or this Agreement"

In an effort to avoid the forum selection clauses in certain Sirius contracts from 2009 that do not contain arbitration clauses, as well as the informal resolution provisions in all Sirius, XM

and Sirius XM contracts,[7] Hooker argues that the provisions do not apply because Hooker's claims do not relate to Sirius XM's service, its website, the terms of its agreement or any subscription of Hooker or any of the putative class members.  This, too, makes no sense—all of the conduct at issue in this case relates to Hooker's trial subscription and Sirius XM's satellite radio service.  Indeed, Sirius XM called Hooker to see if he wanted to extend his trial subscription into a paid subscription.  *See* Defendant Sirius XM's Objections and Responses to Plaintiff's Second Set of Requests for Admission ¶¶ 111; 117; 123 (attached hereto as Exhibit A); *see also* Complaint ¶ 26 (Dkt. No. 1) ("Defendant urged Plaintiff to extend his complimentary subscription into a paid continuing subscription.").  It is disingenuous, on the facts relevant to Hooker (let alone the facts relating to other Sirius XM subscribers), to claim that calls seeking to extend a trial subscription into a paid subscription and thereby extend access to Sirius XM's service and programming do not relate to "the service, the Site, [the] subscription or this Agreement."[8]

---

[7] Persons who received satellite radio service (as well as the Customer Agreements accompanying the provision of that service) during the putative class period (between January 4, 2009 and the filing of the Complaint) were subject to different contracts since Sirius and XM merged to become Sirius XM in August 2008 and did not standardize the Sirius and XM customer agreements until 2011.  During this period, all of the Sirius, XM and Sirius XM customer agreements contained an arbitration clause, with the exception of some agreements with some persons who started their Sirius services at the beginning of the class period in 2009.  *See* Motion to Strike Class Allegations at 9.

[8] In a last ditch effort to save some remnants of a class, Hooker argues that he can represent the trial subscribers from 2009 who received Sirius Customer Agreement that did not contain arbitration clauses and that he is willing to consider a transfer of the case to New York to comply with the Agreement's forum selection clause.  That would not help Hooker, because 1) the same individualized inquiry into contract formation discussed above will be necessary for those subscribers because any subscriber with such a contract is still required to engage in informal dispute resolution prior to filing suit, and 2) informal dispute resolution is inherently individualized.  *See* Motion to Strike Class Allegations at 16-17.

**VI.    Sirius XM Did Not Waive Its Right To Informal Dispute Resolution**

Hooker alleges that Sirius XM waived its right to informal dispute resolution "by filing its Motion to Compel Arbitration, without mention of and thereby by-passing the informal dispute resolution procedure." Opp. Motion to Strike at 26. This is wrong. Sirius XM explicitly asserted its right to informal arbitration in three different places in its Motion to Compel Arbitration. Motion to Compel Arbitration at 5 ("Sirius XM respectfully requests an order staying Plaintiff's claim and compelling compliance with the parties' agreement, including informal resolution efforts and, if those are unsuccessful, arbitration of Plaintiff's individual claims."); *id.* at 6 (describing the mechanics of the informal dispute resolution provision); *id.* at 13 (asking the Court to compel Hooker to seek informal dispute resolution). Sirius XM also asserted its right to informal resolution in subsequent pleadings. *See* Reply to Motion to Compel Arbitration at 13; Opposition to Plaintiff's Motion for Leave to File Surreply at 6 (Dkt. No. 24); Motion to Strike Class Allegations at 16-17.

Hooker disregarded the informal dispute resolution provision and chose instead to file suit. Sirius XM in the course of defending itself has acted in a manner consistent with enforcing the informal and formal dispute resolution provisions. As explained in Sirius XM's opening brief, Hooker cannot adequately represent persons who received Sirius XM's Customer Agreement and who are contractually required to engage in an informal dispute resolution process. *See* Motion to Strike Class Allegations at 16-17. Lastly, as a practical matter, the Court should reject Hooker's request to stay the case and allow him to engage in some sort of wide-scale informal resolution because doing so would be fruitless. The parties have no way of knowing which, if any, putative class members believe they have claims for purposes of informal resolution absent individualized inquiry, and, regardless, Hooker does not have any authority to act on their behalf.

-19-

## VII.    CONCLUSION

For the reasons set forth above, Defendant Sirius XM respectfully requests this Court to strike the class allegations from Hooker's Complaint.

Dated: January 17, 2014                    Respectfully submitted,


/s/ William V. O'Reilly_____
William V. O'Reilly (VA Bar. No.  26249)
Jeffrey A. McSorley (Va Bar. No. 68437)
Attorneys for Defendant Sirius XM Radio Inc.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: woreilly@jonesday.com
Email: jamcsorley@jonesday.com


Thomas Demitrack (admitted pro hac vice)
Attorney for Defendant Sirius XM Radio Inc.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

-20-

**CERTIFICATE OF SERVICE**

I certify that on January 17, 2014, a copy of the foregoing was filed electronically with

the Clerk of Court using the ECF system which will send notification to the following ECF

participants:

Christopher Colt North, Esq.
William L. Downing, Esq.
Attorneys for Plaintiff
THE CONSUMER & EMPLOYEE
RIGHTS LAW FIRM, P.C.
751-A Thimble Shoals Blvd.
Newport News, VA 23606
Tel: (757) 873-1010
Fax: (757) 873-8375
Email: cnorthlaw@aol.com
Email: wdowninglaw@aol.com

 

 

/s/ Jeffrey A. McSorley_____
William V. O'Reilly (VA Bar. No.  26249)
Jeffrey A. McSorley (VA Bar. No. 68437)
Attorneys for Defendant Sirius XM Radio Inc.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: woreilly@jonesday.com
Email: jamcsorley@jonesday.com