UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

FILED

JUN - 5 2014

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

FRANCIS W. HOOKER, JR., *for
himself and on behalf of all
similarly situated individuals,*
      Plaintiff,

    v.

SIRIUS XM RADIO, INC.,
      Defendant.

Civil Action No. 4:13cv3

ORDER

Plaintiff Francis W. Hooker, Jr. brought this suit on January 4, 2013, contending that certain telemarketing calls made to him by Defendant Sirius XM Radio, Inc. ("Sirius XM") violated the Telephone Consumer Protection Act (47 U.S.C. § 227). The Complaint indicates that this case is intended to be a class action on behalf of Mr. Hooker and all others who were subjected to Sirius XM's alleged illegal marketing techniques.

On March 18, 2013, Sirius XM moved to compel arbitration of this case. This motion relied on an arbitration provision in a Customer Agreement that Sirius XM purportedly mailed to Mr. Hooker in connection with a trial subscription to Sirius XM's services. Mr. Hooker denied having received the Customer Agreement. Mr. Hooker also argued that the Customer Agreement was part of Sirius XM's offer of a paid subscription, and that his failure to cancel a trial subscription did not constitute acceptance of the Customer Agreement.

Because Mr. Hooker's receipt of the Customer Agreement was not established, the Court denied the motion to compel arbitration, and did not consider the effects that receipt of that agreement might have had. *See* Order 7, Aug. 14, 2013, ECF No. 28 (stating that a finding that Mr. Hooker received the Customer Agreement "may" result in arbitration).

1

On December 16, 2013, Sirius XM filed a Motion to Strike Class Allegations. ECF No. 34. Sirius XM argues that this case cannot be brought as a class action because it depends on the individual question of whether Mr. Hooker received the Customer Agreement.

On January 20, 2014, Mr. Hooker moved to strike Sirius XM's reply brief on this motion, arguing that that brief was untimely. ECF No. 41. The following day, Mr. Hooker moved to withdraw his motion to strike, stating that he had miscalculated the deadline for reply briefs and that Sirius XM's brief was timely. ECF No. 43. Mr. Hooker's Motion to Withdraw Motion to Strike Reply (ECF No. 43) is **GRANTED**, and Mr. Hooker's Motion to Strike Reply (ECF No. 41) is **WITHDRAWN**.

On February 19, 2014, the parties filed a joint motion asking the Court to stay the case pending its decision on the Motion to Strike Class Allegations. The Court granted this motion. One week later, the parties filed a Joint Motion for Extension of Time asking that the Scheduling Order filed pursuant to Federal Rule of Civil Procedure 16(b) be amended to extend certain deadlines. ECF No. 47. Because granting the Joint Motion to Stay struck the dates in the existing Scheduling Order, and directed the parties to determine a new schedule after the Motion to Strike Class Allegations was resolved, the parties' Joint Motion for Extension of Time (ECF No. 47) is **DISMISSED AS MOOT**.

Sirius XM filed a Motion for Leave to File Notice of Supplemental Authority, which was granted on April 17, 2014. Mr. Hooker filed a Motion for Leave to respond to Sirius XM's notice, which was granted on May 7, 2014. The Court has considered both of the underlying filings.

For the reasons that follow, Sirius XM's Motion to Strike Class Allegations (ECF No. 34) is **DENIED**. The parties are ordered to file a joint proposed trial schedule within thirty days of the date of this Order.

## I. FACTUAL BACKGROUND

In August 2011, Mr. Hooker and his wife purchased a car. The car purchase included ninety days of complementary satellite radio services provided by Sirius XM. The satellite radio subscription was activated by the car dealership.

Sirius XM mails Welcome Kits to trial subscribers. Ruhland Decl. para. 6, ECF No. 13. Each Welcome Kit contains a letter reading as follows:

> Dear [customer name],
>
> **Welcome to SiriusXM!** Your new [vehicle make] is equipped with many exciting features—including a 3-month trial subscription to the XM Select package. This service is already activated and it's yours to enjoy.
>
> Now you have access to over 170 channels of great entertainment, including: [list of channels]
>
> Use the enclosed brochure to find your favorite channels and preset them on your radio for quicker access. (Check your vehicle owner's manual for instructions.)
>
> **Get Program Alerts and Newsletters**
> Keep in touch with the latest SiriusXM information including new channels, live performances, special events, sports schedules and more. Just click on "Sign Up for Our Free E-Newsletter" at **siriusxm.com/GetMostofTrial.**
>
> To continue enjoying SiriusXM once your trial is over, simply complete and return the enclosed renewal form in the postage-paid envelope provided. You can also renew online at **siriusxm.com/extendnow** or call **1-800-248-4114**. After your trial ends, the XM Select package is only $12.95* a month—or less if you take an annual or longer plan.
>
> Sincerely,
> [signature]
> Joe Zarella
> Chief Service Officer
> SiriusXM Radio

