## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

**FRANCIS W. HOOKER, JR.,**
**for himself and on behalf of all**
**similarly situated individuals,**

     **Plaintiff,**

                                  **Case No.: 4:13-cv-00003 (AWA/LRL)**

**v.**

**SIRIUS XM RADIO INC.**

     **Defendant.**

---

### MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

---

Plaintiff Francis W. Hooker submits this Memorandum in Support of his Motion for Preliminary Approval of Class Action Settlement. The Settlement Agreement,[1] reached after full discovery in an arm's-length, contentious negotiation before an experienced mediator, represents an excellent result for the Class and easily falls within the range of possible approval. The Court should therefore grant preliminary approval, direct that notice be sent to the Class, and establish a schedule for Final Approval proceedings.

## I. INTRODUCTION

Plaintiff Francis W. Hooker moves for approval of a nationwide settlement reached with Defendant Sirius XM Radio Inc. ("Sirius XM"). This settlement will resolve the pending case, as well as litigation between Sirius XM and Plaintiffs Erik Knutson, Yefim Elikman, and Anthony Parker (together with Mr. Hooker, the "Class Representatives") in the related cases *Knutson v.*

---

[1] (*See* Class Action Settlement Agreement ("Settlement Agreement"), attached as Exhibit 1 to the Declaration of Michael A. Caddell ("Caddell Decl."), attached as Exhibit A.)

*Sirius XM Radio Inc.*, No. 12-cv-0418-AJB-DHB (S.D. Cal.) ("*Knutson*"); *Elikman v. Sirius XM Radio Inc.*, No. 15-cv-02093 (N.D. Ill.) ("*Elikman*"); and *Parker v. Sirius XM Radio Inc.*, No. 15-cv-01710-JSM-EAJ (M.D. Fla.) ("*Parker*") (together with this case, the "Litigation"). The Class Representatives allege that Sirius XM called them and the Settlement Class members on their cellular phones using an automatic telephone dialing system ("autodialer" or "ATDS") without prior express consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). Mr. Hooker also alleges other TCPA violations, including that Sirius XM called him after 9:00 p.m., in violation of the FCC's curfew regulations, and that Sirius XM continued calling him after he asked them to stop. (Dkt. 1 ¶¶ 25–59.)

This settlement represents an excellent result for the Class. Every Settlement Class member, without any requirement to even file a claim, will be entitled to three (3) months of free access to Sirius XM's Select service, valued at $47.97, plus applicable sales taxes, at the retail price. (Ex. A, Caddell Decl. ¶ 35.) Sirius XM's service is highly popular with consumers, as shown by the fact that approximately 40% of those who purchased or leased new vehicles equipped with Sirius XM satellite radios chose to become paying subscribers. (*Id.*) In the alternative, Class members have the option of submitting a claim for a pro rata share of a $35 million common fund, after deductions for cost of notice, claims administration, and Court-awarded attorneys' fees and costs. (Ex. 1 to Ex. A, Settlement Agreement § 3.a.) Based on the size of the fund, the number of Class members, and Class Counsel's experience with claims rates in similar settlements, the expected per-class-member cash award is estimated to be in the range of $5–15, although the actual amount is dependent on a number of factors and may be higher or lower than that range. (Ex. A, Caddell Decl. ¶ 36.)

The Settlement Agreement was reached after good-faith, contentious, arm's-length negotiations, which included multiple face-to-face meetings, over a number of days, and required the assistance of an experienced and well-respected private mediator, Randall W. Wulff. The cash common fund alone is within the range of other class settlements that have been approved in TCPA

cases of similar size, and the alternative in-kind consideration makes the total value of this settlement truly extraordinary. (*Id.*) The Court should therefore grant preliminary approval.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Allegations

The Class Representatives and the Settlement Class members all received Sirius XM programing in connection with their purchase or lease of a new or used vehicle equipped with a Sirius XM satellite radio. (Dkt. 1 ¶¶ 23–24.) These radios look similar to an ordinary car radio, but are specially designed to connect to Sirius XM's satellite radio service. Plaintiff alleges that Sirius XM used certain telemarketing vendors to contact the Settlement Class members to see whether they wanted to purchase Sirius XM service following the expiration of their promotional subscription period. (*Id.* ¶¶ 25–26.) Plaintiff also alleges that Sirius XM used an autodialer to place these calls to him and the Settlement Class members on their cellular phones without consent, in violation of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii). (*Id.* ¶ 41.) Mr. Hooker also alleges that Sirius XM placed calls to him after 9:00 p.m. local time, in violation of the FCC's curfew regulations and that Sirius XM continued calling him after he asked them to stop. (*Id.* ¶¶ 25–59.) The TCPA provides for injunctive relief, statutory damages of $500 per violation, and treble damages of $1,500 for willful or knowing violations. 47 U.S.C. § 227(b)(3).

### B. The Litigation

Mr. Hooker filed this case in January 2013. (Dkt. 1.) Sirius XM moved to compel arbitration based on a clause contained in a Customer Agreement, which Sirius XM contended it had mailed to Plaintiff as part of a "Welcome Kit." (Dkt. 12 at 1–4.) Mr. Hooker opposed arbitration, denying that he received the Customer Agreement and denying that he had an arbitration agreement with Sirius XM. (Dkt. 15 at 5–8.) Mr. Hooker also argued that even if Sirius XM did send him a Customer Agreement, simply taking no action, i.e., merely not cancelling his 90-day trial subscription, did not constitute acceptance of the Customer Agreement. (*Id.* at 10–13.) The Court

denied Sirius XM's motion, holding that there was an issue of fact as to whether Mr. Hooker received the Customer Agreement. (Dkt. 28 at 6.) The Court further held that, even if Mr. Hooker had received the Customer Agreement, nothing in the Customer Agreement showed that it applied to promotional subscribers. (*Id.* at 6–7.)

Sirius XM then moved to strike Mr. Hooker's class allegations, arguing, among other things, that Mr. Hooker could not represent Class members who received Sirius XM's Customer Agreement, because Sirius XM contended that non-common issues would exist regarding whether such Class members were bound to arbitrate. (Dkt. 35 at 10, 12.) Plaintiff responded that receipt of Sirius XM's Welcome Kit would not constitute a contractual offer because neither he nor the Class members had any obligation to read it and, further, that silence or inaction cannot constitute acceptance of a contractual offer. (Dkt. 39 at 9, 12–16.) The Court denied the Motion to Strike, concluding that "trial customers [such as Plaintiff] are not bound by the Customer Agreement." (Dkt. 56 at 8–9.)

