UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

FRANCIS W. HOOKER, Jr.,
for himself and on behalf of all
similarly situated individuals,

      Plaintiff,

v.

                                        Case No.: 4:13-cv-00003 (AWA/LRL)

SIRIUS XM RADIO INC.

      Defendant.

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR FINAL
APPROVAL AND ATTORNEYS' FEES**

---

## I. INTRODUCTION

Class Representatives Francis W. Hooker, Jr., Eric Knutson, Yefim Elikman, and Anthony Parker ("Plaintiffs") respectfully submit this memorandum in support of their motion for: (1) final approval of the class action settlement and certification of the settlement class; and (2) an award of attorneys' fees, litigation expenses, and service awards.

The proposed Settlement with Defendant Sirius XM Radio Inc. ("Sirius XM") creates a $35,000,000 settlement fund and provides three months of free Select Sirius XM satellite radio service (the "Free Service") to all Settlement Class members who do not choose to participate in the cash fund. All Settlement Class members who did not submit a claim for cash will have an opportunity to register for the Free Service, and registration will not carry any obligation to continue service with Sirius XM beyond the three months of free access. In addition, Sirius XM agreed to contractually require its outbound telemarketing vendors to modify their systems to

ensure use of manual telephone dialing systems that that comply with the Telephone Consumer Protection Act ("TCPA").

This Settlement was only obtained after vigorous, hard-fought litigation involving multiple TCPA lawsuits against Sirius XM. The Settlement finally resolves not only *Hooker*, but also the *Knutson v. Sirius XM Radio Inc.*, No. 12-cv-0418-AJB-DHB (S.D. Cal.) action ("*Knutson*"), the *Elikman v. Sirius XM Radio Inc.*, 11:15-cv-02093 (N.D. Ill.) action ("*Elikman*"), and the *Parker v. Sirius XM Radio Inc.*, 8:15-cv-01710-JSM-EAJ (M.D. Fla.) ("Parker") action (together with *Hooker*, the "Litigation"). Altogether, the Litigation has spanned almost five years, and counsel in all the cases cooperated to achieve the best possible result for the Settlement Class. This Settlement was achieved over two days of hard-fought, contentious mediation before Randall W. Wulff, a nationally respected mediator. *See* Dkt. No. 186-2. It provides compensation in the form of a cash payment estimated to be $44 to Settlement Class members who filed a claim for cash, or three months of free Sirius XM Select satellite radio service (the "Free Service"), valued at $62.97, plus applicable fees, to those who chose not to file a claim for cash. Altogether, the relief obtained is valued at approximately $285.8–$752.8 million, (*See* Declaration of Professor Geoffrey P. Miller, attached as Ex. 15 ("Miller Decl."), ¶ 42), not even including the agreement regarding changes in Defendant's vendors' telemarketing practices, which will be worth at least millions of dollars to the Settlement Class. (*See* Declaration of Jeffrey A. Hansen, attached as Ex. 16 ("Hansen Decl."), ¶¶ 8–9; Declaration of Michael A. Caddell, attached as Ex. 1 ("Caddell Decl."), ¶ 36.) In short, the Settlement is an outstanding result for the almost 12 million Settlement Class members and should be finally approved.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs' counsel worked for almost five years to secure the relief obtained.

The TCPA litigation against Sirius XM began on February 15, 2012, when *Knutson* was filed. On May 20, 2012, the district court granted Sirius XM's motion to compel Mr. Knutson to arbitration. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 562 (9th Cir. 2014). Plaintiffs' counsel in *Knutson* obtained reversal of this order on appeal, securing a ruling from the Ninth Circuit that

Mr. Knutson "could not assent to Sirius XM's arbitration provision because he did not know that he was entering into a contract with Sirius XM." *Id.* at 569. The Ninth Circuit therefore remanded *Knutson* to the district court in November 2014. *Id.* at 570.

This *Hooker v. Sirus XM Radio Inc.*, 4:13-cv-00003 (AWA/LRL) action ("*Hooker*") was filed on January 4, 2013. As it had in *Knuston*, Sirius XM moved to compel arbitration. (Dkt. 12 at 1–4.) The Court denied Sirius XM's motion. (Dkt. 28 at 6.) Sirius XM then moved to strike Mr. Hooker's class allegations, and the Court denied the Motion to Strike as well. (Dkt. 56 at 8–9.) Mr. Hooker diligently pursued discovery in this case, taking or defending 14 depositions, including taking corporate representative depositions of Sirius XM and five of its telemarketing vendors. (Caddell Decl. ¶ 31.) Mr. Hooker's counsel also served over 100 Requests for Production, two sets of Requests for Admission, and 11 Interrogatories on Sirius XM, as well as five third-party subpoenas on the telemarketing vendors, and reviewed almost 100,000 pages of documents produced in response to these requests. (*Id.*) Sirius XM also deposed Mr. Hooker and his wife and served 23 Requests for Production and 16 Interrogatories on Mr. Hooker, to which Mr. Hooker responded. (*Id.*) In addition, both Mr. Hooker and Sirius XM filed expert reports, including supplemental and rebuttal reports, and deposed each other's expert witnesses regarding whether the dialing systems used by Sirius XM's telemarketing vendors constituted an "Automatic Telephone Dialing System" ("ATDS") as defined by the TCPA. (*Id.*) Discovery closed on April 17, 2016.

The *Elikman* action was filed on November 10, 2014. (*See* Declaration of Myles McGuire, attached as Ex. 7 ("McGuire Decl.") ¶ 3.) In April 2015, Counsel in *Knutson* and *Elikman* asked the Judicial Panel on Multidistrict Litigation ("JPML" or "MDL Panel") to consolidate those cases with *Hooker*, as well as four other then-pending TCPA actions against Sirius XM. (Dkt. 121-1 at 2.) *Parker v. Sirius XM Radio Inc.*, No. 15-cv-01710-JSM-EAJ (M.D. Fla.) ("*Parker*"), filed on March 10, 2015, was also added to the proposed *In re Sirius XM TCPA Litigation* MDL proceeding. (Ex. 1, Caddell Decl. ¶ 32.) While the JPML ultimately declined to create an MDL, Plaintiffs' counsel took the MDL Panel hearing as an opportunity and a catalyst to form a cooperating

attorney agreement to advance the common benefit for Plaintiffs in these TCPA cases against Sirius XM. (*Id.*)

Pursuant to the cooperating attorney agreement, Plaintiffs' counsel have worked together in this Litigation since May of 2015. (Ex. 1, Caddell Decl. ¶ 32.) This work included additional complex and potentially dispositive motion practice, as Plaintiffs responded to Sirius XM's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (Dkts. 148, 165), and Motion to Stay pending Sirius XM's appeal of a recent FCC order bearing on the interpretation of "Automatic Telephone Dialing System," a key issue in this case. (Dkts. 128, 132.) Plaintiffs' counsel also filed and fully briefed a Motion for Class Certification, with extensive evidentiary support. (Dkts. 141, 164.) By fully developing the factual and legal issues in a cooperative, unified team effort, Plaintiffs' counsel placed this Litigation in a position of well-informed strength, enabling them to negotiate for the best possible Settlement for the Class. (Ex. 1, Caddell Decl. ¶ 33.)

## B. Settlement Negotiations and Preliminary Approval

This Settlement resulted from good-faith, contentious, arm's-length settlement negotiations, including two days of mediation before Randall W. Wulff in Oakland, California. (Ex. 1, Caddell Decl. ¶ 34.) Plaintiffs and Sirius XM submitted detailed mediation submissions to Mr. Wulff before the mediation sessions and made detailed, substantive presentations at the mediation. (*Id.*) Every aspect of the Settlement Agreement was heavily negotiated, culminating in an outstanding nationwide settlement. (*Id.*; *see also* Declaration of Abbas Kazerounian, attached as Ex. 4 ("Kazerounian Decl."), ¶ 14.) On August 18, 2016, the Court found that the proposed Settlement fell within the range of possible approval, preliminarily certified the Settlement Class, appointed Plaintiffs' Counsel as Class Counsel, and approved the Notice plan. (Dkt. 188 at 3.)

