UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

FRANCIS W. HOOKER, Jr.,
for himself and on behalf of all
similarly situated individuals,

    Plaintiff,

v.

    Case No.: 4:13-cv-00003 (AWA/LRL)

SIRIUS XM RADIO INC.

    Defendant.

---

## SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ATTORNEYS' FEES

### I. INTRODUCTION

Whether a settlement involves a cash payment, a claims procedure, non-monetary benefits, or (as here) some combination of these benefits, the same principles apply. Under the Supreme Court's controlling decisions in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), and *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), district courts properly consider all components of settlement value in awarding percentage-of-the-fund attorneys' fees. *Boeing*, 444 U.S. at 477 (holding that class members receive a benefit, entitling class counsel to equitable fees, whether class members choose to collect their settlement benefits or not); *Mills*, 396 U.S. at 395 (holding that plaintiffs may receive a benefit from litigation "justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature").

In keeping with the equitable nature of percentage-of-the-fund attorneys' fee awards, district courts have broad discretion to consider the appropriate percentage award in light of monetary and non-monetary benefits, including benefits that may be unclaimed. *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 628 (11th Cir. 2015), *cert denied sub. nom. Frank v. Poertner*, 136 S. Ct.

1453 (2016) (affirming award of common-fund attorneys' fees based on unclaimed cash benefits as well as non-monetary benefits secured for class). Of course district courts can and do take into account the fact that not all class members may value non-monetary and/or unclaimed settlement benefits equally. Thus, while awards of 25–30% of the fund are standard in all-cash settlements, courts considering settlements with significant unclaimed and/or non-monetary components like this one may decide to award a lower percentage of the overall fund. *See, e.g. Poertner v. Gillette*, No. 12-cv-0803, 2014 WL 4162771, at *5 (M.D. Fla. August 21, 2014), *aff'd* 618 Fed. App'x 624 (11th Cir. 2016) (awarding only 10% of fund in case involving unclaimed benefits as well as non-monetary benefits); *Clark v. Experian*, No. 00-cv-1217, 2004 WL 256433, at *84 (D.S.C. Jan. 14, 2004) (awarding $15 million fee, based on 3% of conservative minimum valuation of settlement, in case involving exclusively non-monetary benefits).

These authorities amply support the requested $19.8 million fee award—to which neither the attorneys general nor the Department of Justice ("DOJ") objected—based on a range of reasonable estimates of the total value of this Settlement. (*See* Miller Decl., Dkt. 195-22 ¶¶ 41–42.) If the Free Service benefit is valued at its market price of $62.97, then the requested fee represents only 2.6% of the total recovery. (*Id.* ¶ 42.) And even if class members value it at only half of the estimated $44 cash benefit, the $19.8 million fee is still just 6.9% of the total recovery, less than the 10% fee that the Eleventh Circuit recently affirmed for a settlement consisting primarily of unclaimed and/or nonmonetary benefits in *Poertner*. *See Poertner*, 2014 WL 4162771, at *5 (awarding $5.4 million in attorneys' fees despite the fact that only $344,850 out of estimated $50 million in potential benefits had been claimed, citing substantial nonmonetary settlement value); *Poertner*, 618 Fed. App'x at 629 (holding that district court did not abuse its discretion in "including the value of the nonmonetary relief and cy pres award as part of the settlement pie"); *see also Clark*, 2004 U.S. Dist. LEXIS 32063, at *65 (finding that "[w]hile it is difficult to assign a precise value to the benefits," the nonmonetary benefits in that case "will average no less than $100 per class member, being less for some and more for others"). The on-point analysis in

2

*Poertner* and *Clark*, applying the well-established principles established in *Boeing* and *Mills*, confirms the reasonableness of the requested fee award.