> P.S. For your convenience, you can renew now and you will not be charged until
> the end of your trial. Just send the enclosed renewal form before your trial ends
> to avoid an interruption in your SiriusXM service.*

Welcome Kit 2, ECF No. 39-3. The footnote in this letter read as follows: "*Complete payment

terms, restrictions and other details on reverse. Prices shown are for the XM Select package of

audio channels and do not include the XM Premier package, NavTraffic, NavWeather or

SiriusXM Travel Link." *Id.*

> The Welcome Kit contains a renewal form, which includes the following statement:

> By providing my payment information below or enclosing a check, I authorize my
> payment for the offer I have selected and **agree to automatic renewal and
> billing** for the Plan I have chosen. I agree to the SiriusXM **Customer
> Agreement** (available at siriusxm.com) and certify that I am at least 18 years of
> age.

*Id.* at 4. Additionally, the section labeled "Payment Terms" includes the following term: "It is

important that you read our Customer Agreement; see www.siriusxm.com, because renewal of

your service means that you have agreed to its terms." *Id.*

> Welcome Kits also contain a copy of the Customer Agreement, which provides terms and

conditions related to Sirius's services. Language near the beginning of the Customer Agreement

reads as follows:

> PLEASE READ THE TERMS OF THIS AGREEMENT CAREFULLY
> BEFORE ACCESSING OR USING THE [SIRIUS WEB]SITE OR THE
> SERVICE. BY ACCESSING OR USING THE SITE OR THE SERVICE, YOU
> AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT. PLEASE DO
> NOT USE THE SITE OR THE SERVICE IF YOU DO NOT AGREE WITH
> THIS AGREEMENT.

> IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US
> IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION. IF YOU
> DO NOT CANCEL YOUR SUBSCRIPTION WITHIN 3 BUSINESS DAYS OF
> ACTIVATION OF YOUR RECEIVER, IT WILL MEAN THAT YOU AGREE
> TO THIS AGREEMENT WHICH WILL BE LEGALLY BINDING ON YOU.

Customer Agreement 1, ECF No. 39-3 at 11.

The Customer Agreement contains the following arbitration clause:

### I. RESOLVING DISPUTES:

PLEASE READ THIS PROVISION OF THIS SECTION CAREFULLY. IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. BY AGREEING TO ARBITRATION, YOU ARE HEREBY WAIVING THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR A JURY. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE (BY THEIR ACCEPTANCE OF THIS AGREEMENT, IN ACCESSING OR USING THE SERVICE OR THE SITE) TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

In order to expedite and control the cost of disputes, you agree that any legal or equitable claim relating to the Service, the Site, or your Subscription or this Agreement (a "**Claim**"), will be resolved as follows:

. . .

**6. Class Actions and Severability:** If either party elects to resolve a claim by arbitration, that Claim shall be arbitrated on an individual basis. There shall be no right or authority for any [C]laims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other subscribers, or other persons similarly situated. No Claim submitted to arbitration is heard by a jury or may be brought as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim submitted to arbitration ("**Class Action Waiver**"). . . .

*Id.* at 9–10, ECF No. 39-3 at 11. Some previous versions of the Customer Agreement did not require arbitration, but required that cases be brought in New York City, New York and that customers provide notice to Sirius XM prior to filing suit. Fitzgerald Decl. para. 7, ECF No. 36.

Sirius XM believes that a Welcome Kit was mailed to the Hookers between September 9 and September 16, 2011. Ruhland Decl. para. 10, ECF No. 13. It is disputed whether the Hookers received this Welcome Kit.

Sometime in mid-September 2011, Sirius XM allegedly began to make illegal telemarketing calls to Mr. Hooker's cellular telephone. These calls are the subject of this suit.