Meanwhile, Mr. Knutson was pursuing his case, which was filed on February 15, 2012, in the Southern District of California. *Knutson* alleged TCPA violations against Sirius XM similar to those alleged by Mr. Hooker, also on behalf of a putative class of similarly situated persons. On May 20, 2012, the district court granted Sirius XM's motion to compel Mr. Knutson to arbitration. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 562 (9th Cir. 2014). The Ninth Circuit reversed on November 10, 2014, holding that Mr. Knutson "could not assent to Sirius XM's arbitration provision because he did not know that he was entering into a contract with Sirius XM." *Id.* at 569. The Ninth Circuit therefore remanded *Knutson* to the district court. *Id.* at 570.

While Mr. Knutson's case was in the Court of Appeals, Mr. Hooker was diligently pursuing discovery in this case, taking or defending 14 depositions, including taking corporate representative depositions of Sirius XM and 5 of its telemarketing vendors. (Ex. A, Caddell Decl. ¶ 31.) Mr. Hooker's counsel also served over 100 Requests for Production, two sets of Requests for Admission, and 11 Interrogatories on Sirius XM, as well as 5 third-party subpoenas on the telemarketing vendors, and reviewed almost 100,000 pages of documents produced in response to

these requests. (*Id.*) Sirius XM also deposed Mr. Hooker and his wife and served 23 Requests for Production and 16 Interrogatories on Mr. Hooker, to which Mr. Hooker responded. (*Id.*) In addition, both Mr. Hooker and Sirius XM filed expert reports, including supplemental and rebuttal reports, and deposed each other's expert witnesses regarding whether the dialing systems used by Sirius XM's telemarketing vendors constituted ATDSs as defined by the TCPA. (*Id.*) Discovery closed on April 17, 2016.

On March 10, 2015, *Elikman* was filed in the Northern District of Illinois, also alleging class claims against Sirius XM for violation of the TCPA. (Declaration of Myles McGuire, attached as Ex. E ("McGuire Decl.") ¶ 3.) The last case, *Parker*, was filed in the Middle District of Florida on July 22, 2015, again making similar TCPA claims against Sirius XM on behalf of a putative class. (*Id.* ¶ 4.) On April 10, 2015, Mr. Knutson and Mr. Elikman, as well as the plaintiff in *Trenz v. Sirius XM Radio Inc.*[2] (another TCPA case against Sirius XM that has since been dismissed), filed a Motion to Transfer with the Judicial Panel of Multidistrict Litigation ("JPML"), seeking to create an *In re Sirius XM TCPA Litigation* multidistrict litigation ("MDL") proceeding. Proceedings in this case were stayed pending the JPML's decision. (Dkt. 123.) While this case was stayed, the Federal Communications Commission ("FCC") issued a declaratory order setting forth the FCC's interpretation of what constitutes an autodialer under the TCPA. *In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, No. CG02-278, 2015 WL 4387780 (July 10, 2015) (the "2015 TCPA Order"). Sirius XM has appealed the 2015 TCPA Order to the D.C. Circuit Court of Appeals, arguing that the FCC's interpretation of "ATDS" goes beyond the statutory meaning. *See* Petition for Review, *ACA Int'l v. Fed. Commc'ns Comm'n*, No. 15-1211 (D.C. Cir.).

The JPML denied the Motion to Transfer on August 7, 2016, and, pursuant to an agreement among plaintiffs' counsel in the various cases, Mr. Knutson's counsel filed his motion to appear *pro hac vice* in this case on September 1, 2015. (Dkt. 131.) Sirius XM asked this Court to

---

[2] No. 3:15-cv-0044-AJB-DHB (S.D. Cal.).

stay further proceedings pending its appeal of the 2015 TCPA Order, but the Court declined to do so. (Dkt. 136.) After obtaining leave, Mr. Hooker filed his motion for class certification on September 29, 2016, and that motion has been fully briefed. (Dkt. 164.) On the day of the Class Certification filing, Sirius XM made a Rule 68 Offer of Judgment to Mr. Hooker, offering to settle his claims in exchange for $10,521. (Dkt. 149 at 3.) Mr. Hooker declined that offer, and Sirius XM then filed a 12(b)(1) Motion to Dismiss Mr. Hooker's claim as moot in light of the Offer of Judgment, which is also fully briefed. (Dkt. 148.)

### C. Settlement Negotiations

The settlement was reached after good-faith, contentious, arm's-length negotiations. (Ex. A, Caddell Decl. ¶ 33.) All settlement discussions took place under the direction of Randall W. Wulff, an experienced and well-respected private mediator, who has mediated a number of large class-action cases, and who was selected, after a nationwide search for several months, to lead the panel that heard and decided the property damage claims for the World Trade Center arising from the tragedy on September 11. (*Id.*) The parties exchanged detailed pre-mediation briefs. (*Id.*) They also made extensive presentations setting forth their positions at the mediation, which extended over two days at Mr. Wulff's offices in Oakland, California. (*Id.*) At the conclusion of the mediation, the parties signed a Memorandum of Understanding agreeing to settle the litigation. (*Id.*) The parties worked over the next few months to finalize the terms of the Settlement Agreement, assemble the list of Settlement Class members for notice, and engage a Settlement Administrator. (*Id.*) The final Settlement Agreement was executed on July 29, 2016. Ex. 1 to Ex. A, Settlement Agreement at 44–45.

### D. Terms of the Proposed Settlement

#### 1. Class Definition

The Settlement Class includes Sirius XM-radio equipped vehicle purchasers who received calls on their cell phones from Sirius XM but never became paying subscribers and is defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States) who (a) received programming on a promotional basis from Sirius XM in connection with the purchase or lease of a new or used vehicle that ended no later than April 5, 2016; (b) were the recipients of one or more telephone calls made by or on behalf of Sirius XM to their wireless, cell or mobile phone numbers after February 15, 2008 and before July 5, 2016; and (c) never were or became paying subscribers prior to July 5, 2016.  Excluded from the class definition are any employees, officers, or directors of Sirius XM, and any attorneys appearing in this case, and any judge assigned to hear this case as well as their immediate family and staff.

(Ex. 1 to Ex. A, Settlement Agreement § 2.)