## C. Settlement Terms

The terms of the Settlement Agreement (the "Agreement" or the "Settlement Agreement") are summarized below.

### 1. The Settlement Class

The Agreement defines a Settlement Class under Fed. R. Civ. P. 23(b)(3) composed of:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States) who (a) received programming on a promotional basis from Sirius XM in connection with the purchase or lease of a new or used vehicle that ended no later than April 5, 2016; (b) were the recipients of one or more telephone calls made by or on behalf of Sirius XM to their wireless, cell or mobile phone numbers after February 15, 2008 and before July 5, 2016; and (c) never were or became paying subscribers prior to July 5, 2016. Excluded from the class definition are any employees, officers, or directors of Sirius XM, and any attorneys appearing in this case, and any judge assigned to hear this case as well as their immediate family and staff.

(Settlement Agreement, Ex. A to Caddell Decl., § 2; *see also* Dkt. 188 at 2.)

### 2. Significant Relief to Settlement Class Members

There are almost 12 million members of the Settlement Class. (Dkt. 191 at 9.) Under the Settlement Agreement, members of the Settlement Class have until November 26, 2016, to file a claim on the Settlement Website for a *pro rata* share of $10,000,000 reserved for cash claimants out of the $35,000,000 cash payment made by Sirius XM as part of the Settlement (the "Settlement Fund"). (Settlement Agreement, Ex. A to Caddell Decl., § 6(a); *see also* Exhibit C to Caddell Decl.; Dkt. 191 ¶¶ 28–29.) All Settlement Class members who do not choose to submit a cash claim will be entitled to register for the Free Service and will receive a notice instructing them how to activate the Free Service following final approval. (Settlement Agreement, Ex. A to Caddell Decl., § 3(b).) The Settlement Class will also benefit from meaningful changes in Sirius XM's telemarketing vendors' calling practices by having Sirius XM contractually require its outbound telemarketing vendors to modify their systems to ensure use of manual telephone dialing systems that comply with the TCPA. (Settlement Agreement, Ex. A to Caddell Decl., § 4; Hansen Decl. ¶¶ 8–9.) Any uncashed Settlement checks or other monies remaining in the Settlement Fund will first be distributed to cash claimants who cashed their checks from the first distribution and then, if additional funds remain, will be distributed as a *cy pres* award for purposes consistent with the

objectives of the litigation and interests of the Settlement Class members. (Settlement Agreement, Ex. A to Caddell Decl. § 19(c).)

### 3. Notice and Settlement Administration Costs, Attorneys' Fees and Litigation Costs, and Plaintiffs' Service Awards

In addition to the monetary payments to the Class, all notice and settlement administration expenses, attorneys' fees and litigation costs, and Plaintiffs' service awards will be paid from the $35,000,000 Settlement Fund. (Settlement Agreement, Ex. A to Caddell Decl., § 17.) Sirius XM has agreed not to oppose Class Counsel's request for litigation costs and attorneys' fees of up to 30% of the total value of the Settlement (Settlement Agreement, Ex. A to Caddell Decl., § 17(a).) In order to ensure that sufficient funds remain to make a distribution to Class members who submit claims for a share of the Settlement Fund, as well as to cover notice and administration expenses, Class Counsel agreed to reserve at least $10,000,000 of the Settlement Fund for payments to Settlement Class members who file claims for the cash distribution, and are actually reserving $10.8 million, making additional funds available in case notice and administration costs are higher than expected or, if not, to increase the cash distributions to Settlement Class members. (Ex. 1, Caddell Decl. ¶ 40.) Accordingly, Class Counsel here request only $19.8 million in fees and approximately $200,000 in expenses (the expense request will be updated at the Fairness Hearing since Class Counsel will continue to incur costs). This fee request represents 2.6–6.9% of the total value of the Settlement, well below the 4th Circuit benchmark, and only a multiplier of 3.5 on the time and effort Class Counsel has invested in securing this substantial relief for the Settlement Class. (Ex. 15, Miller Decl. ¶ 66.) Sirius XM has also agreed not to oppose requests for service awards of $10,000 to Plaintiff Hooker, and $2,500 each to Plaintiffs Knutson, Elikman and Parker. (Settlement Agreement, Ex. A to Caddell Decl., § 17(d).)

### III. ARGUMENT AND AUTHORITIES

**A.  The Court should certify the Settlement Class for settlement purposes.**

In its Order Granting Preliminary Approval, the Court preliminarily certified the Settlement Class for settlement purposes. (Dkt. 188 ¶ 4.) The Court preliminarily found that the Settlement Class met Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. (*Id.* ¶ 5.) The Court further concluded that the Settlement Class met Rule 23(b)(3)'s predominance and superiority requirements. (*Id.*) For the same reasons, the Court should finally certify the Settlement Class for Settlement purposes here.

**B.  The Class Notice satisfied due process.**

The Class Notice provided to the Settlement Class was adequate and satisfies Fed. R. Civ. P. 23 and all other due process requirements. Rule 23 requires that "the court … direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B). While actual notice is not required, the notice must be reasonably calculated to apprise the Settlement Class of the pendency of the settlement and afford them an opportunity to present their objections or opt out. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). The Class Notice plan here, administered by Epiq Systems and Claims Solutions (the "Settlement Administrator" or "Epiq"), was reasonably calculated to apprise Settlement Class members of the pendency of the Litigation and their right to object or exclude themselves from the Settlement and satisfied Due Process. (Dkt. 191 ¶¶ 41–44.)

Settlement Class members were afforded notice of the proposed Settlement by individual notice (email or mail), as well as by publication notice in the form of internet advertisements with links to the Settlement Website. (Dkt. 191 ¶¶ 15–34.) Sirius XM generated the Settlement Class list by working in cooperation with its telemarketing vendors to obtain the names and contact information of persons called by the vendors on their cellular phones and who did not become

paying subscribers, providing a list of 12,870,814 records to the Settlement Administrator. (Dkt. 191 ¶ 15.) After deduplication, Epiq generated a list of 11,959,106 unique records, of which contact information was available for all but 3,361 records. (*Id.*) As of November 4, 2016, Epiq emailed or mailed notices to 11,955,745 unique Settlement Class members, with notice to 242,518 Settlement Class members currently known to be undeliverable. (*Id.* at ¶ 23.) This represents an excellent 98% delivery rate.

Epiq also established the Settlement Website, containing the Settlement Agreement, the Preliminary Approval Order, a detailed class notice in English and Spanish, and the operative complaints in the four lawsuits at issue, in compliance with the Preliminary Approval Order. (Dkt. 191 ¶ 28.) The Settlement Website permits Settlement Class members to submit a claim for cash payment. (*Id.* ¶ 28.) To date, 204,507 Settlement Class members have done so, with one remaining week before the claims deadline on November 26, 2016, and Class Counsel estimate that approximately 250,000 cash claims will be received by the deadline. (Ex. 1, Caddell Decl. ¶ 39.) Based on this claims rate, Class Counsel estimate that Class members who submit a claim for cash will each receive a check for approximately $44. (*Id.*) Following final approval, all Settlement Class members who did not submit a claim for a cash payment will have an opportunity to activate their three (3) months of Free Service on any Sirius XM satellite radio,[1] which would ordinarily cost $62.97, including the $47.97 in monthly fees plus a $15 activation fee, not including any other applicable fees. (*Id.*) Because of the passage of time, many Settlement Class members no longer own the Sirius XM satellite radios originally associated with their trial subscriptions. The Settlement takes this into account by allowing them to activate the Free Service on any unit they currently own or lease simply by entering the unit's ID number or their vehicle's VIN at the Settlement Website. (*Id.*; Settlement Agreement, Ex. A to Caddell Decl. § 6(e).)