The lodestar multiplier of (less than) 3.3[1] also confirms that the requested fee is reasonable. Multipliers are appropriate where, as here, class counsel have taken on contingent-fee litigation at substantial risk and achieved an excellent result after five years of battling experienced defense counsel. *See In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 787 (E.D. Va. 2001) (holding that "the process of setting a proper fee in a PSLRA case must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case"). In calculating the lodestar, the court's analysis "need entail neither mathematical precision nor bean-counting." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *see also In re Microstrategy*, 172 F. Supp. 2d at 787 (explaining that "arithmetic calculations aid the fee-setting process, but ultimately a trial court's judgment is centrally important and may trump the calculations"). In making these calculations, courts awarding fees in nationwide, complex class actions like this one use national market rates for complex class action work handled by experienced lawyers with excellent credentials.[2] *In re Microstrategy*, 172 F. Supp. 2d at 788 (finding that the "market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"). Class Counsel's rates (used for lodestar purposes here)—which have been consistently approved by federal courts throughout the country—are in line with current market rates for complex class action work, such as courts regularly use in calculating lodestars in similar matters. And the requested 3.3 multiplier in this case is in the middle of the range of multipliers commonly awarded in similar cases and amply justified by the excellent result Class Counsel have achieved for Class members in this complex, protracted litigation. *See Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp.

---

[1] Of course, that multiplier will continue to shrink as Class Counsel responds to any appeals of the settlement approval and administers the benefits of the settlement.

[2] Mr. Caddell has been practicing for 37 years and his partner, Ms. Chapman, has been practicing for 24 years.

2d 756, 766 (S.D. W. Va. 2009) ("Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee.")

Finally, Caddell & Chapman have submitted additional detail regarding their request for reimbursement of $24,695.25 in miscellaneous travel expenses, which consist of expenses for hotel, airfare, transportation, and parking incurred before June 2015, when Caddell & Chapman's old accounting system recorded all of these expenses under the general "Travel" category. Class Counsel hope that this additional information will address the Court's questions and aid in evaluating their request for attorneys' fees and expenses.

## II. ARGUMENT AND AUTHORITIES

### A. On-point authority supports considering all benefits secured for the class, whether claimed or unclaimed, monetary or non-monetary, in valuing the settlement.

#### 1. It is well established that a common fund for attorneys' fees purposes includes all benefits, claimed or unclaimed.

The Supreme Court's controlling decision in *Boeing* has long established that class recoveries should be valued, for attorneys' fees purposes, based on the total value made available to the class. *Boeing*, 444 U.S. at 480 (affirming award of attorneys' fees based on total value of common fund created for class, regardless of how many class members submitted claims). This principle flows from "the traditional practice in courts of equity," from which the common fund doctrine arises. *Id.* at 478. Because class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel," class counsel have an equitable right to a percentage of the total value of the fund in fees. *Id.* at 480. As the Supreme Court held in *Boeing*, this common fund exists as soon as a settlement agreement gives class members a "'present vested interest in the class recovery.'" *Id.* at 477. Whether class members choose to collect their interest or not, the Supreme Court held that they "had received a benefit within the meaning of the common-fund doctrine." *Id.*

Courts applying *Boeing* around the country have consistently recognized that the Supreme Court's holding requires awarding fees based on the total potential value of the common fund, without regard to how many class members ultimately choose to claim their benefit. *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 282 (6th Cir. 2016) (holding that "the district court properly relied on Supreme Court authority [*Boeing v. Van Gemert*]" in awarding fees based on total value made available to the Class in a claims-made settlement); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 435 (2d Cir. 2007) (reversing attorneys' fee award for abuse of discretion where district court had "calculated the percentage of the Fund on the basis of the claims made against the Fund, rather than on the entire Fund created by the efforts of counsel"); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295–96 (11th Cir. 1999) (holding that common-fund percentage fee should be calculated based on total amount "potentially available to be claimed," even where the actual payment to the class following a claims process is lower); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (holding that the "district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar"); *Saccoccio v. JP Morgan Chase Bank*, 297 F.R.D. 683, 689–90, 695–96 (S.D. Fla. 2014) (approving $20 million attorneys' fee for achieving class settlement that made $300 million available through claims procedure, regardless of number of claims filed).

The policy behind the total-benefits rule serves an important purpose: the deterrence of defendants' wrongdoing in small-stakes class actions. By keying attorneys' fees to the total fund available, the total-benefits rule allows attorneys to effectively litigate class actions under consumer-protection statutes with capped statutory damage provisions like the TCPA (and the FCRA), in which the alleged aggregate harm is huge, but individual damages are small. The FCC has noted that unwanted telemarketing calls are the most frequent complaint they receive from consumers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 1 (2015) ("Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the