## II. STANDARD OF LAW

### A. CLASS ALLEGATIONS

A class representative "must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974). A court may certify a class action only when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) (2013). "This does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2251 (2011). Instead, "[t]heir claims must depend upon a common contention." *Id.* "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (omission in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (internal quotation marks omitted).

If a class action fails to meet this standard, a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons." Fed. R. Civ. P. 23(d)(1)(D). There is disagreement regarding whether a court must deny a request for class certification under Rule 23(c)(1) before striking class allegations under Rule 23(d)(1)(D). *Compare, e.g., Korman v. Walking Co.*, 503 F. Supp. 2d 755, 762 (E.D. Pa. 2007) (holding that an order under Rule 23(d)(1)(D) can be issued only "*after* the court has determined, under Rule

23(c)(1), that maintenance of a class action is inappropriate") *and* 7B Charles A. Wright, et al., *Federal Practice & Procedure* § 1795 (3d ed. 2005) ("Subdivision (d)(4) is procedurally inseparable from subdivision (c)(1)(A) . . . ."), *with, e.g., King v. Capital One Bank (USA), N.A.*, No. 3:11–cv–00068, 2012 WL 5570624, at *14 (W.D. Va. 2012) (analyzing a motion to strike under Rule 23(d)(1)(D) under the same standard as a motion to certify under Rule 23(c)(1)) *and In re Yasmin & Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270, 274 (S.D. Ill. 2011) (considering such a motion where "it is obvious from the pleadings that no class action can be maintained").

The United States Court of Appeals for the Fourth Circuit has affirmed the granting of a motion to strike class allegations under Rule 23(d)(1)(D) where no Rule 23(c)(1) motion had been filed. *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 109–110, 116 (4th Cir. 2013). In that case, the district court granted a motion to dismiss under Rules 12(c), 12(f), and 23(d)(1)(D) because the complaint failed to allege commonality as a matter of law. *Id.* at 109–110. The court also denied leave to amend. *Id.* at 109–110. The Fourth Circuit affirmed the dismissal of the original complaint, but reversed the denial of leave to amend and remanded the case with instructions to consider whether "the proposed amended complaint satisfies the class certification requirements of Federal Rule of Civil Procedure 23." *Id.* at 116, 119. Therefore, under *Scott*, a court may strike a plaintiff's class allegations under Rule 23(d)(1)(D) before deciding a motion to certify under Rule 23(c)(1).

B. CONTRACT FORMATION

"Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002). Under Virginia law, a contract is formed when (1) one party to the contract makes an offer; and

(2) the other party accepts that offer. *See, e.g.*, *Va. Farm Bureau Mut. Ins. Co. v. Hodges*, 385 S.E.2d 612, 613 (Va. 1989).

In determining whether a party has made or accepted an offer, the law looks not to the party's unspoken intent but "to the reasonable meaning of his words and acts." *Lucy v. Zehmer*, 84 S.E.2d 516, 521 (Va. 1954) (quoting *First Nat'l Bank v. Roanoke Oil Co.*, 192 S.E. 764, 770 (Va. 1937)) (internal quotation marks omitted). A party has offered or accepted a contract when that party's "words and acts, judged by a reasonable standard, manifest an intention to agree." *Id.* at 522.

### III. ANALYSIS

Sirius XM identifies three groups of potential Plaintiffs: (1) customers who, like Mr. Hooker, claim to have not received the Customer Agreement; (2) customers who received the current version of the Customer Agreement and are purportedly bound to arbitrate their claims; and (3) customers who received a previous version of the Customer Agreement and are purportedly bound by its forum selection and notice provisions. Sirius XM argues that the Court cannot hear claims by the latter two groups, and that that the first group's claims are too individualized to be suitable for class litigation. *See King*, 2012 WL 5570624, at *14 (striking the plaintiff's class allegations where the parties had a similar dispute regarding an arbitration agreement).

Mr. Hooker responds that it is possible that the Customer Agreement is not binding on potential Plaintiffs who received it, and that even if it is binding, Mr. Hooker is qualified to represent potential Plaintiffs who received the version of the Customer Agreement that did not contain an arbitration clause. Mr. Hooker also attempts to distinguish *King* because in this case,

unlike in *King*, the Customer Agreement's arbitration clause is optional, and operates only if one party demands arbitration.