### 2.  Consideration to the Settlement Class

#### a.  Monetary Relief

The Settlement Agreement requires Sirius XM to fund a non-reversionary cash Settlement Fund of $35 million, from which cash to Settlement Class members, notice, administrative costs, service awards, attorney's fees, costs, and other expenses shall be paid. (Ex. 1 to Ex. A, Settlement Agreement § 3.a.) Based on the size of the fund, the number of Class members, and Class Counsel's experience with claims rates in similar settlements, the expected per-class-member cash award is estimated to be in the range of $5–15, although the actual amount is dependent on a number of factors and may be higher or lower than that range. (Ex. A, Caddell Decl. ¶ 36.)

#### b.  In-kind Relief

For all Class Members who do not chose to make a cash claim, and who are not currently active subscribers,[3] Sirius XM will provide three (3) months of free access to Sirius XM's "Select" service, which includes over 140 channels, including commercial-free music, live professional sports games, talk shows, and comedy ("Free Service"). (Ex. 1 to Ex. A, Settlement Agreement § 3.b.) Sirius XM radio is a popular service that consumers value highly. As reported in Sirius XM's Annual Report, from 2013–2015, approximately 40% of the persons who purchased or leased new

---

[3] Class members who have a currently active paid subscription with Sirius XM associated with their satellite radios do not qualify for the Free Service, but are eligible to receive a cash award. (Ex. 1 to Ex. A, Settlement Agreement § 6.e.)

vehicles equipped with Sirius XM satellite radios chose to become paying subscribers. (Ex. A, Caddell Decl. ¶ 35.) Many Class members are expected to enjoy and benefit from the Free Service. This Free Service will not carry any obligation to continue service with Sirius XM beyond the three months of free access and will not affect a Settlement Class member's eligibility for any other service offer. (Ex. 1 to Ex. A, Settlement Agreement § 6.e.)

To activate the Free Service on their satellite radios, following the Effective Date, Settlement Class members need only provide their contact information and their Vehicle Identification Number ("VIN") and/or the electronic serial numbers of their Sirius XM radios (which identification numbers Sirius XM requires, for technical reasons, in order to activate the service on each Settlement Class member's satellite radio unit). (Ex. 1 to Ex. A, Settlement Agreement § 6.e.) Settlement Class members will not be asked to provide any payment information to Sirius XM, and the Free Service will simply stop at the end of the three-month period, with no continuing obligation on the part of the Class members. (*Id.*)

### c. The Claims Process

All costs of notice and administration will be paid from the Settlement Fund. (Ex. 1 to Ex. A, Settlement Agreement § 9.e.) The parties have agreed that Epiq Systems ("Epiq") will serve as Settlement Administrator, subject to Court approval. (Ex. A, Caddell Decl. ¶ 34.) Epiq was selected by a thorough competitive bidding process, in which Class Counsel solicited and compared bids from five settlement administrators. (*Id.*) Epic has extensive experience administering large class action settlements and suggested procedures to enhance Class member participation and provided the lowest bid among those that met all parties' requirements. (*Id.*)

Within 30 days of preliminary approval, the Settlement Administrator will send individual notice of the proposed settlement to the Settlement Class members by post or electronic mail. (Ex. 1 to Ex. A, Settlement Agreement § 10.) Settlement Class members who wish to receive a pro rata share of the Settlement Fund must visit www.siriusxmtcpasettlement.com (the "Settlement Website") to elect this option at least 24 days before the Final Approval Hearing. (Ex. 1 to Ex. A,

Settlement Agreement § 6.f.) Following Final Approval and the expiration of any time for appeals (or resolution of any appeals), the settlement will become final (the "Effective Date"). The Settlement Administrator will make an initial distribution from the Settlement Fund to each Class member who elected to receive cash within 90 days of the Effective Date. (Ex. 1 to Ex. A, Settlement Agreement § 19.a.i.) Any checks not cashed within 75 days of the initial mailing will revert to the Settlement Fund. (Ex. 1 to Ex. A, Settlement Agreement § 19.a.iii.) So long as the cost of doing so would not result in distribution to the Settlement Class members of a *de minimis* amount, the Settlement Administrator will then make a second pro rata distribution to all Settlement Class members who cashed their checks from the initial distribution. (*Id.*) If money remains in the Settlement Fund after the distribution of all Court-approved amounts and the second distribution to the Settlement Class members, those funds will be distributed to one or more nonprofit organizations mutually agreed upon by the parties, and approved by the Court, as a *cy pres* award for purposes consistent with the objectives of the Litigation and interests of Settlement Class members. (*Id.* § 19.c.)

Within 10 days of the Effective Date, the Settlement Administrator will contact all Settlement Class members who did not elect to receive cash consideration by email or post mail with instructions for activating the Free Service. (Settlement Agreement § 6.e.) In order to activate the Free Service, Settlement Class members need only provide their contact information and the VIN and/or electronic service number identifying their satellite radio. (*Id.*) The Free Service "shall not carry any obligation to continue service with Sirius XM beyond the three (3) months of free access." (*Id.*)

### 3. Injunctive Relief

Sirius XM has also agreed to changes designed to separate the dialing systems that their telemarketing vendors use to call cell phones from the predictive dialing systems that Plaintiff and Plaintiff's expert witness contend are ATDSs under the TCPA. (Dkt. 141 at 9–10.) Sirius XM will enter into agreements, or amend existing agreements, with its telemarketing vendors to require

them to use manual telephone dialing systems that use human intervention to initiate calls to cell phones. (Ex. 1 to Ex. A, Settlement Agreement § 4.a.) These systems will be separate and distinct from any automatic dialing systems, including any predictive dialing systems, used by those vendors to call landline phones. (*Id.*)

While Sirius XM contends that it was always TCPA compliant, the practice changes agreed to will bring all of Sirius XM's telemarketing practices into line with the "Servicom model," i.e., the system that one of Sirius XM's telemarketing vendors, Servicom, adopted from October 2013 going forward in order to bring its cell phone dialing operations into TCPA compliance. (Dkt. 141 at 7 n.5.) After thorough discovery—including review of documents produced in response to Plaintiff's subpoena and a deposition of Servicom's corporate representative—Mr. Hooker's expert witness, Jeffrey Hansen, opined that the Servicom model complies with TCPA requirements to call cell phones. (Ex. 13 to Dkt. 141 at 19–21.)[4]