---

[1] The website also offered Settlement Class members who wished to do so the opportunity to register for the Free Service before final approval, with the understanding that they would need to update their information if they acquired a new vehicle or radio before the Settlement was finally approved. (Ex. 1, Caddell Decl. ¶ 40.) To date, 38,531 Class members have already done so. (*Id.*)

In addition to the email and mail notices, Epiq placed internet banner advertisements which generated 66.5 million impressions. (Dkt. 191 ¶ 24.) Epiq also acquired sponsored search listings on highly visited internet search engines Google, Yahoo!, and Bing. (*Id.*) As of November 4, 2016, these sponsored listings have been displayed 21,866 times, resulting in 3,571 clicks that displayed the Settlement Website. *Id.* ¶ 26. Epiq also established a toll-free telephone number, where individuals could obtain additional information related to the Settlement, including a long-form version of the Notice in either English or Spanish. *Id.* ¶ 18.

The combined notice program apprised approximately 98% of the Settlement Class of the Settlement. (Dkt. 191 ¶ 40.) The parties have carried out the notice program as the Court required when it approved the form and manner of notice. (Dkt. 188 ¶ 9.) This notice thus satisfied Due Process and all applicable legal requirements. *See* Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, at 3 (2010) (recognizing that a reach of between 70-95% is reasonable); *In re Serzone Prods. Liability Litig.*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Manuel v. Wells Fargo Bank, N.A.*, No. 3:14-cv-238 (DJN), 2016 U.S. Dist. LEXIS 33708, at *12-13 (E.D. Va. Mar. 15, 2016) (approving similar notice plan administered by Epiq).

## C.  The required CAFA notices have been sent.

In addition, the notice required by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, was provided by Defendant on August 12, 2016. (Dkt. 187.) After the CAFA notice, the Attorneys General of California, Texas, and New York expressed concern that the Release could be interpreted to encompass claims arising out of calls other than those placed by or on behalf of Sirius XM. After discussing the issue with the Attorneys General, the parties agreed to make a slight modification to the Release to clarify the parties' original intent to limit the release to calls placed by or on behalf of Sirius XM. (*See* Ex. B to Caddell Decl.)

The Release as modified is acceptable to the Attorneys General of California, Texas, and New York, and neither they nor any other Attorneys General have objected to the Settlement. *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 590 (E.D. Mich. 2006) (granting final approval to proposed class action settlement and noting that "GM issued notice to the appropriate federal and state attorneys general pursuant to [CAFA.] None submitted an objection."); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("The Court notes that in several recent Title III of the ADA class actions in this district which were similarly noticed, the Department of Justice and several state attorneys general filed objections. This has not been the case in this matter. The fact that no objections have been filed strongly favors approval of the settlement.").

### D.  The Court should finally approve the Settlement as fair, reasonable, and adequate.

There is a strong and long-standing judicial policy within this Circuit favoring resolution of litigation before trial. *See S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)); *see also Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 08- 1310, 2009 U.S. Dist. LEXIS 89136, at *27 (E.D. Va. June 23, 2009) ("There is an overriding public interest in favor of settlement, particularly in class action suits."). Rule of Civil Procedure 23(e) requires that the Court evaluate and approve any class action settlement. FED. R. CIV. P. 23(e). Approval of a class action settlement is committed to the "sound discretion of the district courts." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Courts should approve settlements where settlement class members have received reasonable notice of the settlement, as they did here, (*see supra* Section III.B), and where the settlement "is fair, reasonable, and adequate." FED R. CIV. P. 23(e)(1)(C). Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id.* (quoting *S.C. Nat'l Bank*, 139 F.R.D. at 339); *see also Muhammad v. Nat'l City Mortg., Inc.*, 2008 U.S. Dist. LEXIS 103534, at *12–13 (S.D. W. Va. Dec. 19, 2008) (citing *Rolland v. Cellucci*, 191 F.R.D. 3, 11 (D. Mass. 2000)) ("A

settlement compromising conflicting positions in class action litigation serves the public interest.").

As one court has observed, "the test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable." *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 258 (D. Del. 2002) (citation omitted); *see also In re Compact Disc Litig.,* 216 F.R.D. at 211 (the role of the court is not to "second-guess" the settlement but to decide whether its overall terms are reasonable). The Fourth Circuit has articulated four "fairness" factors and five "adequacy" factors that courts in this Circuit use in evaluating class settlements. *In re: Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991); *see also Domonoske v. Bank of Am., N.A.,* 790 F. Supp. 2d 466, 472 (W.D. Va. 2011). As shown below, the *Jiffy Lube* factors all favor approval here.

### 1. The *Jiffy Lube* fairness factors favor final approval.

In determining the fairness of a settlement, courts in the Fourth Circuit consider: (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of … class action litigation. *In re Jiffy Lube Sec. Litig.,* 927 F.2d at 158–59. Analyzing these factors enables the Court to determine that "the settlement was reached as a result of good-faith bargaining at arm's length, without collusion …" *Id.* Here, these factors confirm that this Settlement was achieved by experienced counsel on a well-developed record, through contentious, hard-fought negotiations before an experienced mediator, and the Court should accordingly find the Settlement is fair.

#### a. The advanced stage of this litigation and the extensive amount of discovery conducted favor final approval.

The first and second "fairness factors" weigh in favor of final approval because of both the advanced posture of this litigation and the significant amount of discovery that has been conducted. *See In re Jiffy Lube Sec. Litig.,* 927 F.2d at 158–59. When "several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement." *Mills,* 265 F.R.D. at 254. The

parties here fully briefed motions to compel arbitration both in *Hooker* and in *Knuston* (including Plaintiffs' successful appeal of the arbitration issue in *Knutson,* 771 F.3d at 566); Sirius XM's motion to strike class allegations, motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), and motion to stay; and Plaintiffs' motion for class certification. (Dkts. 11, 15, 16, 28, 34, 39, 40, 56, 82, 128, 132, 134, 140, 148, 153, 165 & 172.) The parties have also conducted full, thorough discovery on Plaintiffs' claims, including multiple sets of written discovery; the exchange of expert reports; depositions of the parties, non-party telemarketing vendors, and the parties' experts; and the production and review of almost 100,000 pages of documents. (Ex. 1, Caddell Decl. ¶ 31.) The first and second *Jiffy Lube* fairness factors thus favor final approval. *See Winingear v. City of Norfolk, Va.*, No. 12-560, 2014 U.S. Dist. LEXIS 97392, at *12 (E.D. Va. July 14, 2014).

**b. This Settlement was reached through arms'-length negotiations conducted by experienced class counsel, favoring final approval.**

The third fairness factor also weighs in favor of final approval of the Settlement, because the parties' settlement negotiations were hard-fought and contentious. "In the absence of any evidence to the contrary, it is presumed that no fraud or collusion occurred." *Winingear*, 2014 U.S. Dist. LEXIS 97392, at *13 (citing *Lomascolo*, 2009 U.S. Dist. LEXIS 89136, at *32); *see also In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663. The parties engaged in extensive, arms'-length settlement negotiations during two days of mediation before an impartial mediator, Randall W. Wulff. (Ex. 1, Caddell Decl. ¶ 34.) Mr. Wulff has mediated a number of large class-action cases and was selected, after a nationwide search for several months, to lead the panel that heard and decided the property damage claims for the World Trade Center arising from the tragedy on September 11. (*Id.*) The circumstances of the settlement negotiations thus demonstrate that the Settlement Agreement was the result of tough, good-faith bargaining, favoring final approval.

**c. Class Counsel has extensive experience in TCPA litigation and recommends that the Settlement be approved.**

Analyzing the fourth *Jiffy Lube* fairness factor, courts recognize that the opinion of experienced and informed counsel should be afforded substantial consideration in determining whether a class settlement is fair and adequate. *See Winingear*, 2014 U.S. Dist. LEXIS 97392, at

*13–14; *see also In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 665. Class Counsel here are highly experienced in consumer class action litigation generally and TCPA class actions in particular.