Commission"); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 742 (2012) (finding that the TCPA was born out of the need to combat "[v]oluminous consumer complaints about abuses of telephone technology"). Yet "the TCPA's $500 statutory damages provision is likely insufficient to compensate the average consumer for the time and effort involved in bringing a small claims action." *Booth v. Appstack, Inc.*, No. 13-cv-1533, 2015 WL 1466247, at *13 (W.D. Wash. Mar. 30, 2015) (collecting TCPA cases so holding). While class actions involving larger stakes for each class member may both insure plaintiffs against harm and deter defendants from causing it, small-stakes class actions primarily serve a deterrence function. Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043, 2046-47 (2010) ("small-stakes class actions serve an especially important deterrence role because if small-stakes claims are not brought to court through the class action device, they will not be brought at all, and defendants will not internalize the costs of causing small harms"); *see also* David L. Shapiro, *Class Actions: The Class as Party and Client*, 73 NOTRE DAME L. REV. 913, 924 (1998) ("[t]he purpose of [these actions] is solely to deter the kind of wrong that causes a small injury to a large number"). By basing fee awards on the total amount made available, the common-benefit rule incentivizes class counsel to achieve the maximum possible benefit for the class, functioning as a critical deterrent to defendants' wrongdoing.

### 2. The total settlement value includes non-monetary as well as monetary benefits.

The Supreme Court has also established that counsel are "entitled" to fees for securing *non-monetary* as well as monetary benefits. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 389–92 (1970) (holding that attorneys' fees could be awarded based on common benefit created for the class where suit "has not yet produced, and may never produce, a monetary recovery"); *see Poertner*, 618 Fed. App'x at 628 (affirming award of common fund fees and holding that "the value of the nonmonetary relief and cy pres award were part of the settlement pie"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999) (finding that the fact that "significant nonmonetary benefits are also being given to the class" further supported reasonableness of percentage fee

award); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (holding that reimbursement is permitted under the common-fund doctrine "when litigation indirectly confers substantial monetary or nonmonetary benefits on members of an ascertainable class"); *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 172 (3d Cir. 1975) ("Attorneys' fees are awardable even though the benefit conferred is purely nonpecuniary in nature."); *Clark*, 2004 U.S. Dist. LEXIS 32063, at *82 (awarding $15 million percentage-of-fund fee for exclusively non-monetary benefits conferred by agreed business practice changes).

The district of South Carolina's opinion in *Clark*, in which Judge Cameron McGowan Currie awarded $15 million in total fees and expenses in connection with a settlement for exclusively non-monetary relief, directly addresses this Court's question regarding awarding attorneys' fees calculated as a percentage of the total estimated value of the settlement "when the projected value of the settlement is based largely on unclaimed non-monetary benefits." (Dkt. 210 at 3.) The plaintiffs in *Clark* brought claims under the Fair Credit Reporting Act, ("FCRA"), challenging the three major credit reporting agencies' ("CRAs") practice of noting reported accounts as "in bankruptcy" if any holder or user of the account had filed for bankruptcy. *Id.* This "bankruptcy" notation appeared even on the reports of co-holders or users of these accounts who had never filed for bankruptcy. *Id.* The plaintiffs alleged that this misleading reference to "bankruptcy" impaired the class members' ability to access credit. *Clark v. Experian*, No. 00-cv-1217, 2004 WL 256433, at * 1 (D.S.C. Jan. 14, 2004).

Following litigation in three consolidated class actions, the CRAs agreed to remove all "bankruptcy" notations from the reports of account co-holders or users who were not in bankruptcy. In addition, class members had a right to claim a free credit report, valued at $9, from each defendant, and the court approved the settlement. *Clark*, 2004 WL 256433, at *15. In a separate opinion, the court awarded $15 million in fees. *Clark*, 2004 U.S. Dist. LEXIS 32063. Overruling objections that this fee award was excessive "given that no monetary relief was provided to the class," the court found that the value of the non-monetary benefits justified the requested fee under a percentage-of-the-fund analysis. *Id.* at *18, *64–68. The court considered