In its Reply brief, Sirius XM argues that Mr. Hooker waived his objections to the Customer Agreement because he did not raise them in his response to Sirius XM's Motion to Compel Arbitration. Contrary to this assertion, Mr. Hooker's response to the Motion to Compel argued that the Customer Agreement was not binding on trial users (although it did not include all of the specific arguments that Mr. Hooker now raises). Resp. Mot. Compel Arbitration 10–12, ECF No. 15. The Court did not reach this issue.

A party does not waive a legal argument by failing to raise it at the earliest possible opportunity. *Scott*, 733 F.3d at 118 (holding that a party may adopt a legal position that is the opposite of the position it took earlier in the litigation). Mr. Hooker's argument that the Customer Agreement is inapplicable to trial subscriptions is raised properly.

Whether each customer received the Welcome Kit is an individualized inquiry. However, the Welcome Kit indicates that the Customer Agreement applies only to paid subscriptions. The only portions of the Welcome Kit that refer to the Customer Agreement indicate that a customer will be bound by the agreement only upon purchase of a paid subscription. Welcome Kit 4, ECF No. 39-3 (indicating that renewal of the subscription implies acceptance of the Customer Agreement); *cf.* Order 6–7, Aug. 14, 2013, ECF No. 28 (finding that a brochure included in the Hookers' car made a similar offer). The reasonable meaning of these documents is that the Welcome Kit contains an offer to the customer that the customer purchase a paid subscription subject to the terms of the Customer Agreement. These documents do not constitute an offer that includes a requirement that existing trial subscriptions become subjected

9

to the terms of the Customer Agreement, as Sirius XM suggests. Therefore, trial customers are not bound by the Customer Agreement.

Sirius XM relies on the broad language of the Customer Agreement, which purportedly implies that all consumers who use Sirius XM's services are bound by the Customer Agreement. Because the Welcome Kit indicates that the Customer Agreement was offered only in connection with paid subscriptions, trial subscribers had no reason to read the Customer Agreement if they did not intend to purchase a paid subscription. Therefore, to the extent to which the Customer Agreement contains language implying that it applies to trial subscriptions, reasonably prudent trial subscribers lacked notice of this language. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d. Cir. 2012) (holding that under California and Connecticut law, which apply the same objective standard employed in Virginia, if "the purported assent is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue").

Sirius XM's interpretation of the Customer Agreement is inconsistent. The Customer Agreement states that the Agreement will be deemed accepted unless the offeree unsubscribes from Sirius XM's services within three days of the receiver being activated. Customer Agreement 1, ECF No. 39-3 at 11. However, plausible evidence indicates that trial subscribers were sent copies of the Customer Agreement several weeks after their receivers were activated. *See* Ruhland Decl. paras. 7, 10, ECF No. 13 (indicating that in the ordinary course of business, Mr. Hooker would have been sent a Welcome Kit in seventeen to twenty-four days after his receiver was activated). To the extent to which the Customer Agreement is construed as applying to trial subscribers, the offer of the Customer Agreement had to be rejected several

weeks before it was received. This contradictory interpretation cannot overcome the Welcome Kit's statements that the Customer Agreement was offered in connection with paid subscriptions.

Under an objective interpretation, the Welcome Kit did not offer the Customer Agreement to trial subscribers. Sirius XM's Motion to Strike Class Allegations (ECF No. 34) is **DENIED**.

## IV. CONCLUSION

Sirius XM's materials implied that its Customer Agreement was offered only in connection with paid subscriptions. Although the Customer Agreement contained broader language, the application of this provision to trial subscriptions would result in inconsistencies. Trial subscribers were given no reason to read the Customer Agreement if they were uninterested in purchasing paid subscriptions.

Sirius XM's Motion to Strike Class Allegations (ECF No. 34) is **DENIED**.

Mr. Hooker's Motion to Strike Reply (ECF No. 41) is **WITHDRAWN**.

Mr. Hooker's Motion to Withdraw Motion to Strike Reply (ECF No. 43) is **GRANTED**.

The parties' Joint Motion for Extension (ECF No. 47) is **DISMISSED AS MOOT**.

The parties are **ORDERED** to confer and file a joint proposed trial schedule in this matter, providing proposed deadlines for further dispositive motions, pretrial filings, the pretrial conference, and trial. This joint proposed trial schedule shall be filed within thirty days of the date of this Order. The Court will review this submission and issue a Final Scheduling Order.

**IT IS SO ORDERED.**

Arenda L. Wright Allen
United States District Judge

June 5th, 2014
Norfolk, Virginia