### 4. Release

Settlement Class members who do not opt out will provide a release tailored to the facts at issue in this case. Specifically, they will release claims that were asserted or that could have been asserted in the Litigation, including TCPA claims for curfew violations or violations of "do not call" regulations, as well as any claims under the TCPA or similar laws alleging the use of an ATDS or autodialer to make telephone calls to cell phones. (Ex. 1 to Ex. A, Settlement Agreement § 5.) This release is appropriately limited to claims arising out of the factual predicate of the Litigation. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015) ("In class action settlements, parties may

---

[4] In the event that Sirius XM prevails in its appeal of the 2015 TCPA Order to the D.C. Circuit Court of Appeals, or that the TCPA's definition of "ATDS" is otherwise changed by legislative action or administrative regulation, the parties have asked this Court to retain jurisdiction to resolve any disagreement regarding what modifications to these agreed practice changes may be appropriate. (Ex. 1 to Ex. A, Settlement Agreement § 4.c.) Sirius XM has agreed to give Class Counsel notice of any proposed modification to the practice changes at least thirty (30) days before implementation up to January 2021, so that Class Counsel may approach the Court if there is disagreement regarding whether the changes are authorized. (*Id.*)

release not only the very claims raised in their cases, but also claims arising out of the 'identical factual predicate.'")

### 5. Attorney's Fees, Expenses, and Service Awards

Before the Final Approval Hearing, Class Counsel will also apply to the Court for an award of attorney's fees and costs, not to exceed 30% of the total value of the Settlement. (Ex. 1 to Ex. A, Settlement Agreement § 17.a.) The Class Representatives will ask the Court to award them service awards for the time and effort they have personally invested in securing this relief for the Settlement Class. (Ex. 1 to Ex. A, Settlement Agreement § 17.d.) In the case of Mr. Hooker, who will request an award of $10,000, this time and effort includes producing documents in response to Sirius XM's requests, having his and his wife's depositions taken, and declining a $10,521 offer of judgment from Sirius XM, which he turned down in favor of continuing to pursue relief on behalf of the entire Settlement Class. (Declaration of Francis W. Hooker, Jr. ("Hooker Decl."), attached as Ex. G, ¶ 6; *see* Dkts. 149, 167-1.) Messrs. Knutson, Elikman, and Parker, who also have worked diligently with their counsel to pursue relief on behalf of the Settlement Class, will each request $2,500 for their service. (Ex. 1 to Ex. A, Settlement Agreement § 17.d; *see* Declarations of Eric Knutson, Yefim Elikman, and Anthony Parker, attached as Exs. H–J.)

### III. ARGUMENT AND AUTHORITIES

#### A. The Court should grant preliminary approval of the settlement.

Rule 23(e) of the Federal Rules of Civil Procedure governs settlements of class action lawsuits. It provides that a "class may be settled, voluntarily dismissed, or compromised only with the court's approval." FED. R. CIV. P. 23(e); *see In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991) (noting Rule 23(e) provides that "a class action shall not be dismissed without the approval of the court"). "The voluntary resolution of litigation through settlement is strongly favored by the courts" and is "particularly appropriate" in class actions. *South Carolina Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990); *see also Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 08-cv-1310, 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009) (noting judicial policy favoring

the resolution of litigation through settlement, particularly in class actions and other complex litigation).[5]

Courts considering a proposed settlement under Rule 23 typically engage in a three-step process. First, the Court determines whether the proposed settlement merits preliminary approval and, if it does, preliminarily certifies a settlement class. Second, the Court directs that notice be distributed to the settlement class, providing class members with the opportunity to opt out of or object to the settlement. Third, the Court evaluates whether final approval of the settlement is warranted and, if so, grants final approval. *See* Manual for Complex Litigation § 21.632 (4th ed. 2012) ("MCL 4th"); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622 (1997).

The preliminary approval process is merely the Court's initial assessment of the proposed settlement, the purpose of which is to determine (1) whether the proposed settlement is within the range of reasonableness; (2) whether it is worthwhile to provide notice to the class of the terms of the settlement; and (3) whether to schedule a formal fairness hearing. 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.25 (4th ed. 2002). The question at the preliminary approval stage is thus whether the settlement appears to be within the range of possible approval and was "[t]he result of good-faith bargaining at arm's length, without collusion." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159; *see also Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975); *Horton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994).[6]

---

[5] *See also In re Lupron Mktg. and Sales Practices Litig.,* 228 F.R.D. 75, 88 (D. Mass. 2005) (holding that "the law favors class action settlements"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 740 (S.D.N.Y. 1985) ("There is little doubt that the law favors settlements, particularly of class action suits.") (citations omitted).

[6] The court's final approval follows input from class members, additional submissions by the parties, and completion of a fairness hearing. Neither notice to class members nor a hearing is required for preliminary approval, which may be granted after an application by the parties. MCL

In making its preliminary approval decision, a court may consider a number of factors, which include: whether the settlement has no obvious deficiencies and otherwise falls within the range of possible approval; whether it unreasonably grants preferential treatment to the plaintiffs or segments of the class; and whether it appears to be the product of serious, informed and non-collusive negotiations. MCL 4th § 21.631. If the settlement survives scrutiny under these criteria, the Court should direct that notice of a formal fairness hearing be given to class members, at which time arguments and evidence may be presented in support of and (to the extent there are any objectors) in opposition to the settlement. *Id.* §§ 21.632, 21.633.

Settlements are the preferred method of resolving legal disputes because they reflect the collective judgment of the litigants, who are in the best position to evaluate the strengths and weaknesses of their legal positions. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2nd Cir. 1982). Courts recognize that the opinion of experienced counsel supporting the settlement is entitled to considerable weight. *See, e.g., Reed v. GMC*, 703 F.2d 170, 175 (5th Cir. 1983) ("In reviewing proposed class settlements, a trial judge is dependent upon a match of adversary talent because he cannot obtain the ultimate answers without trying the case."). Courts also take into account whether the settlement was reached with the assistance of a respected and experienced mediator. *See In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000) ("Most significantly, the settlements were reached only after arduous settlement discussions conducted in a good faith, non-collusive manner, over a lengthy period of time, and with the assistance of a highly experienced neutral mediator[.]").