Caddell & Chapman's current docket includes a variety of national consumer class actions, at various stages of litigation. (Ex. 1, Caddell Decl. ¶ 12.)  In the majority of these cases, Caddell & Chapman has either been appointed Lead or Co-Lead Counsel or will seek appointment to such a lead role at the appropriate time. (*Id.*) In this District alone, Caddell & Chapman recently secured final approval of national class action settlements in *Henderson v. Acxiom Risk Mitigation, Inc.*, No. 3:12-cv-00589-REP (E.D. Va.) and *Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015), *cert. denied sub nom. Schulman v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 15-1420, 2016 WL 2962583 (U.S. Oct. 3, 2016). The Consumer & Employee Rights law firm also has extensive consumer class action experience and notable recent recoveries in this District. (*Id.* ¶ 11.) The addition of *Knutson*, *Elikman*, and *Parker* counsel, who collectively have participated successfully in more than 20 TCPA cases around the country, further deepens and strengthens Class Counsel's expertise.[2] The fact that these highly experienced counsel endorse the Settlement as fair and an excellent result for the Class strongly favors approval. *See Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501–02 (E.D. Va. 1995) (concluding fairness met where experienced plaintiffs' counsel endorsed settlement).

## 2. The Settlement Agreement is adequate and reasonable.

In assessing the adequacy of a settlement, courts in the Fourth Circuit consider: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the expected duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood

---

[2] *See* Ex. 2, Kazerounian Decl. ¶ 29; Declaration of Joshua B. Swigart, attached as Ex. 5 ("Swigart Decl."), ¶ 26; Declaration of Jason A. Ibey, attached as Exhibit 6 ("Ibey Decl."), ¶ 16; Ex. 7, McGuire Decl. ¶ 19.

of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In Re Jiffy Lube*, 927 F.2d at 159.

> ### a. The strength of Plaintiffs' case on the merits and the risks inherent in continued litigation favor final approval.

Plaintiffs believe strongly in the merits of their case. They nevertheless appreciate that Sirius XM has raised numerous defenses, both to class certification and on the merits, and that there is a risk that Sirius XM might prevail on at least one of these defenses. On the central issue of whether Sirius XM's telemarketing vendors' dialing systems were ATDSs subject to the TCPA's autodialer restrictions, Plaintiffs have developed substantial evidence, including discovery from Sirius XM's telemarketing vendors and extensive expert testimony, that Sirius XM's vendors used an ATDS to place the calls to nearly 12 million Settlement Class members. (Dkt. 141 at 9–11.) Plaintiffs recognize, however, that Sirius XM has argued that the equipment did not qualify as ATDSs. (*See* Dkt. No. 164.) The definition of "ATDS" is the subject of Sirius XM's pending petition for review of the FCC's July 10, 2015 declaratory ruling interpreting the relevant portions of the TCPA. *See ACA Int'l, et al. v. FCC*, No. 15-1211 (D.C. Cir. Nov. 25, 2015). Oral argument was held on Sirius XM's Petition on October 19, 2016, and the D.C. Circuit has yet to issue a ruling. (Ex. 1, Caddell Decl. Decl., ¶ 42.) While Plaintiffs believe the FCC's arguments in favor of its statutory interpretation are strong, a D.C. Circuit ruling granting the relief Sirius XM requests could undermine Plaintiffs' claims. (*Id.*)

Litigation risk also exists on the issue of consent. As pled in Mr. Hooker's complaint, when Settlement Class members provided their telephone numbers to automobile dealerships, they gave no express consent that these numbers would be used by Sirius XM for marketing efforts. (Dkt. 1 ¶¶ 23–54). Plaintiffs nevertheless appreciate that Sirius XM has introduced evidence that it contends shows that some Settlement Class members did consent to be contacted or that lack of consent cannot be tried on a common basis. (Dkt. 153 at 18–19 & Exs. 2–6 & 19 thereto.) Again, the risk that Sirius XM might prevail on this argument must be factored into consideration of the Settlement's reasonableness.

Sirius XM has asserted numerous other defenses both to class certification and on the merits. For example, Sirius XM has argued that common issues of fact would not predominate because some putative class members agreed to arbitrate their disputes, requiring numerous mini-trials on the arbitration issue. (Dkt. 153 at 2.) Sirius XM also has filed a motion to dismiss Mr. Hooker's claims under Fed. R. Civ. P. 12(b)(1) as moot based on its rejected Rule 63 Offer of Judgment to Mr. Hooker. (Dkt. 148.) While Plaintiffs believe the Supreme Court's recent decision in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), requires denial of Sirius XM's Motion, Sirius XM continues to assert this defense. This Settlement avoids any risk that Sirius XM may succeed on any of its arguments and defenses. As such, considerations of the first and second "adequacy factors" weigh heavily in support of final approval of the Settlement.

### b. The expected duration and expense of further litigation also favor final approval.

Were it not for this Settlement, the parties also face the certainty that further litigation would be expensive, complex, and time consuming. The Settlement Agreement provides Settlement Class members with valuable benefits, worth approximately $22-$62.97 per class member, or $285.8–$752.8 million in the aggregate. (Ex. 15, Miller Decl. ¶ 42.) Settlement Class members will receive these benefits now, without the risk and delays of continued litigation. Absent this Settlement, litigation would likely continue for well over a year, as this Court would have to rule on the pending motion for class certification, (Dkt. 140), and pending motion to dismiss (Dkt. 148), and the parties would have to prepare the case for trial. Even if Plaintiffs prevailed at trial, Sirius XM would likely challenge the result on appeal. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("In the absence of a settlement, this matter will likely extend for ... years longer with significant financial expenditures by both defendants and plaintiffs."). The fact that this Settlement eliminates substantial delay and expense strongly supports final approval. *See Winingar*, 2014 U.S. Dist. LEXIS 97392, at *20; *Scott v. Clarke*, No. 3:12-CV-00036, 2016 U.S. Dist. LEXIS 14192, at *40 (W.D. Va. Feb. 5, 2016) ("The additional expenses that both sides would have necessarily incurred in trying the case, on top of the large sums that had already been

incurred before trial, would have been substantial. In addition, the trial itself would have almost certainly been followed by extensive post-trial proceedings and a likely Fourth Circuit appeal by whichever side received an adverse judgment from this Court.").

### c.  Possible collection risk and risk of remittitur also favor settlement.

In addition, even if Plaintiffs were to prevail on their claims, the large class size and the possibility of statutory damages of as much as $1,500 per call for willful TCPA violations introduce a risk that an eventual judgment in Plaintiffs' favor could be uncollectable or subject to remittitur. *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award that would be unconstitutionally excessive may be reduced[.]") The agreed relief under the Settlement, by contrast, estimated to provide Settlement Class members who filed claims for cash with approximately $44, or those who choose to wait and register for the Free Service after final approval with benefits valued at $62.97 (including the $47.97 monthly fees and $15 activation fee, without taking into account other fees that Settlement Class members would have to pay to purchase these services from Sirius XM), provides certain relief to Settlement Class members now, eliminating all risk of insolvency or remittitur. This factor therefore further supports approval of the Settlement. *Deem*, 2013 WL 2285972, at *3.

### d.  The degree of opposition to the Settlement is minimal.

"The opinion of class members concerning the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Winingear*, 2014 U.S. Dist. LEXIS 97392, at *14. Out of almost 12 million Settlement Class members, with just one week remaining before the final exclusion deadline, Class Counsel and Epiq have received only 124 requests for exclusion (Ex. 1, Caddell Decl. ¶ 41). Additionally, only two objections (both from serial objectors with long histories of filing unmeritorious and ethically questionable objections to class action settlements) have been filed with the Court. (Dkts. 189 & 190.)[3] *See In re Wachovia Corp. ERISA Litig.*, No. 3:09-cv-262, 2011 WL 7787962, at *4 (W.D.N.C. Oct. 24, 2011) (finding class members implicitly

---

[3] Plaintiffs will respond to the objections in a separate filing and believe the objections are without merit and should be overruled.

approved settlement where only 4 of 150,000 class members filed objections). "The strong favorable reaction of the class is overwhelming evidence that the Settlement is fair, reasonable and adequate." *In re Veeco Instruments Inc. Sec. Litig.*, MDL No. 05-1695, 2007 U.S. Dist. LEXIS 85629, at *22 (S.D.N.Y. Nov. 7, 2007); *see also Domonoske v. Bank of America, N.A.*, 790 F. Supp. 2d 466, 474 (W.D. Va. 2011).