evidence from several experts regarding valuation of the non-monetary relief. *Id.* at *64–68. While the court determined that "[i]n the court's view, some of these estimates are excessive," it ultimately determined that a conservative minimum valuation of the non-monetary relief supported the requested award. *Id.* at *65. In reaching this conclusion, the court recognized that not all class members would benefit from the non-monetary relief, basing its valuation on the assumption that "some Class Members would not be troubled at all by the complained-of remark on their credit reports. They might, in fact, never have become aware of the remarks and might never have suffered any adverse consequences." *Id.* at *67–68 n.33. The court also noted that "relatively few" class members sought the free credit reports. *Id.* at *65. The court nevertheless recognized that the settlement benefits to the class as a whole easily exceeded, at a minimum, $150 million. ("While it is difficult to assign a precise value to the benefits, the court concludes that the total benefits will average no less than $100 per class member, being less for some and more for others.") Because that minimum value "result[ed] in a fee equal to or above the agreed cap on fees," the court found it was not necessary to determine the precise settlement value. *Id.* at *83. In addition, the court noted that the requested fee was the functional equivalent of "asking each Class Member to pay $10 to obtain the benefits of this litigation, including discontinuation of the complained-of practice by Defendants" and that "[v]iewed from this perspective, the fees are particularly reasonable." *Clark*, 2004 U.S. Dist. LEXIS 32063, at *83 n.42.

The recent *Poertner v. Gillette* decision from the Eleventh Circuit—which involved a settlement including both monetary and non-monetary benefits—follows similar reasoning. *See Poertner*, 618 Fed. App'x 624. In *Poertner*, the plaintiffs alleged that Gillette had misleadingly marketed "Ultra" batteries as longer-lasting than its regular "Copper Top" batteries. *Poertner*, 2014 WL 4162771, at *1. With a motion for class certification fully briefed, the parties engaged in mediation. *Id.* at *1–2. Ultimately, the parties agreed to a settlement that allowed class members who filed valid claims to receive $3.00 per pack of AA or AAA Duracell "Ultra" batteries purchased—up to four packs with proof of purchase and two packs without proof. *Id.* at *2; *Poertner*, 618 Fed. App'x at 626. Gillette also agreed to stop making the misleading statements and,

motivated materially by the litigation, actually stopped selling the "Ultra" branded batteries. *Id*. Finally, Gillette agreed to contribute $6 million to charitable first-responder organizations that regularly use consumer batteries, including Toys for Tots and The American Red Cross, as a *cy pres* award. *Id*.

The district court approved the settlement and awarded $5.4 million dollars in attorneys' fees, together with $272,000 in expenses. *Poertner*, 2014 WL 4162771, at *4 (M.D. Fla. Aug. 21, 2014). In estimating the settlement value, the Court noted that "[i]n determining a reasonable fee … the Court is not limited by the actual amount of claims to be paid." *Id*. at *4. Instead, the *Poertner* court considered "both the monetary and non-monetary benefits to the class and the economics involved in prosecuting the case," as well as the "substantial equitable benefit" the class received from Gillette's ceasing to sell the "Ultra" branded batteries. *Id*. at *5. Overruling objections that "the total monetary value that will personally accrue to the Class Members is relatively small as compared to the attorney's fees," the court again noted that "Class Counsel's efforts have played a large part in ending the Defendants' practice of selling the Ultra batteries" and that the charitable award given as *cy pres* relief was also appropriate to consider, as it "will have an indirect benefit to the class." *Id*. at *3. On appeal, the Eleventh Circuit affirmed, holding that the district court did not abuse its discretion in valuing the settlement, including both the monetary and non-monetary relief. *Poertner*, 618 Fed. App'x at 627. Dismissing the objectors' argument that the district court should have considered only the cash claims actually paid, which totaled $344,850, the Eleventh Circuit held that "the district court's valuation of the nonmonetary relief was supported by the record" and affirmed the $5.4 million fee award. *Id*. at 629.

Here, the requested fee represents only 2.6%–6.9% of the value of the settlement, including the cash fund as well as a reasonable valuation range for the Free Service benefit, but without assigning any value for the injunctive relief obtained. (Dkt. 195-22 ¶¶ 41–42.) This is significantly lower than the 10% award approved in *Poertner*, which was based on unclaimed monetary and non-monetary benefits, and in the range of the 3% award—based on a conservative *minimum* valuation of exclusively nonmonetary benefits in *Clark*. *Poertner v. Gillette*, 2014 WL 4162771, at *5 (noting