---

4th § 21.632. "Ordinarily, counsel should confer with the judge to develop an appropriate review process.… Counsel should submit the settlement documents and a draft order setting a hearing date, and prescribing the notice to be given to class members, and fixing the procedure for presenting objections. Counsel may also be asked for statements about the status of discovery, the identity of those involved in settlement discussions, the arrangements and understandings about attorneys' fees, and the reasons why the settlement is believed to be in the best interest of the class. Counsel should be prepared to disclose and explain any incentive awards or other benefits to be received by the class representatives." *Id.*

At this preliminary stage of the proceedings, the Court is not required to undertake an in-depth consideration of the factors for final approval. Instead, the "judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the [....] proposed settlement, and date of the final fairness hearing." MCL 4th § 21.632.[7] For preliminary approval, a settlement need not satisfy every single concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits. *See South Carolina Nat'l Bank*, 139 F.R.D. at 339 (noting that settlements, by definition, are compromises). When evaluating whether to grant preliminary approval, the court need "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). "The trial court should not … turn the settlement hearing into a trial or a rehearsal of the trial nor need it reach any dispositive conclusions on the admittedly unsettled legal issues in the case." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172–73 (4th Cir. 1975). The Court should examine whether there is a probability that the Settlement could be finally approved, and if so, order notification to the class. *Horton*, 855 F. Supp. at 827.

Here, the settlement is the result of contentious, arms-length negotiations with the help of an experienced mediator. (Ex. A, Caddell Decl. ¶ 33.) The settlement was reached after more than 4 years of litigation, including briefing numerous complex motions and taking extensive discovery, and it provides substantial benefits to the Settlement Class. (*See* Section II.D.2, *supra*.) If this settlement is approved, approximately 12.3 million Settlement Class members who would never have pursued TCPA claims on their own will receive free access to Sirius XM's popular satellite radio service for 3 months or, if they choose, a cash payment estimated to be in the range of $5–15. (Caddell Decl. ¶ 36.) Given the complexity of this Litigation and the significant risks that the Settlement Class would face if the relevant claims were to proceed, the Class Representatives and

---

[7] *See also In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ("Preliminary approval of a proposed settlement is appropriate where it is the result of serious, informed, and non-collusive negotiations, where there are no grounds to doubt its fairness and no other obvious deficiencies … and where the settlement appears to fall within the range of possible approval.") (citing MANUAL FOR COMPLEX LITIGATION).

Class Counsel believe that the settlement is fair and reasonable represents an excellent result for the Settlement Class members.  (Caddell Decl. ¶ 39; Declaration of Christopher Colt North, attached as Ex. B ("North Decl.") ¶¶ 20–21; Declaration of Abbas Kazerounian, attached as Ex. C ("Kazerounian Decl.") ¶ 6; Declaration of Joshua B. Swigart, attached as Ex. D ("Swigart Decl.") ¶ 6; Ex. E, McGuire Decl. ¶ 6; Declaration of Michael J. McMorrow, attached as Ex. F ("McMorrow Decl.") ¶ 4; Ex. G, Hooker Decl. ¶ 8; Declaration of Eric Knutson, attached as Ex. H ("Knutson Decl.") ¶ 6; Declaration of Yefim Elikman, attached as Ex. I ("Elikman Decl.") ¶ 5; Declaration of Anthony Parker, attached as Ex. J ("Parker Decl.") ¶ 5.) The settlement is easily within the range of possible approval, and notice should therefore be sent to the Settlement Class.

> **1.  The settlement is an excellent result for the Class.**
>
>> **a.  The settlement provides valuable benefits to a Settlement Class of approximately 12.3 million people.**

Without even needing to submit a claim, every Settlement Class member will receive three (3) free months of access to Sirius XM's popular Select Service, valued at $47.97, plus applicable sales taxes,[8] at the retail price. (Ex. 1 to Ex. A, Settlement Agreement § 3.b; Ex. A, Caddell Decl. ¶ 35.) This free access carries no obligation to continue service with Sirius XM and will not affect a Settlement Class member's eligibility for any other service offer. (Ex. 1 to Ex. A, Settlement Agreement § 6.e.) Neither will Settlement Class members be asked to provide any payment information to Sirius XM. (*Id.*) Following the Effective Date, they will simply give Sirius XM the information required to activate the service and begin enjoying the free programming. (*Id.*)

In the alternative to the free service, the cash fund participation option provides a cash payment to all Settlement Class members who elect to receive it, despite the fact that this is a case

---

[8] The valuation of the in-kind relief has been calculated using Sirius XM's retail price of $15.99 per month (or $47.97 for the three months of free access), without including the fees and taxes that a Class member would be required to pay if purchasing the service. Those fees and taxes are determined by Sirius XM in accordance with state and local tax laws and regulations.  When the fees and taxes that Class members will not pay are taken into account, the actual value of the in-kind relief to Class members can increase by as much as 20 percent.

in which the Settlement Class's injuries, including intangible injuries such as invasion of privacy, may be difficult to quantify in purely economic terms. (*Id.*) Finally, the agreed practice changes will require Sirius XM to separate its dialing systems used to call cell phones from the predictive dialing systems that Mr. Hooker has contended are autodialers subject to the TCPA. (Ex. 1 to Ex. A, Settlement Agreement § 4.a.; *see* Dkt. 141 at 7–11.) Taken together, this represents a remarkable result for the Settlement Class, providing compensation to approximately 12.3 million Settlement Class members for the alleged invasion of privacy they suffered from Sirius XM's telemarketing calls.

### b. Plaintiff and the Class faced real risks from Sirius XM's defenses to class certification and liability.

Class Counsel and the Class Representatives believe strongly in their case. They nevertheless recognize that continued litigation would present them with a number of challenges. (Ex. A, Caddell Decl. ¶ 37.) Class Counsel appreciates the risk that Sirius XM might prevail on one of its asserted defenses, including multiple asserted defenses to both class certification and liability. (*See* Dkt. 31 at 11–14.) Sirius XM submitted a detailed response to Mr. Hooker's Motion for Class Certification, raising arguments, among others, that the Class is not ascertainable, that certain class members lack Article III standing, that Mr. Hooker's claims are not typical of the Class, and that individual issues will predominate, making individual lawsuits superior to Class treatment. (Dkt. 153, *passim*). Mr. Hooker and his Counsel of course disagree with Sirius XM's arguments, (Dkt. 164), but they understand that the Court has not decided the motion and that there is a risk that the Court might not certify the Class. (Ex. A, Caddell Decl. ¶ 37.)