In sum, the Settlement provides significant, valuable benefits to Settlement Class members now in exchange for claims that are subject to ongoing risks, time, and expense from further litigation. This Settlement is fair, reasonable, adequate, and an excellent result for the Settlement Class, and it should be finally approved.

## E.  The Court should approve the requested attorneys' fees and expenses.

In this circuit, courts use two methods to determine attorneys' fees awards in class actions: (1) the percentage of recovery method and (2) the lodestar method. *Mills*, 265 F.R.D. at 260. Here, Class Counsel request a fee of $19,800,000, constituting 2.6–6.9% of the total value of the Settlement, as well as approximately $200,000 in reimbursement of out-of-pocket expenses that Class Counsel incurred in the course of representing the Settlement Class. This request represents a lodestar multiplier of 3.5, within the expected range in this Circuit, and it is significantly less than the 30% of the total value of the Settlement which Sirius XM agreed not to oppose, and which is typical in class actions of this size. *See In re LandAmerica 1031 Exch. Servgs., Inc. I.R.S. 1031 Tax Deferred Exch. Litig.*, MDL 2054, 2012 WL 5430841, at *4 (D.S.C. Nov. 7, 2012) (collecting cases showing that most percentage fee awards range from 18–36% of the settlement value). Because this request is reasonable and in line with fees and expenses awarded in similar cases, the Court should approve Class Counsel's fee and expense request.

### 1.  The fee request is fair and reasonable in light of the total value of the Settlement.

Federal courts have developed a strong preference for using a percentage of the recovery method. *Kirven*, 2015 U.S. Dist. LEXIS 36393, at *29–30 (the percentage method "better aligns the interests of class counsel and class members … by tying the attorneys' award to the overall

17

result achieved rather than the hours expended by the attorneys") (quoting *Kay*, 749 F. Supp. 2d at 461); *see also Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014) ("An attractive aspect of the percentage of recovery method is its results-driven nature which ties the attorneys' award to the overall result achieved rather than the hours expended by the attorneys."); *Strang v. JHM Mortgage Sec. Ltd. Partnership*, 890 F. Supp. 499, 502 (E.D. Va. 1995) ("the current trend among the courts of appeal favors the use of a percentage method …"); *see also Deem v. Ames True Temper, Inc.*, 2013 U.S. Dist. LEXIS 72981, 2013 WL 2285972, at *4 (S.D. W. Va. May 23, 2013) (noting that "[d]istrict courts within the Fourth Circuit have consistently endorsed the percentage method," and collecting cases supporting this conclusion).

To determine the amount of the benefit conferred, courts look to the total amount made available to the class, rather than the amount ultimately claimed by class members. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980); *see also Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). This method recognizes that the efforts of class counsel established the entire settlement, including non-monetary benefits, for the benefit of the entire class. *Masters v. Wilhelmina* Model *Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (citing *Williams*, 129 F.3d at 1027); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance."). Attorneys' fees are awardable even though some or all of the benefit conferred is nonpecuniary in nature. *Mills v. Electric Auto-Lite*, 396 U.S. 375 (1970); *see also Clark v. Experian Info. Sols., Inc.*, 2004 WL 256433, at *9 (D.S.C. Apr. 20, 2004) (finding that nonpecuniary benefits have value to class members).

Class Counsel base their requested fee on a conservative range of the value of the total Settlement, taking into consideration the value of the Free Service offered and the Settlement Fund, not even accounting for the injunctive relief, which provides substantial additional value. Here, Class Counsel estimate that approximately 250,000 Settlement Class members will submit claims for cash, meaning that approximately 11.4 million Settlement Class members will be entitled to the Free Service and will receive notice after final approval instructing them how to activate their benefit. (Ex. 15, Miller Decl. ¶ 42.) Valuing this benefit at $62.97 per Settlement Class

member, which includes the $47.97 in monthly fees and $15.00 activation fee consumers would pay to purchase this service from Sirius XM, but does not include other applicable fees, the Free Service component is valued at $717.8 million. (Ex. 15, Miller Decl. ¶ 42); *see In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001) (stating "the non-cash character of the settlement consideration represents, in the circumstances of this case, a reasonable method for securing value for plaintiffs' settlement of their claims against the MicroStrategy Defendants."). Even if the Free Service is conservatively valued at only $22, or half the estimated cash benefit, the value of the Free Service is still $250 million. Adding the Free Service component to the $35,000,000 Settlement Fund, the total value of the Settlement is therefore $285.8–752.8 million. (Ex. 15, Miller Decl. ¶ 42); *see Clark*, 2004 WL 256433, at *9 (recognizing a benefit to the class from payment of fees and litigation expenses and notice-related expenses including the costs of preparing and forwarding notices, and the costs of publication); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 364 (D.D.C. 2007) (noting "the attorneys' fees are borne by defendants and not plaintiffs, [thus] they represent a valuable part of the settlement"). This valuation is conservative because it does not include any amount ascribed to the injunctive relief, which, though difficult to quantify, is meaningful and significant, worth at least millions of dollars to the Settlement Class. (Ex. 1, Caddell Decl. ¶ 36; Ex. 16, Hansen Decl. ¶¶ 8–9.) *See Boeing*, 444 U.S. at 472 (holding that it is proper to award fees based on total value of the settlement); *see also Berry v. Schulman*, 807 F.3d 600, 615 (4th Cir. 2015) (upholding FCRA class action settlement and award of attorneys' fees for injunctive relief).

In considering the reasonableness of attorneys' fees under a percentage of recovery calculation, courts in this Circuit consider: (1) the results obtained; (2) the efficiency, skill and experience of counsel involved; (3) the risk of nonpayment; (4) objections by class members; (5) awards in similar cases; (6) the complexity and duration of the litigation; and (7) public policy. *Kay*, 749 F. Supp. 2d at 464; *Boyd*, 299 F.R.D. at 463. "Importantly, fee award reasonableness factors need not be applied in a formulaic way because each case is different, and in certain cases, one

factor may outweigh the rest." *Boyd*, 299 F.R.D. at 462 (citing *In re AT&T Corp.*, 455 F.3d 160, 166 (3d Cir. 2006)).

These factors support Class Counsel's requested fee award of $19.8 million here.

### a.   Results obtained for the Settlement Class

"The result achieved by the attorneys for the class is often cited as one of the most significant factors in determining the reasonableness of a fee award." *Kay*, 749 F. Supp. 2d at 464; *see also* Federal Judicial Center, *Manual for Complex Litigation*, § 27.71, p. 336 (4th Ed. 2004) (the "fundamental focus is on the result actually achieved for class members") (citing Fed. R. Civ. P. 23(h) committee note). Standing alone, this factor supports Class Counsel's fee request. Through hard-fought litigation and despite the substantial uncertainty and risk with proceeding through class certification, trial, and any subsequent appeals, the Settlement provides outstanding value to the Settlement Class. (Ex. 15, Miller Decl. ¶ 42.)

The estimated individual Settlement Class member recovery here, both in terms of the Free Service (valued at $62.97) and the cash claim (approx. $44), is in line with or exceeds other finally approved TCPA class action settlements. *See e.g., Arthur v. Sallie Mae, Inc.*, 2012 U.S. Dist. LEXIS 132413 (W.D. Wash. Sept. 17, 2012) (approving TCPA settlement where each claiming class member was estimated to receive recovery between $20.00 and $40.00); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) (finally approving TCPA settlement where the individual settlement award was approximately $30.00); *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) (individual recovery of $20 to $40 per claimant); *Amadek v. Capital One Fin. Corp. (In re Capital One Tel. Consumer Prot. Act Litig.)*, 80 F. Supp. 3d 781, 787 (N.D. Ill 2015) (awarding $34.60 per claiming class member).[4]

---

[4] Settlements under the Fair Credit Reporting Act have been approved with similar individual recoveries. *See e.g., Pitt v. K-Mart Corp, et al.*, 3:11-cv-697 (E.D. Va. 2013), attached as Exhibit E to Caddell Decl. ($29.50 payment for those class members with claims accruing five to three years before the filing of the action, and a $59 payment to those class members whose claims had accrued within two years prior to the filing of the Complaint).