9

that $50 million valuation of common fund did not account for claims rate, but that "the Court is not limited by the actual amount of claims to be paid" and also taking nonmonetary benefit into account); *Clark*, 2004 U.S. Dist. LEXIS 32063, at *84 (awarding $15 million fee as 3% of benefits worth "at least $150 million per case"). While Class Counsel in this case have assigned a dollar value only to the Free Service benefit, it is worth noting that the injunctive relief also has significant value to the Class which, though perhaps difficult to quantify, the court may consider in assessing what percentage-based fee is reasonable. *See Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (affirming award of additional $1.5 million fee for work performed to secure injunctive relief); *see also Poertner*, 618 Fed. App'x at 626 (approving consideration of "substantial equitable benefit" secured for class in stopping the sale of allegedly misleadingly marketed batteries); *Saccoccio*, 297 F.R.D. at 695 (finding that injunctive relief secured further supported reasonableness of requested attorneys' fee); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 478 (D.N.J. 2008) (awarding $69.7 million fee and considering value of injunctive relief in deciding to award higher percentage fee). Further confirming its reasonableness, the requested fee amounts to only approximately $1.65 per class member for achieving all of these valuable benefits:

| Fee | ÷ | Class Members | = | Per-class-member fee for Free Service, cash benefit option, and business practice changes |
|---|---|---|---|---|
| $19,800,000 | | @12 million | | $1.65 |

Viewed from the Class members' perspective, cash claimants receiving a check for $44 will thus bear only 3.75% of their recovery in fees, those receiving 3 months of Free Service valued at $62.97 will bear only 2.62% of that amount in fees, and the entire Class will benefit from Sirius XM's business practice changes for less than the cost of a cup of coffee. *See Clark*, 2004 U.S. Dist. LEXIS 32063, at *83 n.42 (finding that $10 per class member was reasonable for achieving the benefits secured in that case). The Supreme Court's opinions in *Boeing* and *Mills*, establishing that fees should be evaluated based on *all* benefits secured for the class—claimed or unclaimed, non-

monetary or cash—and the *Clark* and *Poertner* cases applying these principles to very similar facts show that strong legal authority supports the fee requested here.

### B. A lodestar multiplier of 3.3 is appropriate in this case given the complexity of the case, depth of work completed, results achieved, and awards in similar cases.

The 3.3 multiplier resulting from a lodestar cross-check confirms that the requested fee in this case is appropriate and well within the range of awards in similar cases. Courts in the Fourth Circuit recognize that multipliers are appropriate "to reward lead counsel for the favorable result achieved for the class and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis." *In re Microstrategy*, 172 F. Supp. 2d at 778. In order to give counsel an incentive to pursue such cases despite the substantial risk of non-recovery, "the ultimate award must be substantially greater than the lodestar figure." *Id.* "Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 766 (S.D.W. Va. 2009); *see also Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 439 n.6 (D. Md. 2006) (holding that multiplier of 3.6 was well within the average range of 3–4.5 for comparable cases); *Clark*, 2004 U.S. Dist. LEXIS 32063, at *85 (approving 3.36 multiplier).

The work performed and results achieved easily justify a higher fee than the current moderate 3.3 multiplier—squarely in the middle of the customary range—requested here. First, this case achieved an outstanding result for the almost 12 million Class members, who will receive approximately $44 in cash or the right to receive Free Service valued at $62.97. (Dkt. 195 at 20.) In addition, this case was complex and protracted, involving almost five years of litigation in a highly detailed legal area, including the *Knutson* Ninth Circuit appeal and grappling with complex regulations at issue in Sirius XM's appeal in *ACA Int'l, et al. v. FCC*, No. 15-1211 (D.C. Cir. Nov. 25, 2015). Sirius XM brought motion after motion in its efforts to defeat Plaintiffs' claims, raising complex legal issues that are the subject of rapidly developing law. (Dkts. 12, 56, 128, 148); *see Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (recent Supreme Court case regarding "offer of judgment" defense raised in Dkt. 148). Even in a case the court found not particularly

complex, involving merely "'technical'" violations and "limited discovery"—unlike the review of almost 100,000 pages of documents and numerous fact, expert, and third-party depositions conducted here—the *Singleton* court found "a multiplier closer to 3" was reasonable. *Singleton*, 976 F. Supp. 2d at 689 (approving 25% fee award, with a 3.12 multiplier). Counsel's request for a similar award in this far more complex case is thus more than reasonable and easily justified.