Even if a Class is certified, Mr. Hooker and the Class must prevail on their claims that the dialing systems Sirius XM's vendors used are ATDSs under the TCPA. (*See* Dkt. 141 at 7–11.) Whether a dialing system meets the ATDS definition involves numerous, highly technical facts, on which the parties have submitted extensive expert testimony. (*See* Exs. 13–15 to Dkt. 141.) Sirius XM has strongly contested whether the dialing systems its vendors used were ATDSs under the TCPA's definition. (Dkt. 153 at 4–5.) Furthermore, Sirius XM has raised the definition of ATDS

in its appeal of the FCC's 2015 TCPA Order before the D.C. Circuit. *See* Joint Brief for Petitioners, *ACA Int'l v. Fed. Commc'ns Comm'n*, No. 15-1211, Doc. No. 1585568 (November 25, 2015). The outcome of that appeal is uncertain and could affect the definition of "ATDS" in a way that would bear on the outcome of this case. Sirius XM has also raised as defenses, among others, its contentions that certain Class members consented to be called and/or agreed to arbitrate their claims. (Dkt. 31 at 11–14; Dkt. 153 at 18–25.)

Finally, at least some courts view awards of aggregate statutory damages with skepticism, and Class Counsel appreciate the risk that any such award could be reduced on due process grounds, either in this Court or on appeal. *See, e.g.*, *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (holding, in class action seeking aggregate statutory damages, that "[a]n award that would be unconstitutionally excessive may be reduced"); *Aliano v. Joe Caputo & Sons—Algonquin, Inc.*, No. 09-cv-910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case—between $100 and $1,000 per violation—would not violate Defendant's due process rights …. Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.")

### c. Continued litigation is likely to be complex, lengthy, and expensive.

If this case were to continue, trial and trial preparation would be time consuming and costly. (Ex. A, Caddell Decl. ¶ 38.) The parties would need to engage in considerable work with their witnesses, including their experts, to prepare the case for trial. (*Id.*) In addition, further motion practice, including motions for summary judgment and/or *Daubert* motions, is likely. (*Id.*) Considering the likelihood that Sirius XM would appeal any judgment in favor of the Settlement Class, it could easily be years before this case would be finally resolved. (*Id.*) Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows the Class Representatives and Settlement Class members to receive immediate and certain relief.

### 2. The settlement was negotiated at arm's length before an experienced mediator following full discovery.

A presumption of fairness attaches to the proposed settlement if it is reached after meaningful discovery and "arm's length negotiation." *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992); *see also* MCL 4th § 21.6; Newberg on Class Actions § 11.42 (4th ed. 2008); 3B Moore's Federal Practice ¶ 23.160, et seq. (3d ed. 2009). "So long as the integrity of the arm's length negotiation process is preserved … a strong initial presumption of fairness attaches to the proposed settlement." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997). This initial presumption of fairness applies here because the parties completed full discovery, including extensive written discovery, 14 depositions, 5 third-party subpoenas, and production of almost 100,000 pages of documents. (Ex. A, Caddell Decl. ¶ 31.) The settlement was reached by experienced, fully informed counsel after protracted arm's-length negotiations before an experienced mediator, (Ex. A, Caddell Decl. ¶ 33), and was thus "the result of good-faith bargaining at arm's length, without collusion." *Jiffy Lube*, 927 F.2d at 159.

### 3. The attorney's fees and service awards are proper.

The agreement that Class Counsel will request attorney's fees not to exceed 30% of the total value of the settlement is in the normal range approved by courts in other class actions and is well-justified in light of the excellent result for the Settlement Class, the specialized area of law involved, the significant uncertainty and risk of the legal claims and theories at issue, and the over four-year duration of the Litigation.[9] (Ex. A, Caddell Decl. ¶¶ 30–33; Ex. B, North Decl. ¶¶ 14–21; Ex. C, Kazerounian Decl. ¶¶ 3–4; Ex. D, Swigart Decl. ¶¶ 3–4; Ex. E, McGuire Decl. ¶¶ 3–4; Ex. F, McMorrow Decl. ¶ 3.) Such a fee request is in line with fee amounts routinely allowed in

---

[9] If the total value of Settlement, including the Free Service, is such that 30% of the total value would exceed $20 million, leaving limited cash in the Settlement Fund to cover notice and administration costs and to distribute to class members who elect a cash distribution, Class Counsel will in no event petition for more than $20 million in fees and costs.

other class action settlements. NEWBERG, § 14:6 ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average about one–third of the recovery."); *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 JOURNAL OF EMPIRICAL STUDIES 27, 31–33 (2004) (noting a "remarkable uniformity in awards between roughly 30% to 33% of the settlement amount" based upon a comprehensive survey by the National Economic Research Associates); *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 735 (E.D. Pa. 2001) (citing affidavit of Professor John C. Coffee, Jr., of Columbia University Law School, in which 289 class action settlements are compiled ranging from under $1 million to $50 million; average attorneys' fees percentage is 31.71% and median is one-third).

Similarly, the payments that Class Counsel will request of $10,000 to Mr. Hooker and $2,500 to each of the other Class Representatives are intended to recognize these individuals' time and efforts. (*See* Exs. G–J.) These payments are appropriate and justified as part of the overall settlement. *See, e.g., Deloach v. Philip Morris Cos., Inc.*, 2005 WL 1528783, *3 (M.D.N.C. June 29, 2005) (permitting service payments).

**B.  Conditional class certification is appropriate for settlement purposes.**

Plaintiff requests that the Court conditionally certify the proposed Settlement Class for purposes of settlement at this time. Class certification is appropriate at the preliminary approval stage where, as here, the proposed class, as defined in the parties' Settlement Agreement, has not previously been certified by the Court and the requirements for certification are met. NEWBERG § 11.27.

Plaintiff requests that the Court certify a Settlement Class consisting of Sirius XM-radio equipped vehicle purchasers and lessees who received calls on their cell phones from Sirius XM but never became paying subscribers, defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States) who (a) received programming on a promotional basis from Sirius XM in connection with the purchase or lease of a new or used vehicle that ended no later than April 5, 2016; (b) were the recipients of one or more telephone calls made by or on behalf of Sirius XM to their wireless, cell or

mobile phone numbers after February 15, 2008 and before July 5, 2016; and (c) never was or became paying subscribers prior to July 5, 2016. Excluded from the class definition are any employees, officers, or directors of Sirius XM, and any attorneys appearing in this case, and any judge assigned to hear this case as well as their immediate family and staff.

(Ex. 1 to Ex. A, Settlement Agreement § 2.)