### b.   The efficiency, skill, and experience of counsel

Class Counsel are all experienced and skilled class action attorneys with significant experience prosecuting large consumer rights class actions, including TCPA class actions, as outlined in their respective declarations.[5] Class Counsel achieved this excellent Settlement after hard-fought and extensive motion practice and significant amounts of discovery, but without trial and extended litigation, which would only have increased the costs ultimately borne by the Class. Counsel should be justly rewarded for obtaining relief in a timely and efficient manner. *See Kirven*, 2015 U.S. Dist. LEXIS 36393, at *30 ("The percentage-of-the-fund approach rewards counsel for efficiently and effectively bringing a class action to a resolution."). The significant skill and competence of opposing counsel should be considered as well. *See Kirven*, 2015 U.S. Dist. LEXIS 36393, at *32-*33; *Temp. Servs.*, 2012 U.S. Dist. LEXIS 86474, at *25. Sirius XM is represented by experienced attorneys from Jones Day, a global law firm skilled in class action defense. *See* http://www.jonesday.com/experiencepractices.

### c.   The risk of nonpayment

Class Counsel prosecuted this case on a purely contingent basis, with no guarantee they would receive reimbursement for fees or expenses. Indeed, when the *Hooker* Case was filed, there was a pending appeal of the district court's order to compel arbitration in *Knutson*, making the risk that Plaintiffs' claims could be forced into arbitration especially salient. As explained above, the definition of ATDS, now at issue in Sirius XM's pending appeal of the FCC's July 20, 2015 declaratory ruling, and the risk that a class might not be certified, among other litigation risks, made Plaintiffs' recovery in this case far from certain. (*See* Section III.D.2.a *supra*.) In light of the legal risks and hurdles, and substantial out-of-pocket expenses to effectively prosecute this complex litigation, the risk of nonpayment was real, and favors the requested fee award. *Mills*, 265 F.R.D.

---

[5] *See* Ex. 1, Caddell Decl. ¶¶ 10–17; Ex. 2, North Decl. ¶¶ 7–10; Ex. 3, Downing Decl., ¶¶ 6–9; Ex. 4, Kazerounian Decl. ¶ 29; Ex. 5, Swigart Decl. ¶¶ 26–28; Ex. 6, Ibey Decl. ¶¶ 14-15; Ex. 7, McGuire Decl. ¶¶ 5–8; Declaration of Cliff Cantor, attached as Ex. 8 ("Cantor Decl."), ¶ 8 & Ex. 1 thereto; Declaration of Michael J. McMorrow, attached as Ex. 9 ("McMorrow Decl.") ¶¶ 8–9; Declaration of David Healy, attached as Ex. 10 ("Healy Decl.") ¶ 5.

at 263; *Kirven*, 2015 U.S. Dist. LEXIS 36393, at *33; *Temp. Servs.*, 2012 U.S. Dist. LEXIS 86474, at *26-27.

### d. Objections to the Settlement

Out of almost 12 million Settlement Class members, only 2 objections have been filed, both by serial objectors who may not even be Class members. (*See* Response to Objections, filed contemporaneously herewith.) The small number of objections further supports the reasonableness of the requested fee. *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 763 (S.D. W. Va. 2009) (holding that "very low incidence of objections, especially in light of the success of the direct notification, not only demonstrates the Class Members' satisfaction with the settlement result, but also shows their implicit approval of its terms, including the attorneys' fee provision").

### e. Awards in similar cases

Attorneys' fees awarded under the "percentage of recovery" method are generally between twenty-five percent and thirty percent of the fund. MANUAL FOR COMPLEX LITIGATION ("MCL") § 14.121. *See also Manuel,* 2016 U.S. Dist. LEXIS 33708, at *16 (noting "In the Fourth Circuit, the most recent data demonstrates an average fee award of 27.7 percent.") (citing NEWBERG ON CLASS ACTIONS § 15:83 (5th ed. 2011)); *see also Savani v. URS Prof'l Sols. LLC*, 2014 U.S. Dist. LEXIS 5092, at *20–21 (D.S.C. Jan. 15, 2014) (opining that a fee request of 27% of the total value of the settlement, equating to approximately 39.57% of the available, recovered fund was "within the normal ranges of fees awarded)" and noting that a fee award of 30% of a $46.5 million settlement was awarded in *In re Household Int'l, Inc. ERISA Litig.*, No. 02-7921 (N.D. Ill. Nov. 22, 2004), and a fee award of 30% of a $21 million settlement was awarded in *In re MRRM, P.A.*, 404 F.3d 863 (4th Cir. 2005)).

Here, Class Counsel have reserved $10.8 million to pay claims to Settlement Class members who filed claims for cash, making the requested fee only 2.6–6.9% of the total settlement value. (Ex. 1, Caddell Decl. ¶ 41; Ex. 15, Miller Decl. ¶ 42.) This is far below the range typically awarded in class actions. (*See* Ex. 15, Miller Decl. ¶¶ 43–46 (citing numerous studies showing that the mean percentage fee award in class actions is approximately 30%); *id.* ¶ 49 (finding that in

2009–2013, the mean fee award in class actions was 27% and the median was 29% and that in the Fourth Circuit, the mean was 26% and the median was 25%); *see also Bridgeview Health Care Ctr., Ltd. v. Clark*, No. 09-cv-5601, 2015 U.S. Dist. LEXIS 95918, at *4 (N.D. Ill. July 23, 2015) (recognizing that one-third of the settlement value was awarded as fees in the multimillion dollar TCPA settlement in *Saf-T-Gard Int'l., Inc., v. Seiko Corp. of Am.*, No. 09-cv-0776 (N.D. Ill.); *Ikuseghan v. Multicare Health System,* 2016 WL 4363198, at *2 (W.D.Wash., 2016) (surveying TCPA class action settlements and finding that 30% of the recovery was a proper benchmark for awarding attorneys fees in a TCPA class action).

### f.   The complexity and duration of the litigation

As shown in the briefing of the motion to compel arbitration, motion to strike class allegations, and motion for class certification, this Litigation involved complex legal and factual issues. It has lasted for almost five years, and the parties have engaged in substantial discovery, including numerous depositions, discovery from third party telemarketing vendors, and the production and review of almost 100,000 pages of documents. (Dkt. 186 at 4–5.) In addition, the TCPA is a highly technical area of the law, involving complex issues such as whether particular dialing systems qualify as "ATDSs" under the TCPA and the FCC's regulations interpreting the statute. *See Barani v. Wells Fargo Bank, N.A.*, 2014 WL 1389329, at *5 (S.D. Cal. Apr. 9, 2014) (recognizing that "the law interpreting the TCPA … has been under flux …"); *see also Wilkins v. HSBC Bank Nev., N.A.*, 2015 U.S. Dist. LEXIS 23869, at *22 (N.D. Ill. Feb. 27, 2015) ("Plaintiffs here run the risk that potentially forthcoming FCC orders may extinguish their claims.").

### g.   Public policy

Public policy also weighs in favor of the proposed fee and expense award. The TCPA is a federal statute aimed at protecting consumer privacy. *See Meyer v. Portfolio Recovery Assocs., LLC*, 696 F.3d 943, 951 (9th Cir. Cal. 2012). Consumers find individual TCPA actions complex and time consuming, *see Mainstream Mktg. Servs. v. FTC*, 284 F. Supp. 2d 1266, 1273 (D. Colo. 2003), and it is unlikely individual actions will be filed because of the small individual claims of Class Members. *See Kensington Physical Therapy, Inc. v. Jackson Therapy Partners, LLC*, 974 F. Supp. 2d 856, 862

(D. Md. 2013) ("the maximum statutory fine [under the TCPA] is relatively small"); *see also Anselmo v. West Paces Hotel Group, LLC*, 2012 U.S. Dist. LEXIS 164618, at *13 (D.S.C. Nov. 19, 2012) ("public policy weighs in favor [of the requested fees] … in light of the fact that many Plaintiffs would not have pursued their claims individually.").