Indeed, many courts around the country have approved far higher multipliers, including in significantly less complex and protracted cases. *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (finding that requested fee amount with a multiplier of 7.89 was not unreasonable "[g]iven the outstanding settlement in this case and the noticeable skill of counsel"); *In re Charter Commc'n, Inc., Sec. Litig.*, No. MDL 1506, 02-cv-1186, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005) (approving multiplier of 5.61 in settlement reached before depositions were taken); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (approving a multiplier of 4.7 in a case that only involved document review, and was resolved without depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding multiplier of 6.96 despite fact that the parties engaged in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y 2002) (describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, and confirmatory discovery consisted of tens of thousands of pages of documents).[3]

---

[3] *See also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *DiGiacomo v. Plains All Am. Pipeline*, Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec. 19, 2001) (endorsing multiplier of 5.3 despite the fact no depositions were taken and most of the discovery was informal or document review); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming multiplier of 3.65 to compensate counsel for risk of taking the case); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197–98 (S.D.N.Y. 1997) (approving multiplier of 5.5 in what the court described as risky and hard fought litigation); *In re Interpublic Sec. Litig.*, No. 02 Civ.6527(DLC), 03 Civ.1194(DLC), 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (awarding multiplier of 3.96); *In re WorldCom, Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005) (awarding multiplier of 4).

In addition to awarding significant multipliers, these cases recognized that it is appropriate to use nationwide market rates for complex class action work, similar to Class Counsel's billing rates here, in calculating the lodestar. As the *In re Microstrategy* court explained, the "market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials," making approval of rates that might be "high for the locality" appropriate in complex class actions. *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001); *see also Kay*, 749 F. Supp. 2d at 470 (using for cross check rates that were "at the top of the market, but are within the range of reasonableness, considering the quality, efficiency and skill of Class Counsel"); *In re Charter Commc'ns*, 2005 WL 4045741, at *19 (finding hourly rates reasonable for purposes of cross-check, noting that "while the hourly rates ranging up to $695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions"); *Clark*, 2004 U.S. Dist. LEXIS 32063 at *86 (approving a rate higher than that routinely charged in South Carolina given that "this is a nationwide class action"). At the time *Microstrategy* was decided, in 2001, nationwide complex class action rates ranged from $220-$555/hour. *In re Microstrategy*, 172 F. Supp. 2d at 788 n.33. In determining reasonable lodestar rates, the court looked to "rates charged by lawyers in large, prominent, and, as here, expert law firms that typically represent defendants in securities class actions." *Id.*

Of course market rates for legal work have increased substantially in the past 15 years, rising even faster than the overall rate of inflation. *See Salazar v. District of Columbia*, 809 F.3d 58, 64 (D.C. Cir. 2015) (affirming decision to adjust 30-year-old benchmark hourly billing rates using the Legal Services Index of the Nationwide Consumer Price Index). Rates approaching and even exceeding $1,000/hour for the most senior lawyers are now not uncommon. *In re Optical Disk Drive Prod. Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 7364803, at *8 (N.D. Cal. Dec. 19, 2016) (approving rate of $950 per hour for senior partner); *In re Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 WL 6663005, at *6 (N.D. Cal. Nov. 11, 2016) (approving rates of between $845 and $1,200 for three senior attorneys). Noting the effect of inflation, the D.C. Circuit recently found that "for lawyers with experience levels between eleven and nineteen years

from the date of law school graduation, the average national law firm rate in 2012 to 2013 was $672." *Salazar*, 809 F.3d at 65. Professor Miller's research here confirms that market rates for defense firms, based on publicly available data, typically ranged from $580–$1,120 in 2010–2012. (Miller Decl., Dkt. 195-22 ¶¶ 61–62.) Just as the *In re Microstrategy* court looked to rates charged by large defense firms in nationwide class actions, these benchmarks provide a reliable guide to reasonable hourly rates for Plaintiffs' counsel here, given that this is a nationwide class action defended by Jones Day, a global firm with more than 2,500 lawyers.

Indeed, Caddell & Chapman's 2016 rates, which were used for calculating the lodestar here, are based on prevailing rates for national class-action work and have been most recently approved by a district court in the Fourth Circuit in a FCRA class action. *Brown v. Lowe's*, No. 5:13-cv-00079 (W.D.N.C. November 1, 2016) (Dkt. 173) (approving settlement and granting one-third percentage fee, finding that the fee "is confirmed as reasonable with a lodestar cross-check that falls in line with fees approved in other cases in this District and Circuit"); *id.* Dkt. 170-3 (detailing lodestar based on Mr. Caddell's 2016 rate of $900 per hour and Ms. Chapman's and Ms. Tabor's 2016 rates of $725/hour and $525/hour, respectively). Further confirming that these rates represent fair market value, the same rates have been paid by clients where Caddell & Chapman were engaged on an hourly basis. (Caddell Decl., Dkt. 195-1 ¶ 50.)