### 1.   The Settlement Class meets the requirements of Rule 23(a).

Rule 23(a) establishes four prerequisites for one or more members of a class to sue as representatives of the entire class: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representatives are typical of claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a). Though not expressly required by Rule 23(a), most courts, including the Fourth Circuit, also imply a requirement that a class be "readily identifiable," commonly known as "ascertainability." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015.) Here, all Rule 23(a) prerequisites for Class certification are met.

**1.   *Numerosity*.** The first requirement is clearly satisfied. Sirius XM, working with its telemarketing vendors, has identified approximately 12.3 million individuals in the Settlement Class. *See, e.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 425 (4th Cir. 2003) (finding that a class of 1,400 members "easily satisfied Rule 23(a)(1)'s numerosity requirement").

**2.   *Commonality.*** Rule 23(a)(2)'s commonality requirement "is satisfied if 'common questions [are] dispositive and overshadow other issues.' And, '[m]inor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law.'" *DiFelice v. US Airways, Inc.*, 235 F.R.D. 70, 78 (E.D. Va. 2006) (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001); *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)). This case involves multiple common questions of law and fact, including whether the dialing systems that Sirius XM's telemarketing vendors used to call Settlement Class members for telemarketing purposes were ATDS and

whether Sirius XM is vicariously liable for its vendors' conduct. (Dkt. 141 at 20–21.) These common questions easily satisfy the requirement under Rule 23(a)(2).

    **3.** *Typicality.* Plaintiff's claims also satisfy the typicality requirement. The Supreme Court has noted that, because both commonality and typicality focus on the similarity of the claims, the two requirements "tend to merge." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157, n. 13, 102 S. Ct. 2364, 2371, n.13 (1982). Here, Plaintiff's claims are based on the same legal theories and virtually the same fact pattern upon which the claims of all the members of the class are based. *See, e.g., Lienhart*, 255 F.3d at 146 ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (citing *Falcon*, 457 U.S. at 156, 102 S. Ct. at 2370). Therefore, the typicality requirement is satisfied.

    **4.** *Adequacy.* Under Rule 23(a)(4), a class may be certified if "the representative parties fairly and adequately protect the interests of the class." First, adequacy requires that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Gunnells*, 348 F.3d at 425. The interests of the Class Representatives here are aligned with the interests of the Settlement Class because the Settlement Class members, just like each of the Class Representatives, suffered an alleged invasion of their privacy interest when they received Sirius XM's telemarketing calls, and they all have similar interests for purposes of the claims at issue. In addition, adequacy requires that Class Counsel must be "qualified, experienced, and able to conduct this litigation." *Souter*, 307 F.R.D. at 212. Here, Class Counsel have extensive experience prosecuting complex consumer class actions. (Ex. A, Caddell Decl. ¶¶ 3–17; Ex. B, North Decl. ¶¶ 6–13; Ex. C, Kazerounian Decl. ¶¶ 10–11; Ex. D, Swigart Decl. ¶¶ 9–11; Ex. E, McGuire Decl., ¶¶ 7–10; Ex. F, McMorrow Decl. ¶¶ 5–6.) Consequently, the Rule 23(a)(4) requirement is also satisfied.

    **5.** *Ascertainability.* Sirius XM has worked with its telemarketing vendors to assemble a list of Settlement Class members for notice and now has a list of Settlement Class members including their names, mailing addresses, and, in the case of approximately 40% of the Class, email addresses as well. All of the Rule 23(a) requirements are therefore met.

### 2.   Common issues predominate under Rule 23(b)(3).

In addition to the prerequisites of Rule 23(a), a case may proceed as a class action only if it also satisfies one of the three alternative requirements of Rule 23(b). Here, the class satisfies Rule 23(b)(3) because the questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986).

The predominance requirement is satisfied here because the essential factual and legal issues regarding the Settlement Class Members' claims—whether Sirius XM's telemarketing vendors used ATDSs to call Settlement Class members on their cell phones—are common. *See Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290, 2013 WL 444619, at *4 (S.D. Cal. Feb. 5, 2013) ("The central inquiry is whether Wells Fargo violated the TCPA by making calls to the class members. Accordingly, the predominance requirement is met.") These key common issues far outweigh the importance of any individual issues particular to Settlement Class members. The Class Representatives' and the Settlement Class members' claims are identical, and all issues are subject to the same proof, easily satisfying predominance. *See Amchem*, 521 U.S. at 625 (noting that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud …").

The superiority inquiry requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When determining whether a class action is superior, the Court should generally consider the following factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3)(A)–(D). When class certification is sought for settlement purposes only, as it is here, however, the Court need not consider factor (D), because difficulties likely to be encountered in managing the case at trial are irrelevant in the settlement context, where "the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

A class action in this case is superior to other available methods for the fair and efficient adjudication of the controversy because a class resolution will allow access to the courts for those who might not gain such access standing alone, particularly in light of the relatively small amount of the damages that would be available to individuals. The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. Rule 23(b)(3) was designed for situations such as this, where the amount in controversy for any individual claimant is small, but injury is substantial in the aggregate. To the extent individual claimants may believe they can recover more in an individual suit, they may opt-out and pursue their own actions separately. FED. R. CIV. P. 23(c)(2)(B)(v); (*see* Ex. 1 to Ex. A, Settlement Agreement § 11.) Thus, Rule 23(b)(3)'s predominance and superiority requirements, as well as the prerequisites of Rule 23(a), are satisfied. The Court should therefore conditionally certify the Settlement Class.

### C. Class Counsel should be appointed to represent the Settlement Class.

Attorneys appointed to serve as class counsel must "fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B). Relevant criteria include: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources counsel will

commit to representing the class." Rule 23(g)(1)(C)(i). Class Counsel satisfy each of these criteria, as their law firms have extensive experience in class-action and complex litigation. *See* (Ex. A, Caddell Decl. ¶¶ 3–17; Ex. B, North Decl. ¶¶ 6–13; Ex. C, Kazerounian Decl. ¶¶ 10–11; Ex. D, Swigart Decl. ¶¶ 9–11; Ex. E, McGuire Decl., ¶¶ 7–10; Ex. F, McMorrow Decl. ¶¶ 5–6.) The Court should therefore appoint Class Counsel to represent the Settlement Class.