### 2. The lodestar/multiplier cross-check confirms the reasonableness of the requested fee award.

Under the two-step lodestar/multiplier cross-check, trial courts first calculate the lodestar "by multiplying the number of hours reasonably worked by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Mills*, 265 F.R.D. at 264. The lodestar figure may then be augmented or multiplied to reflect additional factors to be considered in determining a reasonable attorney fee award. *Singleton*, 976 F. Supp. 2d at 689. These factors include "the benefit obtained for the settlement class, the complexity of the case, and the quality of the representation." *Id.* at 688. "The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar." *Boyd*, 299 F.R.D. at 467. Thus, "[w]hen using the lodestar method as a 'cross-check,' the Court need not apply the 'exhaustive scrutiny' typically mandated, and the Court may accept the hours estimates provided by Lead Counsel." *Mills*, 265 F.R.D. at 264; *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 765 (S.D. W.Va. 2009); *Kay*, 749 F. Supp. 2d at 469; *Boyd*, 299 F.R.D. at 467. The lodestar approach should not trump the percentage of the fund methodology. *See In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3d Cir. 2005)) (holding that "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method").

A multiplier of between 3 and 4.5 in complex cases is not uncommon. *See, e.g.*, *Kay*, 749 F. Supp. 2d at 470 (approving a fee that was between 3.4 to 4.3 times the lodestar amount, noting that "courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee"); *see also Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 439 n.6 (D. Md. 1998) (noting that "the $2.55 million fee requested amounted to a lodestar enhancement

of 3.6—well within the average range of 3–4.5 for comparable cases"); *In re Beverly Hills Fire Litigation*, 639 F. Supp. 915 (E.D. Ky. 1986) (awarding multiplier of 5 for lead counsel); *Di Giacomo v. Plains All Am. Pipeline*, 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. Dec. 18, 2001) (approving 5.3 multiplier).

The lodestar multiplier here is 3.5, based on counsel's fee request of $19.8 million and their collective lodestar of $5,646,997.50, which is well within the range of fee awards in similar cases. (Ex. 15, Miller Decl. ¶ 69.) In light of the significant results obtained, the efficiency with which the case was litigated, the risk, difficulty, and the public service rendered by this action, and the work still to be done in effectuating the Settlement's administration, the lodestar cross-check confirms that the requested fee is reasonable. (*Id.*) The hourly rates of Plaintiffs' Counsel and their staff and a summary of the hours worked (which includes a reasonable number of anticipated hours) is set forth in the chart below. Additional detail regarding the work performed by each firm, including a breakdown of the hours worked by task category, is found in the accompanying declarations of Plaintiffs' counsel.

| | Hrs. | Rate/Hr. | Total |
|---|---|---|---|
| **CADDELL & CHAPMAN** | - | - | - |
| Michael A. Caddell | 1076.2 | $900 | $968,580.00 |
| Cynthia B. Chapman | 709.3 | $725 | $514,242.50 |
| Amy E. Tabor | 847.4 | $525 | $444,885.00 |
| Kathy E. Kersh | 128 | $250 | $32,000.00 |
| Felicia D. Labbe | 118.9 | $175 | $20,807.50 |
| Tatiana P. Lutomski | 95.50 | $175 | $16,712.50 |
| Craig Marchiando | 685.2 | $425 | $291,210.00 |
| Benjamin C. Wickert | 22.7 | $425 | $9,647.50 |
| **THE CONSUMER AND EMPLOYEE RIGHTS LAW GROUP, P.C.** | - | - | |
| Christopher C. North | 421.7 | $575 | $242,477.50 |

| | | | |
|---|---|---|---|
| William L. Downing | 2095.5 | $575 | $1,204,912.50 |
| **KAZEROUNI LAW GROUP, APC** | - | - | - |
| Abbas Kazerounian | 839.5 | $625 | $524,687.50 |
| Jason A. Ibey | 214.6 | $425 | $91,205.00 |
| **HYDE & SWIGART** | - | - | - |
| Joshua B. Swigart | 651.5 | $625 | $407,187.50 |
| **MCGUIRE LAW, PC** | - | | |
| Myles McGuire | 428.6 | $665 | $285,019.00 |
| Evan Meyers | 296.3 | $615 | $182,224.50 |
| Eugene Y. Turin | 291.5 | $340 | $99,110.00 |
| Paul T. Geske | 3.9 | $310 | $1,209.00 |
| Law Clerks | 65.6 | $225 | $14,760.00 |
| **LAW OFFICES OF CLIFFORD CANTOR** | 16.0 | $600 | $9,600.00 |
| **MCMORROW LAW, PC** | | - | |
| Michael J. McMorrow | 425 | $660 | $280,500.00 |
| **DUDLEY SELLERS HEALY & HEATH, PLC** | | - | |
| David P. Healy | 17.2 | $350 | $6,020.00 |
| **TOTAL COMBINED LODESTAR** | | - | **$5,646,997.50** |

### a. The hourly rates are reasonable.

Plaintiffs' Counsel are entitled to the hourly rates charged by attorneys of comparable experience, reputation, and ability for similar litigation. *Kay*, 749 F. Supp. 2d at 469; *see also Boyd*, 299 F.R.D. at 467 n.6 (noting that "the court need not engage in an intensive analysis of the rates charged when applying the lodestar analysis merely as a cross-check"). Payment at full market rates is essential to fulfill the goal of enticing well-qualified counsel to undertake difficult consumer interest litigation, such as this. *Boyd*, 299 F.R.D. at 466-67. The background and experience of Plaintiffs' Counsel are set forth in their attached declarations and firm resumes. Plaintiffs' Counsel have excellent reputations as nationwide class action practitioners. Their hourly rates are within

the range of rates billed by comparable attorneys in this market, have been approved by other courts, and are the standard rates they charge to all of their clients. (*See* Ex. 1, Caddell Decl. ¶¶ 49–52; Ex. 4, Kazerounian Decl. ¶ 18; Ex. 5. Swigart Decl. ¶ 15; Ex. 6, Ibey Decl. ¶ 8; Ex. 7, McGuire Decl. ¶ 19; Ex. 8, Cantor Decl. ¶ 5; Ex. 9, McMorrow Decl. ¶ 16.)

Plaintiffs' Counsel's lodestar is calculated using rates that have been accepted in other class action cases. *See Boyd*, 299 F.R.D. at 467 and n.6 (approving attorney rates from $325 to $700 per hour, and support staff rates from $175 to $250 per hour for "firms with national class action practices"); *Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *8 (M.D.N.C. May 9, 2016) (finding that partner billing rates of $640-$880 per hour and associate billing rates of $375-$550 per hour were "within the range of reasonableness[,]" especially given that "the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"); *In re NeuStar, Inc. Sec. Litig.*, No. 1:14cv885 (JCC/TRJ), 2015 U.S. Dist. LEXIS 165320, at *28 (E.D. Va. Dec. 8, 2015) (approving rates of $800–$975 for partners, $420–$700 for associates, and $260–$310 for paralegal services); *Hosch v. BAE Systems Info. Sols., Inc.*, 2015 WL 12227738, at *3 n.4 (E.D. Va. Apr. 28, 2015) (finding that rates of up to $650/hour were "within the acceptable range of reasonableness"); *Burke v. Shapiro, Brown & Alt, LLP*, 2016 U.S. Dist. LEXIS 65120, at *14 (E.D. Va. May 17, 2016) (finding hourly rates of counsel with particular expertise in consumer class actions ranging from $325 to $625 reasonable; finding $200 per hour for paralegals reasonable).