Caddell & Chapman's historical rates have been consistently approved and used for lodestar cross-check purposes in numerous courts around the country, including within this District. For example, in *Henderson v. Acxiom Risk Mitigation*, Judge Payne performed a lodestar cross-check using Mr. Caddell's and Ms. Chapman's 2015 rates of $875/hour and $675/hour, respectively. *See* Caddell Decl., Dkt. 104-3 ¶ 18, *Henderson v. Acxiom Risk Mitigation*, No. 3:12-cv-589 (E.D. Va. 2015) (detailing Caddell & Chapman's lodestar based on 2015 rates). On September 5, 2014, in a FCRA settlement in which the fee was in part based on a common fund and in part lodestar based, Judge Spencer similarly approved Caddell & Chapman's then-current rates. *See* Order Granting Plaintiffs' Motion for Award of Attorneys' Fees, *Berry v. LexisNexis Risk & Information Analytics Group, Inc.*, No. 3:11-cv-754 (E.D. Va. 2014) (Dkt. 129); *see also Berry* Dkt.

101-1 ¶ 55 (detailing lodestar based on rates of $875 for Mr. Caddell and $675 for Ms. Chapman). In December 2012, after resolving a high profile and complicated *qui tam* action (*United* States *of America, ex. rel. Ivey Woodard v. DaVita Inc.*, United States District Court for the Eastern District of Texas, Civil Case No. 1:05-CV-00227-MAC-ZJH), the DOJ approved attorneys' fees that were based on Caddell & Chapman's then-current rates, including a rate of $875/hour for Mr. Caddell and $675/hour for Ms. Chapman. (Caddell Decl., Dkt. 195-1 ¶ 51; *see also id.* ¶¶ 51–52 (detailing numerous other cases in which Caddell & Chapman's historical rates have been approved).) No court has ever reduced Caddell & Chapman's hourly rates.[4]

Further confirming the reasonableness of Class Counsel's hourly rates, they are in line with the benchmark "*Laffey* matrix," as updated according to the Legal Service Index ("LSI") of the Nationwide Consumer Price Index. *See Salazar*, 809 F.3d at 64–65 (affirming use of LSI-updated *Laffey* matrix as a gap-filler for work lacking a specified rate in the parties' agreement). The LSI-updated *Laffey* matrix for 2017 establishes as a reasonable benchmark average rates of $826/hour for counsel with 20+ years of experience (Mr. Caddell—a 1979 University of Virginia School of Law graduate—has practiced for 37 years); $686/hour for counsel with 11–19 years of experience; $608/hour for counsel with 8–10 years of experience; and $421/hour for counsel with 4–7 years of experience. *See* Adjustments to 1988-1989 *Laffey* Matrix Rates Using Legal Services Index at 4.[5] Class Counsel's blended rate for the experienced team here is approximately $616/hour, comfortably in the middle of the *Laffey* matrix range, confirming that Class Counsel's rates fall within what is typically paid for similar work in the marketplace and thus appropriately used for lodestar calculations in complex class actions like this one.

---

[4] The other counsel representing the Class have also had their rates approved in numerous class actions. (*See* Kazerounian Decl., Dkt. 195-11 ¶ 18; Swigart Decl., Dkt. 195-12 ¶ 15; Ibey Decl., Dkt. 195-13 ¶ 8; McGuire Decl., Dkt. 195-14 ¶ 19; McMorrow Decl., Dkt. 195-16 ¶ 16). While Class Counsel primarily work on a contingent-fee basis, where they have accepted hourly engagements, clients pay these same hourly rates. (McGuire Decl, Dkt. 195-14 ¶ 20; McMorrow Decl., Dkt. 196-16 ¶ 16.)

[5] *Available at* http://tpmlaw.com/global_pictures/Laffey_Matrix_Updated_Using_Legal_Services_Index_(00042285-5xC4E0D).PDF

### C. Caddell & Chapman's travel expenses included airfare, hotel, and transportation expenses that were kept in a previous accounting system under the miscellaneous "Travel" category.