### D.  The proposed notice plan meets the requirements of Rule 23.

Before granting approval to a class action settlement, the Court must "direct notice in a reasonable manner to all class members who would be bound" by the settlement. FED. R. CIV. P. 23(e)(1)(B). Notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). A settlement notice should define the class, describe the essential terms of the settlement, and explain the procedures and deadlines for making a claim, opting out, or objecting. MCL 4th § 21.312.

The parties to the settlement propose a notice process by which each member of the Settlement Class would be sent a postcard notice by postal mail or, if Sirius XM has an electronic mail address for the Settlement Class member, an email notice by electronic mail. (*See* Ex. B to Ex. 1 to Ex. A, Individual Notice); *see also Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 575 (D. Md. 2012) ("With regard to the use of email to notify potential plaintiffs of this litigation, 'communication through email is [now] the norm.'") (citing *In re Deloitte & Touche, LLP Overtime Litig.*, No. 11-cv-2461, 2012 WL 340114, at *2 (S.D.N.Y. Jan. 17, 2012)); *see also Irvine v. Destination Wild Dunes Mgmt., Inc.*, 132 F. Supp. 3d 707, 711 (D.S.C. 2015) (approving notice by regular mail and electronic mail, finding that electronic notice was warranted in light of the fact that "traditional methods of communication via regular mail and land line telephone numbers quickly become obsolete").

This proposed notice is drafted in clear language and sets forth a brief summary of the nature of the action, the Settlement Class definition, and the parties' claims and defenses. (*See* Ex.

B to Ex. 1 to Ex. A, Individual Notice.) It will state the date, time, and location of the hearing on final approval and that objections will be entertained; it explains that the Court will exclude from the Class any Class member who so requests; and it prominently provides the Class member with a website, phone number, and address from which more information may be obtained.

The class notice website will include a detailed long-form notice that, consistent with the mailed notice, sets forth the background and procedural history of this Litigation, including the claims asserted; a summary of the settlement terms; an explanation of the persons and claims being released under the settlement; a detailed explanation of reasons for the settlement; the date, time, and place of the hearing on final approval; a statement of the Settlement Class members' right to opt out or object and the procedures which must be followed; a statement that Class Counsel intend to petition for the Court's approval of attorneys' fees, expenses, and service awards; and whom to contact for more information. This notice process proposed is similar to that approved by other courts. *See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203–04 (D. Me. 2003) (approving class notice); *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 109–10 (D.N.J. 2012), appeal dismissed (Aug. 13, 2012), appeal dismissed (Nov. 13, 2012), appeal dismissed (Dec. 5, 2012) (approving settlement using mailed notices that also directed class members to a website and phone number for more details). The settlement website will also provide copies of key pleadings and documents and up-to-date information on the case status. In addition, the Settlement Administrator will cause to be published internet banner ads and search-term advertising designed to reach any Settlement Class members who may not be reached by the mailed notice. (*See* Ex. C to Ex. 1 to Ex. A, Publication Notice.) The Court should therefore approve the notice plan.

**E. Proposed Schedule for Further Proceedings.**

Plaintiff proposes the following schedule of events leading to the final approval hearing, to which Sirius XM has agreed, and which is consistent with the Settlement Agreement:

| Item | Deadline |
|---|---|
| Mail notice to class members | Within 30 days of entry of preliminary approval order. (Settlement Agreement § 10.) |
| CAFA notice to federal and state officials | Within 10 days of entry of preliminary approval order (Settlement Agreement § 8(b).) |
| Settlement website | Live within 10 days of entry of preliminary approval order. (Settlement Agreement § 6.) |
| Publication notice | Within 45 days of entry of preliminary approval order. (Settlement Agreement § 10.e.) |
| Proof of mailing of notice | Within 36 days after the commencement of notice to the Class (Settlement Agreement § 10.i.) |
| Last day for Class members to object to the Settlement | Objections must be received by the Court and the parties no later than 24 days before the final fairness hearing. (Settlement Agreement § 13.c.) |
| Last day for Class members to opt out | Opt-out form must be postmarked no later than 24 days before the final fairness hearing. (Settlement Agreement § 11.e.) |
| Motion for final approval | At least 10 days before the Final Approval Hearing. (Settlement Agreement § 14.a.) |
| Final fairness hearing | No earlier than 90 days after mailing of CAFA Notice and approximately 70 days after commencement of mailing of individual notice to Class members. (Settlement Agreement § 14.c.) |

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter the accompanying Proposed Order (1) granting preliminary approval of the proposed settlement, (2) conditionally certifying the Settlement Class, (3) appointing Mr. Hooker, Mr. Knutson, Mr. Elikman, and Mr. Parker as Class Representatives, (4) appointing Caddell & Chapman, The Consumer and Employee Rights Law Firm, P.C., Kazerouni Law Group, APC, Hyde & Swigart,

McGuire Law, P.C. and McMorrow Law, P.C. as Class Counsel to represent the Settlement Class,

(5) directing dissemination of Notice to the Settlement Class as proposed, and (5) setting a hearing

on final approval of the settlement.

Date: August 5, 2016                          Respectfully submitted,

_____

Michael A. Caddell (*pro hac vice*)
mac@caddellchapman.com
Cynthia B. Chapman (*pro hac vice*)
cbc@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston, TX 77007-1722
Tel.: (713) 751-0400
Fax: (713) 751-0906

 */s/ Christopher C. North*
_____
Christopher Colt North (VSB # 16995)
cnorthlaw@aol.com
William L. Downing (VSB # 17704)
wdowninglaw@aol.com
THE CONSUMER & EMPLOYEE RIGHTS
LAW FIRM, P.C.
751-A Thimble Shoals Blvd.
Newport News, VA 23606
Tel: (757) 873-1010
Fax: (757) 873-8375

Abbas Kazerounian (*pro hac vice*)
ak@kazlg.com
KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92606
Tel.: (800) 400-6808
Fax: (800) 520-5523

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2016, I filed a true and correct copy of the foregoing document using the Court's CM/ECF system. The system will then send an electronic notice of filing to the following counsel of record:

William V. O'Reilly (VSB # 26249)
Attorneys for Defendant Sirius XM Radio Inc.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: woreilly@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
Attorney for Defendant Sirius XM Radio Inc.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

Lee A. Armstrong
Attorney for Defendant Sirius XM Radio Inc.
JONES DAY
250 Vesey Street
New York, New York 10281
Tel.: (212) 326-8340
Email: laarmstrong@JonesDay.com

*/s/ Christopher Colt North*
Christopher Colt North (VSB # 16995)