Professor Miller's research confirms that courts commonly approve class-action attorney fee rates ranging from $525–$975 per hour. (Ex. 15, Miller Decl. ¶ 62.) These rates are comparable to those typically charged by lawyers in defense firms, which, as shown in publicly available bankruptcy filings, range from $580–$1,120 per hour. (*Id.* ¶¶ 61–62.) Because counsel's rates "are commensurate with rates reported in similar cases," they are reasonable and should be approved. (*Id.* ¶ 64.)

### b.   The hours expended are reasonable.

As of approximately November 2016, Plaintiffs' Counsel have spent a combined 9,003.4 hours in this Litigation against Sirius XM.[6] The Litigation has lasted almost five years (commencing with *Knutson*) and required significant discovery, fact and expert depositions, several fully briefed, complex motions, and the successful appeal in *Knutson. See supra* Section II.A. Class Counsel also spent a significant amount of time preparing for and attending the mediation where the Settlement terms were agreed and then negotiating, drafting, and finalizing the Settlement Agreement and related notices with Sirius XM and preparing the motion for preliminary approval. (Ex. 1, Caddell Decl. ¶ 34.)

Class Counsel note that their work is not yet complete. Class Counsel must still (1) prepare for and attend the final approval hearing set for December 20, 2016; (2) draft any supplemental papers in support of final approval and a response to any objections to the fee request; (3) continue to oversee the settlement administration process, including addressing any claim review issues and monitoring payments to the Settlement Class; (4) handle any appeals; and (5) oversee any potential *cy pres* award. *See* Ex. 1, Caddell Decl. ¶ 34; Ex. 4, Kazerounian Decl. ¶ As Class Counsel's lodestar increases, the multiplier will decrease, further supporting the reasonableness of the requested fee award. Thus, the lodestar multiplier of 3.5 confirms that, in light of the contingent nature of this action and the amount and complexity of the work involved, the requested fee is reasonable.

### c.   Plaintiffs' litigation costs are compensable and reasonable.

"It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." *Singleton*, 976 F. Supp. 2d at 689. Such expenses include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988). Class Counsel submit declarations

---

[6] *See* Ex. 1, Caddell Decl. ¶ 47 & Ex. F thereto; Ex. 2, North Decl. ¶¶ 20–22; Ex. 3, Downing Decl. ¶ 22; Ex. 4 Kazerounian Decl. ¶¶ 15–17; Ex. 5, Swigart Decl. ¶¶ 12–13; Ex. 6, Ibey Decl. ¶¶ 5–6; Ex. 7, McGuire Decl. ¶¶ 20–21; Ex. 8, Cantor Decl. ¶ 8; Ex. 9, McMorrow Decl. ¶¶ 14–15; Ex. 10, Healy Decl. ¶ 10.

attesting that they have incurred approximately $200,0000 in expenses in prosecuting the litigation.[7] The expenses include such expenses as filing fees, mediation fees, travel to depositions, an appeal to the Ninth Circuit Court of Appeals, hearings and settlement conferences, expert fees, discovery, depositions transcripts and court reporter fees, photocopies, and postage. (*See id.*) These expenses were reasonably and necessarily incurred, and are of the sort that would typically be billed to paying clients in the marketplace. *See Singleton*, 976 F. Supp. 2d at 689 (awarding reimbursement for filing fees, travel costs, and copies); *see also Boyd*, 299 F.R.D. at 468.

**F.   The requested service awards are reasonable and appropriate.**

"It is very common in class action cases for service or incentive payments to be paid to named Plaintiffs or class representatives in addition to their proportionate share of the recovery." *Faile v. Lancaster County*, 2012 U.S. Dist. LEXIS 189610, at *41 (D.S.C. Mar. 8, 2012). Such awards "compensate Plaintiffs for their additional efforts, risks, and hardships they have undertaken as class representatives on behalf of the group in filing and prosecuting the action." *Faile*, 2012 U.S. Dist. LEXIS 189610, at *41; *Muhammad*, 2008 U.S. Dist. LEXIS 103534, at *24-*25 ("Class members would have received nothing had [the plaintiff] not been willing to step up and file this action. [The plaintiff] gave his time and effort to prosecute the case."). Service awards are committed to the discretion of the trial court and should be awarded based upon the court's consideration of, *inter alia*, the time and effort spent on the litigation. *See Kay*, 749 F. Supp. 2d at 472-73. Class Counsel respectfully request that the Court approve a service award of $10,000 for Plaintiff Hooker and $2,500 each to Plaintiffs Knutson, Elikman and Parker, in recognition of their contributions toward the prosecution of this litigation culminating in a nationwide settlement.[8]

---

[7] Ex. 1, Caddell Decl. ¶ 48 & Ex. G thereto; Ex. 2, North Decl. ¶ 23; Ex. 4, Kazerounian Decl. ¶ 19; Ex. 5, Swigart Decl. ¶ 16; Ex. 7, McGuire Decl. ¶ 22; Ex. 8, Cantor Decl. ¶ 7; Ex. 9, McMorrow Decl. ¶ 17; Ex. 10, Healy Decl. ¶ 10. Class Counsel will update this information before the final fairness hearing.

[8] Declaration of Francis Hooker, Jr., attached as Ex. 11, ¶¶ 1, 3 & 4; Declaration of Erik Knutson, attached as Ex. 12 ¶¶ 1, 3 & 5; Declaration of Yefim Elikman, attached as Ex. 13 ¶¶ 1, 3 & 5; Declaration of Anthony Parker, attached as Ex. 14 ¶¶ 1, 3, 4 & 7.

The requested service awards are in line with amounts awarded in similar cases. *See, e.g.,* *Decohen*, 299 F.R.D. at 483 ($10,000 service award); *Manuel,* 2016 U.S. Dist. LEXIS 33708, at *18 ($10,000 service award); *Kay*, 749 F. Supp. 2d at 473 ($15,000 service awards); *Leigh v. Bottling Grp., LLC*, 2012 U.S. Dist. LEXIS 17016, at *24 (D. Md. Feb. 10, 2012) ($9,000 service award in FLSA case); *Muhammad*, 2008 U.S. Dist. LEXIS 103534, at *24-25 ($5,000 service award); *Domonoske,* 790 F. Supp. 2d at 477 ($5,000 incentive awards). Sirius XM does not oppose the service awards. (*See* Settlement Agreement, Ex. A to Caddell Decl. § 17(d).)

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court finally approve the Settlement and award the requested fees, expenses, and service awards.

Date: November 21, 2016                    Respectfully submitted,

   /s/ Christopher C. North
Christopher Colt North (VSB # 16995)        Michael A. Caddell (*pro hac vice*)
cnorthlaw@aol.com                           mac@caddellchapman.com
William L. Downing (VSB # 17704)            Cynthia B. Chapman (*pro hac vice*)
wdowninglaw@aol.com                         cbc@caddellchapman.com
THE CONSUMER & EMPLOYEE RIGHTS              CADDELL & CHAPMAN
LAW FIRM, P.C.                              628 East 9th Street
751-A Thimble Shoals Blvd.                  Houston, TX 77007-1722
Newport News, VA 23606                      Telephone: (713) 751-0400
Tel: (757) 873-1010                         Fax: (713) 751-0906
Fax: (757) 873-8375

                                            Abbas Kazerounian (*pro hac vice*)
                                            ak@kazlg.com
                                            KAZEROUNI LAW GROUP, APC
                                            245 Fischer Avenue, Suite D1
                                            Costa Mesa, CA 92606
                                            Tel.: (800) 400-6808
                                            Fax: (800) 520-5523

                                            *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2016, I filed a true and correct copy of the foregoing

document using the Court's CM/ECF system. The system will then send an electronic notice of

filing to the following counsel of record:

William V. O'Reilly (VSB # 26249)
Attorneys for Defendant Sirius XM Radio Inc.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: woreilly@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
Attorney for Defendant Sirius XM Radio Inc.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

Lee A. Armstrong
Attorney for Defendant Sirius XM Radio Inc.
Jones Day
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-8340
Email: laarmstrong@JonesDay.com

*/s/ Christopher Colt North*
Christopher Colt North (VSB # 16995)