Caddell & Chapman appreciates the opportunity to explain the specific costs and expenses that were included in their request for $24,965.25 in miscellaneous travel expenses. In June of 2015, Caddell & Chapman switched to a new software program for recording its case-related expenses. Whereas the older system had recorded all travel-related expenses under the general "Travel" and "Food" categories, this new software allowed recording more detailed travel expense categories, such as airfare, hotels, transportation, and parking. Thus, all of Caddell & Chapman's airfare, hotels, transportation and parking expenses incurred before June 2015 were assigned to the general "Travel" category, while expenses incurred after that date were assigned to the more specific categories.

Caddell & Chapman keeps detailed hard-copy expense reimbursement forms and receipts for all case-related expenses. Caddell & Chapman staff, using these hard-copy records, have created the chart below categorizing the pre-June 2015 "Travel" expenses more specifically:

| Category | Amount |
|---|---|
| Hotel | $3,367.00 |
| Airfare | $22,562.00 |
| Rental Car | $1,563.77 |
| Parking | $296.00 |
| Conference Facilities | $287.87 |
| Misc. (including Taxi, Taxes, Tips, Internet, and Misc. Food) | $1,618.61 |
| **Total** | **$29,695.25** |

These include expenses incurred for Mr. Caddell and Ms. Chapman's travel to Atlanta, Georgia, for the deposition of Sirius XM's expert Kenneth Sponsler; to New York, New York for

16

the corporate representative deposition of Sirius XM; to Indianapolis, Indiana for the deposition of Aaron Gore of Teleservices Direct; to New Jersey and Hartford, Connecticut for the corporate representative depositions of DialAmerica and Servicom; to Houston, Texas for internal meetings regarding class certification briefing; and to San Diego, California for the deposition of Plaintiff's expert Jeffrey Hansen, as well as a non-refundable plane ticket to Chicago, Illinois for a deposition that was cancelled. They also include expenses incurred for Mr. Marchiando's travel to Fort Lauderdale, Florida for the corporate representative deposition of Results Companies; to Washington, D.C. for the depositions of Hollie Donnon and Steven Cook; to Iowa City, Iowa, for the deposition of Kenneth Carlon; and to Tampa, Florida for the corporate representative deposition of Sykes. As noted in Mr. Caddell's declaration, Caddell & Chapman voluntarily reduced these expenses by $5,000 to further ensure that the claimed expenses were reasonable, seeking reimbursement for $24,695.25 in expenses under the general "Travel" category. (Dkt. 195-1 ¶ 48; Dkt. 195-8.)

### III. CONCLUSION

For the reasons stated above and in Plaintiffs' earlier briefing, the Court should grant the requested $19.8 million in attorneys' fees and $191,330.88 in expenses.

Date: January 13, 2017                                   Respectfully submitted,

                                                         _/s/ Michael A. Caddell_____
                                                         Michael A. Caddell (*pro hac vice*)
                                                         mac@caddellchapman.com
                                                         Cynthia B. Chapman (*pro hac vice*)
                                                         cbc@caddellchapman.com
                                                         CADDELL & CHAPMAN
                                                         628 East 9th Street
                                                         Houston, TX 77007-1722
                                                         Telephone: (713) 751-0400
                                                         Fax: (713) 751-0906

       */s/ Christopher C. North*
Christopher Colt North (VSB # 16995)
cnorthlaw@aol.com
William L. Downing (VSB # 17704)
wdowninglaw@aol.com
THE CONSUMER & EMPLOYEE RIGHTS LAW FIRM, P.C.
751-A Thimble Shoals Blvd.
Newport News, VA 23606
Tel: (757) 873-1010
Fax: (757) 873-8375

Abbas Kazerounian (*pro hac vice*)
ak@kazlg.com
KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92606
Tel.: (800) 400-6808
Fax: (800) 520-5523

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2017, I filed a true and correct copy of the foregoing document using the Court's CM/ECF system. The system will then send an electronic notice of filing to the following counsel of record:

William V. O'Reilly (VSB # 26249)
Attorneys for Defendant Sirius XM Radio Inc.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: woreilly@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
Attorney for Defendant Sirius XM Radio Inc.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

Lee A. Armstrong
Attorney for Defendant Sirius XM Radio Inc.
JONES DAY
250 Vesey Street
New York, NY 10281
Tel.: (212) 326-8340
Email: laarmstrong@JonesDay.com

                                        */s/ Christopher Colt North*
                                        Christopher Colt North (VSB # 16995)